**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
KAREN MARSHALL, PAUL FLANNERY, and          :
DARRELL R. WHITE, on behalf of themselves    :
and all others similarly situated,           :
                                             :
                  Plaintiffs,                :
                                             :
            v.                               :
                                             :
HYUNDAI MOTOR AMERICA,                       :
                                             :
                                             :
                  Defendant.                 :
-------------------------------------------------------------x
-------------------------------------------------------------x
STEVE MILLER, RICHARD KOTELLY,               :
KATHLEEN RIORDAN, CHARLENE LIDDLE,           :
KRISTA PIERSKALLA, and REBECCA               :
MCCORMICK, on behalf of themselves and all   :
others similarly situated                    :
                                             :   Case Nos. 15-cv-04722 (CM),
                                             :   12-cv-03072 (CM)
                  Plaintiffs,                :
                                             :
            v.                               :
                                             :
HYUNDAI MOTOR AMERICA,                       :
                                             :
                                             :
                  Defendant.                 :
-------------------------------------------------------------x

**DEFENDANT HYUNDAI MOTOR AMERICA'S MEMORANDUM OF LAW**
**IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ..........................................................................................................1

BACKGROUND ...........................................................................................................3

    A.    The Hyundai Sonata and its Brake System ..............................................4

    B.    The Warranty Process ..............................................................................4

    C.    Plaintiffs' Varied Experiences with Their Vehicles ................................5

STANDARD OF REVIEW ............................................................................................8

ARGUMENT .................................................................................................................9

    I.    Plaintiffs Do Not Satisfy the Commonality and Typicality
        Requirements. ................................................................................................9

        A.    For the Section 349 Claim, No Plaintiff has the Same
            Alleged Theory of Liability or Injury as the Putative Class. ...................9

        B.    McCormick is Not a Member of the Putative Class, and
            No Plaintiff Has a PUTPCPL Claim in Common with
            Any Member of the Putative Class. ......................................................12

        C.    Commonality and Typicality Are Not Satisfied for the
            Warranty Claim. ...................................................................................15

    II.    The Putative Class Satisfies Neither Rule 23(b)(3)'s Predominance
         Nor its Superiority Requirements. ...............................................................15

        A.    Common Questions Do Not Predominate...............................................15

            1.    Plaintiffs Cannot Provide Common Proof of Injury.....................16

            2.    Common Proof is Not Available to Establish Causation...............21

                 a.    Exposure to Environmental Conditions and
                      Corrosive Deicing Materials Lead to Brake
                      Replacements ................................................................23

                 b.    Neglected Maintenance Leads to Brake
                      Replacements ................................................................27

                 c.    Variation In the Driving Habits of Individual
                      Owners and Lessees Influence How Long Brake
                      Components Last ...........................................................28

            3.    Plaintiffs' Theory depends on the Actions of Third
               Parties that are Not Subject to Generalized Proof. ......................32

## <u>TABLE OF CONTENTS</u>—Continued

<u>Page</u>

4.    Plaintiffs Do Not Provide Proof that One or More Common, Class-Wide Defects Exists in the Putative Class Vehicles..................................................................35

5.    No Warranty Claim Should be Certified Because There is No Common Proof of Presentation and Opportunity to Repair...........................................................................44

6.    Most Putative Class Members Have Time Barred Section 349 Claims.....................................................................44

B.    A Rule 23(b)(3) Class Action is Not Superior to Individual Litigation.......................................................................46

III.    A Putative Subclass Cannot be Certified. .............................................47

IV.    Certification of the Putative Rule 23(b)(2) Class is Not Appropriate. .................47

V.    Rule 23(c)(4) Does Not Apply to this Case. ........................................49

CONCLUSION....................................................................................49

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ackerman v. Coca-Cola Co.*,
  No. 09-cv-00395, 2013 WL 7044866 (E.D.N.Y. July 18, 2013)............................................21

*Adkins v. Morgan Stanley*,
  307 F.R.D. 119 (S.D.N.Y. 2015), *aff'd*, 656 F. App'x 555 (2d Cir. 2016) ............................10

*Amchem Prod., Inc. v. Windsor*,
  521 U.S. 591 (1997)........................................................................................................13, 15

*American Pipe & Construction Co. v. Utah*,
  414 U.S. 538 (1974)................................................................................................................45

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018)................................................................................................17, 46

*In re Atlas Roofing Corp. Chalet Shingle Prod. Liab. Litig.*,
  321 F.R.D. 430 (N.D. Ga. 2017)...........................................................................................31

*Ault v. J.M. Smucker Co.*,
  310 F.R.D. 59 (S.D.N.Y. 2015) .............................................................................................18

*In re Avon Anti-Aging Skincare Creams & Prods. Mktg. & Sales Practices Litig.*,
  No. 13-cv-00150, 2015 WL 5730022 (S.D.N.Y. Sept. 30, 2015) ...........................................21

*Beckford v. Pantresse, Inc.*,
  858 N.Y.S.2d 794 (2d Dep't 2008).........................................................................................22

*Broe v. Oneonta Sales Co.*,
  420 N.Y.S.2d 436 (Sup. Ct. 1978)..........................................................................................44

*Brown v. Kelly*,
  609 F.3d 467 (2d Cir. 2010)......................................................................................................9

*Brumfield v. Trader Joe's Co.*,
  No. 17-cv-03239, 2018 WL 4168956 (S.D.N.Y. Aug. 30, 2018)......................................16, 21

*Butler v. Porsche Cars N. Am., Inc.*,
  No. 16-cv-02042, 2017 WL 1398316 (N.D. Cal. Apr. 19, 2017)......................................12, 48

*Cali v. Chrysler Grp. LLC*,
  No. 10-cv-07606, 2011 WL 383952 (S.D.N.Y. Jan. 18, 2011), *aff'd*, 426 F.
  App'x 38 (2d Cir. 2011)..........................................................................................................34

**<u>TABLE OF AUTHORITIES</u>—Continued**

Page

*Callahan v. Toys "R" US-Delaware, Inc.*,
   No. 15-cv-02815, 2017 WL 219371 (D. Md. Jan. 19, 2017) ...................................................40

*In re Canon Cameras*,
   237 F.R.D. 357 (S.D.N.Y. 2006) ...................................................................................20, 23

*Cholakyan v. Mercedes-Benz USA, LLC*,
   281 F.R.D. 534 (C.D. Cal. 2012) ........................................................................................48

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013) ................................................................................................8, 49

*Cunningham Charter Corp. v. Learjet, Inc.*,
   258 F.R.D. 320 (S.D. Ill. 2009) ..........................................................................................34

*Daffin v. Ford Motor Co.*,
   458 F.3d 549 (6th Cir. 2006) .............................................................................................30

*Daniels v. Amerco*,
   No. 81-cv-03801, 1983 WL 1794 (W.D.N.Y. Mar. 10, 1983) .........................................14, 45

*Debbs v. Chrysler Corp.*,
   810 A.2d 137 (Pa. Super Ct. 2002) ..............................................................................14, 21

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006) ..............................................................................................17

*Ebin v. Kangadis Food Inc.*,
   297 F.R.D. 561 (S.D.N.Y. 2014) ........................................................................................17

*Edwards v. Ford Motor Co.*,
   603 F. App'x 538 (9th Cir. 2015) .......................................................................................29

*Falco v. Nissan N. Am. Inc.*,
   No. 13-cv-00686, 2016 WL 1327474 (C.D. Cal. Apr. 5, 2016) ...........................................29

*Feinstein v. Firestone Tire and Rubber Co.*,
   535 F. Supp. 595 (S.D.N.Y. 1982) .....................................................................................20

*Food Pageant, Inc. v. Consol. Edison Co.*,
   54 N.Y.2d 167 (1981) ......................................................................................................35

*Frank v. DaimlerChrysler Corp.*,
   741 N.Y.S.2d 9 (1st Dep't 2002) .......................................................................................16

iv

## TABLE OF AUTHORITIES—Continued

Page

*Gaidon v. Guardian Life Ins. Co. of Am.*,
    96 N.Y.2d 201 (2001) ..................................................................................44

*Gardner v. Ford Motor Co.*,
    166 F. Supp. 3d 1261 (M.D. Fla. 2015).......................................................41

*Gonzalez v. Owens Corning*,
    885 F.3d 186 (3d Cir. 2018)....................................................................35, 38

*In re Grand Theft Auto Video Game Consumer Litig.*,
    251 F.R.D. 139 (S.D.N.Y. 2008) .............................................................13, 14

*Grassi v. Int'l Comfort Prod., LLC*,
    No. 15-cv-00253, 2015 WL 4879410 (E.D. Cal. Aug. 14, 2015)..........47

*Harnish v. Widener Univ. Sch. Of Law*,
    833 F.3d 298 (3d Cir. 2016).........................................................................17

*Hazelhurst v. Brita Prods. Co.*,
    744 N.Y.S.2d 31 (1st Dep't 2002) ..............................................................22

*Helmer v. Goodyear Tire & Rubber Co.*,
    No. 12-cv-00685, 2014 WL 1133299 (D. Colo. Mar. 21, 2014) ...........29

*Hunt v. U.S. Tobacco Co.*,
    538 F.3d 217 (3d Cir. 2008)......................................................................13, 14

*Instant Media, Inc. v. Microsoft Corp.*,
    No. 07-cv-02639, 2007 WL 2318948 (N.D. Cal. Aug. 13, 2007) ..........40

*Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.*,
    929 A.2d 1076 (N.J. 2007)............................................................................13

*Irvine v. Kate Spade & Co.*,
    No. 16-cv-07300, 2017 WL 4326538 (S.D.N.Y. Sept. 28, 2017) .....................17, 18

*Jacob v. Duane Reade, Inc.*,
    293 F.R.D. 578 (S.D.N.Y. 2013) ................................................................49

*Jang Ho Choi v. Beautri Realty Corp.*,
    22 N.Y.S.3d 431 (1st Dep't 2016) ..............................................................45

*Jermyn v. Best Buy Stores, L.P.*,
    256 F.R.D. 418 (S.D.N.Y. 2009) ..................................................... *passim*

v

## TABLE OF AUTHORITIES—Continued

Page

*Johnson v. Nextel Commc'ns Inc.*,
 780 F.3d 128 (2d Cir. 2015) ................................................... 16

*Kacocha v. Nestle Purina Petcare Co.*,
 No. 15-cv-05489, 2016 WL 4367991 (S.D.N.Y. Aug. 12, 2016) ........................... 19

*Kaczmarek v. Int'l Bus. Machs. Corp.*,
 186 F.R.D. 307 (S.D.N.Y. 1999) ............................................. 23

*Kaymark v. Bank of Am., N.A.*,
 783 F.3d 168 (3d Cir. 2015) .................................................. 16

*Lewis v. Ford Motor Co.*,
 263 F.R.D. 252 (W.D. Pa. 2009) .............................................. 20

*Luppino v. Mercedes Benz USA*,
 718 F. App'x 143 (3d Cir. 2017) .............................................. 36

*Marcus v. BMW of N. Am., LLC*,
 687 F.3d 583 (3d Cir. 2012) ................................................... 22

*Marshall v. Hyundai Motor Am.*,
 51 F. Supp. 3d 451 (S.D.N.Y. 2014) .......................................... 10

*Mazzuocola v. Thunderbird Prod. Corp.*,
 No. 90-cv-00405, 1995 WL 311397 (E.D.N.Y. May 16, 1995) ........................... 14

*McLaughlin v. Am. Tobacco Co.*,
 522 F.3d 215 (2d Cir. 2008) .......................................... 22, 44, 46, 49

*Miller v. Hyundai Motor Am. ("Miller I")*,
 No. 15-cv-4722, 2016 WL 5476000 (S.D.N.Y. Sept. 28, 2016) ........................... 10

*Miller v. Hyundai Motor Am. ("Miller II")*,
 No. 15-cv-4722, 2017 WL 4382339 (S.D.N.Y. Sept. 29, 2017) ........................... 13

*Miller v. Wells Fargo Bank, N.A.*,
 994 F. Supp. 2d 542 (S.D.N.Y. 2014) ......................................... 21

*Mullaney v. Delta Air Lines, Inc.*,
 258 F.R.D. 274 (S.D.N.Y. 2009) .............................................. 12

*In re Nassau Cty. Strip Search Cases*,
 742 F. Supp. 2d 304 (E.D.N.Y. 2010) ......................................... 41

## TABLE OF AUTHORITIES—Continued

Page

*Nealy v. U.S. Surgical Corp.*,
   587 F. Supp. 2d 579 (S.D.N.Y. 2008).......................................................................22

*Newman v. RCN Telecom Servs., Inc.*,
   238 F.R.D. 57 (S.D.N.Y. 2006) ....................................................................12, 49

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   259 F.3d 154 (3d Cir. 2001)............................................................................18

*Oscar v. BMW of N. Am., LLC*,
   274 F.R.D. 498 (S.D.N.Y. 2011) ..........................................................18, 23, 35, 37

*Oscar v. BMW of N. Am., LLC*,
   No. 09-cv-00011, 2011 WL 6399505 (S.D.N.Y. Dec. 20, 2011) ...........................22

*Oscar v. BMW of N. Am., LLC*,
   No. 09-cv-00011, 2012 WL 2359964 (S.D.N.Y. June 19, 2012) .....................22, 30

*Parkinson v. Hyundai Motor America*,
   258 F.R.D. 580 (C.D. Cal. 2008) .............................................................30

*Patton v. Topps Meat Co.*,
   No. 07-cv-00654, 2010 WL 9432381 (W.D.N.Y. May 27, 2010)....................31, 47

*Pelman v. McDonald's Corp.*,
   272 F.R.D. 82 (S.D.N.Y. 2010) .............................................................21

*Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*,
   721 F.3d 95 (2d Cir. 2013).........................................................................15

*Rapcinsky v. Skinnygirl Cocktails, L.L.C.*,
   No. 11-cv-06546, 2013 WL 93636 (S.D.N.Y. Jan. 9, 2013) ...................................14

*Rite Aid Corp. v. Grass*,
   854 N.Y.S.2d 1 (1st Dep't 2008) ...........................................................45

*Ruffo v. Adidas Am. Inc.*,
   No. 15-cv-05989, 2016 WL 4581344 (S.D.N.Y. Sept. 2, 2016) ...........................19

*Samuel-Bassett v. Kia Motors Am., Inc.*,
   34 A.3d 1 (Pa. 2011) ...........................................................................30

*Sanchez-Knutson v. Ford Motor Co.*,
   310 F.R.D. 529 (S.D. Fla. 2015)...............................................................31

\\DC - 029016/000009 - 13424266 v14

**TABLE OF AUTHORITIES**—Continued

Page

*Sanneman v. Chrysler Corp.*,
    191 F.R.D. 441 (E.D. Pa. 2000).........................................................................23

*Schachner v. Blue Cross & Blue Shield of Ohio*,
    77 F.3d 889 (6th Cir. 1996) ..............................................................................15

*Schmidt v. Ford Motor Co.*,
    972 F. Supp. 2d 712 (E.D. Pa. 2013) ................................................................44

*Schwatka v. Super Millwork, Inc.*,
    965 N.Y.S.2d 547 (2d Dep't 2013)..............................................................20, 30

*In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*,
    No. 05-cv-02623, 2007 WL 4287511 (N.D. Ill. Dec. 4, 2007)..........................11

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*,
    806 F.3d 71 (2d Cir. 2015)................................................................................21

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,
    659 F.3d 234 (2d Cir. 2011)................................................................................9

*Sinnerard v. Ford Motor Co.*,
    No. 95-cv-02708, 1996 WL 363932 (E.D. Pa. June 20, 1996), *aff'd*, 116 F.3d
    469 (3d Cir. 1997)..............................................................................................44

*Small v. Lorillard Tobacco Co.*,
    94 N.Y.2d 43 (1999) ..........................................................................................17

*Solomon v. Bell Atl. Corp.*,
    777 N.Y.S.2d 50 (1st Dep't 2004) .....................................................................12

*Statler v. Dell, Inc.*,
    841 F. Supp. 2d 642 (E.D.N.Y. 2012) ...............................................................45

*Stuart v. Stuart*,
    No. 12-cv-05588, 2013 WL 6477492 (S.D.N.Y. Dec. 10, 2013) ........................45

*Stutman v. Chem. Bank*,
    95 N.Y.2d 24 (2000) ..........................................................................................13

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015)...........................................................................17, 46

*In re Takata Airbag Prod. Liab. Litig.*,
    193 F. Supp. 3d 1324 (S.D. Fla. 2016) ..............................................................14

## TABLE OF AUTHORITIES—Continued

Page

*Taylor v. Zucker*,
No. 14-cv-05317, 2015 WL 4560739 (S.D.N.Y. July 27, 2015)..................................... *passim*

*In re Teflon Prod. Liab. Litig.*,
254 F.R.D. 354 (S.D. Iowa 2008) ..........................................................................................11

*Tiner v. Gen. Motors Corp.*,
909 F. Supp. 112 (N.D.N.Y. 1995)........................................................................................35

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011).................................................................................9, 10, 46, 48

*Weaver v. Chrysler Corp.*,
172 F.R.D. 96 (S.D.N.Y. 1997) ............................................................................................20

*Weiner v. Snapple Beverage Corp.*,
No. 07-cv-08742, 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010)............................................18

*In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*,
722 F.3d 838 (6th Cir. 2013) ................................................................................................29

*Wolin v. Jaguar Land Rover N. Am., LLC*,
617 F.3d 1168 (9th Cir. 2010) ..............................................................................................30

*In re Yasmin & Yaz (Drospirenone) Mktg.*,
275 F.R.D. 270 (S.D. Ill. 2011) ............................................................................................15

*Yocca v. Pittsburgh Steelers Sports, Inc.*,
854 A.2d 425 (Pa. 2004) .......................................................................................................14

*Zwiercan v. Gen. Motors Corp.*,
58 Pa. D. & C.4th 251 (Com. Pl. 2002) ................................................................................14

**Other Authorities**

1 McLaughlin on Class Actions § 4:16 (15th ed.) .......................................................................10

1 McLaughlin on Class Actions § 4:43 (15th ed.) .......................................................................49

1 McLaughlin on Class Actions § 5:43 (15th ed.) .......................................................................46

1 McLaughlin on Class Actions § 5:56 (15th ed.) .................................................................20, 30

Fed. R. Civ. P. 23(b)(2) ..................................................................................................... *passim*

Fed. R. Civ. P. 23(b)(3)....................................................................................................... *passim*

## <u>TABLE OF AUTHORITIES</u>—Continued

<u>Page</u>

Manual for Complex Litigation (Fourth), § 21.24 (2004) ............................................................49

N.Y. C.P.L.R. 214.2..................................................................................................................44

x

Defendant Hyundai Motor America ("HMA") submits this memorandum of law in opposition to Plaintiffs' Motion for Class Certification ("Motion" or "Mot.") and Memorandum of Law in Support of that Motion ("Memorandum" or "Memo.").

## INTRODUCTION

Plaintiffs seek to certify a class of the tens of thousands of people who purchased or leased 2006-2010 model year Hyundai Sonatas in New York and Pennsylvania by reducing their claim to the highest level of generality: that *some* component (or components) of *some* part of the brake system (front or rear) wore out *sometime* before plaintiffs think it should have, and *some* third party (dealership or independent mechanic) gave them *some* information and required *some* payment for *some* sort of brake repair that *sometimes* was not covered under warranty.  The law does not support certification of a class like this one.  There are dispositive differences both *among* plaintiffs themselves and *between* plaintiffs and the class they purport to be representing.

By way of example, the information and representations about the vehicles' brakes available to the New York plaintiffs and putative class members vary by time (pre- or post-purchase), by speaker (third-party dealership, independent mechanics, or HMA), and by content.  As for Pennsylvania, *no* plaintiff purchased or leased a vehicle in Pennsylvania, so there is no representative for such a class.  On top of these problems, plaintiffs lack evidence showing class-wide commonality (1) as to injury, including any alleged premium paid for the vehicles or any costs resulting from a warranty denial; (2) as to whether a class vehicle prematurely required any brake component replacement; (3) as to the cause of any needed replacements; and (4) as to whether there was presentment at a third-party dealership for warranty service.

A class should not be certified merely because plaintiffs think they should have been given free brake repairs.  The reality is that brake components wear out over time and require replacement for many individualized reasons, including wear and tear based on driving habits,

1

neglected maintenance, exposure to corrosive deicing materials and the severe winter weather conditions prevalent in parts of New York and Pennsylvania.  Plaintiffs lack sufficient proof to counter this reality.  Neither they nor their experts adequately tie together the various potential reasons for replacing brake components into a common, class-wide defect theory.  They also make no effort to calculate or compare the rate at which the brakes at issue were replaced in 2006-2010 model year Sonata vehicles as opposed to those installed in peer vehicles.  As a result, they lack aggregate proof that the brakes at issue wear out more quickly during the warranty period than in similar vehicles.

Nor can plaintiffs simply gloss over the role that numerous independent dealerships, who are not parties to this case, played in making any necessary repairs and determining whether the repairs were covered by HMA's New Vehicle Limited Warranty ("Limited Warranty").  And even if plaintiffs could gloss over those facts, the available evidence indicates that far more often than not, claims related to the brake components at issue *were* covered under warranty—meaning that HMA reimbursed the dealership, and the customer paid nothing.  Plaintiffs lack evidence that anything more than a small percentage of putative class members were asked to pay for brake component repairs—whatever the cause—during the time period at issue.

As a result, plaintiffs' request for certification skips over complex issues of causation and discretionary decision-making by numerous third parties and the reality that the vast majority of putative class members have no injury.  But those shortcomings preclude certification under Second Circuit precedent.  Each putative class member would have to establish on an individual basis that (1) one or more of the brake components on his or her vehicle required replacement during the warranty period; (2) such replacement was caused by an alleged defect, and not by some other causal factor; and (3) he or she incurred out of pocket costs due to an improper

2

warranty denial.  In addition, because of the advanced age of the vehicles at issue, many putative class members' claims are barred by the applicable statutes of limitations.

For this reason and others, plaintiffs' claims are not common with, or typical of, the putative class-wide claims.  Plaintiffs also have not established that common issues predominate for the Rule 23(b)(3) class they seek to certify.  Nor is a Rule 23(b)(2) class appropriate as HMA has not acted uniformly with respect to the putative class.  Certification should be denied.

## BACKGROUND

Plaintiffs allege that several brake components on 2006-2010 model year Sonata vehicles are defective.  Ex. 10 to Mot. ("*Miller* Am. Compl.") ¶ 1; Memo. at 7 (defining the parts at issue as including "rotors, calipers, slider clips, and [caliper] carriers").  They do not contend that the brake pads (including the friction material and backing plate) are defective.  Although the allegedly defective components are implicated in different mechanisms of corrosion, *see infra* at Section II(A)(4), they supposedly have "common material defects" that lead to "uniform symptoms of premature corrosion" within the warranty period.  Ex. 24(b) to Mot. ("McLellan Report") at 16; *see also* Ex. 6 to Mot. ("Lynch Report") at 3.  Plaintiffs' expert attributes the uniform symptoms to the components being "made out of inadequate . . . materials or coatings . . . ."  7/25/2016 McLellan Depo Tr. (Ex. A to Decl. of M. Kidney) ("2016 McLellan Depo.") at 44:20-22.[1]  The evidence, however, shows that the supposedly uniform symptoms are far from uniform.  And plaintiffs have no evidence demonstrating that any or all of the allegedly defective components require more frequent repairs than other vehicles using comparable components.

---

[1] In addition to the above-captioned matter, the same counsel have been litigating a putative class action in the Western District of New York that involves a different Hyundai vehicle model (the Santa Fe), but includes some of the same experts and the same theory of defect.  Because of this overlap, "the parties have agreed to treat the 2016 depositions of Dr. Lynch, [M]r. McLellan, and James Walker as if they were taken in and the transcripts titled with the captions of . . . the Miller and Marshall lawsuits."  1/11/2019 McLellan Depo. Tr. (Ex. B to Decl. of M. Kidney) ("2019 McLellan Depo.") at 18:1-8.

3

Indeed, the only expert analysis of peer vehicles in this case confirms that those vehicles and the putative class vehicles use substantially similar materials and coatings in their brake components. Nor do plaintiffs have evidence of any accidents or injuries being caused by the alleged defects.

Plaintiffs assert express warranty claims and claims under Section 349 of New York's General Business Law and Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("PUTPCPL"). Memo. at 1, 4-5.

A.     The Hyundai Sonata and its Brake System

The Sonata is a sedan vehicle with a disc braking system. In this system, a cast iron rotor (or disc) attaches mechanically to each wheel. When the driver presses down on the brake pedal, a piston housed within a component called a caliper body increases the brake fluid pressure, thereby squeezing brake pads against both sides of the spinning rotor, causing the friction that slows down the wheel. *See* Expert Report of James Walker, Jr., P.E. (Ex. C to Decl. of M. Kidney) ("Walker Report") at 16-17, 26-27 (referencing photographs of relevant components). Each pair of brake pads "was fitted with audible wear indicators, stainless steel backing plate shims, and stainless steel brake pad retaining springs [or clips]." *Id.* at 26, 27. "The rear caliper was a two-piece, sliding design, incorporating a separate caliper body (zinc-coated cast iron) and caliper bracket [or carrier] (zinc-coated cast iron)." *Id.*

B.     The Warranty Process

Upon purchase, each 2006-2010 model year Sonata vehicle was covered by the Limited Warranty for 5 years or 60,000 miles, beginning from the earlier of the date of original retail delivery or the date of first use. 2006 Owner's Handbook & Warranty Information (Ex. D to Decl. of M. Kidney) ("Limited Warranty") at HMAM_002315.[2] Certain "[n]ormal maintenance

_____

[2] Because two plaintiffs owned 2006 vehicles, HMA focuses on the 2006 versions of the warranty and glovebox documents. However, the 2007-10 iterations are substantially similar.

items[,]" including "brake pads and linings," were covered for 12 months or 12,000 miles.  *Id.* at HMAM_002316.  To obtain warranty service, an owner must present his or her vehicle to an authorized Hyundai dealership within the applicable warranty period.  *Id.*

As its name suggests, the Limited Warranty is limited in several ways.  It covers the "[r]epair or replacement of any component originally manufactured or installed by Hyundai Motor Company [("HMC") or certain affiliates] that is found to be defective in material or workmanship under normal use and maintenance."  *Id.* at HMAM_002315.  The 2006 Owner's Manual, Sonata (Ex. E to Decl. of M. Kidney) ("Owner's Manual") explained the relationship between salt and corrosion.  It identified "road salt" as one of the "most common causes of corrosion[,]" in addition to "dirt and moisture that is allowed to accumulate underneath the car."  HMAM_001422.  The Owner's Manual also explained that vehicle "design" and "construction practices" can perform "only part of the job" of "combat[ing] corrosion . . . . To achieve the long-term corrosion resistance . . . the owner's cooperation and assistance is also required." *Id.*

The Limited Warranty's coverage is contingent on "normal use and maintenance . . . ." HMAM_002315.  Maintenance is the responsibility of the owner and "must be carried out in accordance with the recommendations given in [the] Owner's Manual."  *Id.* at HMAM_002316. The Owner's Manual confirms that maintenance "procedures must be performed at [specific] intervals . . .  to assure [the] warranty remains in effect."  HMAM_001428.  For brake components, inspection should occur every 12 months or 15,000 miles, or more frequently if the vehicle is exposed to severe usage conditions, like "salt-spread roads . . . ."  HMAM_1430-1432.

C.      Plaintiffs' Varied Experiences with Their Vehicles

Plaintiffs' testimony shows that their individual experiences with the brake components in their vehicles were anything but uniform.  Marshall purchased a new 2006 Sonata in late 2005 from an authorized dealer in Bedford Hills, New York.  Ex. 9 to Mot. ("*Marshall* Am. Compl.")

¶ 9.  She drove it for more than 42,000 miles before first needing to pay to replace the supposedly defective front rotors, at which time she also replaced the vehicles' undisputedly not defective brake pads.  7/19/2018 Marshall Depo. Tr. (Ex. F to Decl. of M. Kidney) ("Marshall Depo.") at 41:18-24, 42:18-21.  She then drove the car for another 30,000 miles, during which time she wrote HMA a letter stating that she "love[d] her car."  HMAM_006671 (Ex. G to Decl. of M. Kidney).  When her vehicle had nearly 75,000 miles on it—i.e., 15,000 miles after the expiration of the Limited Warranty—Marshall replaced her front rotors and pads once more, this time at an independent repair facility.  Marshall Depo. at 44:11-46:1.  Her vehicle was about seven years old—and had driven nearly 100,000 miles—before she first replaced a supposedly defective front caliper.  *See id.* at 47:20-25, 53:22-54-8.  And Marshall never had issues with her rear brakes, leading her to acknowledge that she is "not contending that the *rear* brakes" on her vehicle required early replacement.  *Id.* at 57:2-6 (emphasis added).

White purchased a 2007 Sonata in August 2007 from an authorized dealer in Syracuse, New York.  *Marshall* Am. Compl. ¶ 10; 7/10/2018 White Depo. Tr. (Ex. H to Decl. of M. Kidney) ("White Depo.") at 11:11-23.  He drove it for more than 26,000 miles before paying to replace the rear pads and to have the front and rear rotors resurfaced.  White Depo. at 58:15-17, 59:4-7, 61:19-23.  He then drove another 50,000 miles.  When his vehicle had about 75,000 miles, White replaced his pads and allegedly defective rotors with non-HMA approved components at an independent repair facility.  *Id.* at 75:3-6, 78:16-25; *Marshall* Am. Compl. ¶ 29.  White eventually traded in his vehicle after 200,000 miles, White Depo. at 101:24-25, without ever having to pay to replace a caliper.

Miller purchased a new 2008 Sonata in October 2007 from an authorized dealer in Brooklyn, New York.  6/28/2018 Miller Depo. Tr. (Ex. I to Decl. of M. Kidney) ("Miller

Depo.") at 9:6-15.  After about 25,000 miles, Miller first paid an independent repair facility to resurface his front and rear rotors, lubricate his front and rear calipers, and reline his front and rear brakes.  *See* MILLER PROD._000009 (Ex. J to Decl. of M. Kidney).  Around the same time, he stated that his vehicle hydroplaned while braking.  Miller Depo. at 45:1-5, 45:10-14, 45:22-24.  Over the next six and half years, Miller purchased three calipers from independent repair facilities.  *Id.* at 66:6-17, 71:4-20, 76:16-77:20.  HMA is not responsible for the performance of the non-HMA approved components typically used by independent repair facilities, as plaintiff's expert concedes.  *See* 2019 McLellan Depo. at 115:10-23.  Miller's "concern" is with the rear brakes on his vehicle, not the front brakes—the exact opposite of Marshall discussed above.  Miller Depo. at 50:9-18.

Liddle purchased a 2006 Sonata in November 2005 from an authorized dealer in Syracuse, New York.  *Miller* Am. Compl. ¶ 12.  Nearly three years later (and after receiving one repair under warranty), 1/11/2018 Liddle Depo. Tr. (Ex. K to Decl. of M. Kidney) ("Liddle Depo.") at 42:24-43:5, Liddle first paid to replace her allegedly defective rear rotors and the indisputably not defective pads, *id.* at 45:5-13, 47:22-48:3.  She testified that the twelve-and-a-half years she owned her Sonata probably is the longest she has ever owned any vehicle.  *Id.* at 76:17-19.  In that time, Liddle estimated that her front rotors were replaced two or three times and her rear rotors about six times (mostly with components supplied by independent repair facilities).  *Id.* at 75:23-76:5.

Carr (formerly and hereinafter "McCormick") purchased a 2009 Sonata in March 2012 from an authorized dealer in Burlington, New Jersey.  *Miller* Am. Compl. ¶ 14.  She is unique among plaintiffs in that she purchased her vehicle used when it had 14,000 miles on it. 7/16/2018 Carr Depo. Tr. (Ex. L to Decl. of M. Kidney) ("McCormick Depo.") at 12:16-13:10.

7

She does not know how the vehicle was driven or maintained prior to her owning it.  *Id.* at 41:20-42:11.  After the 60,000-mile warranty period for McCormick's vehicle had expired, the left rear caliper was replaced.  *Id.* at 53:3-24.[3]  Perhaps because her vehicle was just outside of warranty when the caliper was replaced, HMA offered McCormick a $317.50 check as a matter of good will.  *Id.* at 56:6-24.  The first time she paid (and was not reimbursed) for any brake repair, the vehicle had nearly 70,000 miles on it.  *Id.* at 60:8-20, 61:23-25.  Next, McCormick paid for a caliper that had not yet been replaced, *i.e.*, the right rear caliper.  *Id.* at 62:18-63:20.  No front brake component needed replacement until her vehicle had about 89,000 miles on it.  *Id.* at 76:20-77:3.  Perhaps for this reason, McCormick is not "contending . . . that the front brakes are defective . . . ."  *Id.* at 81:25-82:2.

Thus, during the warranty period, only one plaintiff (Liddle) paid an authorized dealer to replace an allegedly covered rear brake component and only one plaintiff (Marshall) did the same for an allegedly covered front brake component.[4]  Similarly, out of the 66,989 putative class vehicles, the incidence and coverage of repairs was non-uniform, with HMA reimbursing under warranty some ▮▮ brake-related claims, while fielding a lesser ▮▮ brake-related complaints.  Each warranty decision was made by service personnel at one of 89 different authorized dealers in New York and Pennsylvania who exercised their independent judgment based on a physical examination of the specific repairs required and consideration of each vehicle's service history.

## STANDARD OF REVIEW

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432,

---

[3] During the same service visit, she also declined the recommendation that the rotors be resurfaced.  *Id.* at 54:1-10.

[4] Other plaintiffs paid to resurface, but not replace, a rotor during the warranty period or paid for brake *pad* replacements after the expiration of the one-year warranty applicable to brake pads.

(2013) (internal quotations and citations omitted).  Plaintiffs must satisfy the four prerequisites set forth in Federal Rule of Civil Procedure 23(a).  Plaintiffs also must qualify the proposed class under at least one of three subsections to Rule 23(b).  Here, they invoke Rule 23(b)(3) and Rule (b)(2), the requirements of which are discussed *infra* at Sections II and IV, respectively.

Plaintiffs must establish "by at least a preponderance of the evidence" that each of the requirements in Rule 23(a) and one of the requirements in 23(b) has been met.  *Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010).  And the Court must "make a 'definitive assessment'" of each requirement, "notwithstanding their overlap with merits issues," and "resolve material factual disputes relevant to each Rule 23 requirement."  *Id.* (internal quotations and citation omitted).  This involves "a rigorous analysis," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (internal quotations and citations omitted), after which the Court "must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met."  *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 251 (2d Cir. 2011).

## ARGUMENT

## I.   Plaintiffs Do Not Satisfy the Commonality and Typicality Requirements.

For a host of reasons, plaintiffs have not satisfied their burden to establish commonality or typicality.  As this Court has recognized, these two requirements "tend to merge into one another, so that similar considerations animate analysis of Rule 23(a)(2) and (3)."  *Taylor v. Zucker*, No. 14-cv-05317, 2015 WL 4560739, at *8 (S.D.N.Y. July 27, 2015) (McMahon, J.) (internal quotations and citation omitted).

### A.   For the Section 349 Claim, No Plaintiff has the Same Alleged Theory of Liability or Injury as the Putative Class.

Plaintiffs contend that HMA engaged in alleged deception *both* at the time of vehicle purchase *and* afterwards, and that they were injured by paying a supposedly inflated purchase (or

lease) price and by paying for post-purchase repair costs that were not covered under warranty. Memo. at 28, 35.  They cannot show commonality or typicality for these contentions.

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Taylor*, 2015 WL 4560739, at *8 (quoting *Dukes*, 564 U.S. at 349-50). Similarly, typicality "is satisfied . . . when each class member's claim arises from the same course of events[,]" and when the challenged conduct "harmed each class member in the same way . . . ." *Adkins v. Morgan Stanley*, 307 F.R.D. 119, 138 (S.D.N.Y. 2015) (internal quotations and citation omitted), *aff'd*, 656 F. App'x 555 (2d Cir. 2016); 1 McLaughlin on Class Actions § 4:16 (15th ed.)  ("the claims of the class" must "proceed on the same legal theory").  Here, however, the putative class and plaintiffs do not share a common injury or theory of liability for the Section 349 claim.  Thus, no plaintiff has a Section 349 claim typical of the putative class.

For starters, no plaintiff has a live Section 349 claim alleging deception and injury at the time of purchase.  This Court has partially dismissed as time barred plaintiffs' Section 349 claims to the extent they allege pre-purchase deception.  In a prior opinion, Judge Karas distinguished between when a Section 349 claim accrues with respect to HMA's alleged pre-purchase and post-purchase practices.  *See Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 461-66 (S.D.N.Y. 2014).  He concluded that Marshall's and White's Section "349 claim based on Defendant's conduct prior to Plaintiffs' purchase of the vehicles is time-barred."  *Compare id.* at 466, *with* Memo. at 6 (incorrectly asserting that Judge Karas found this "claim was not time barred").  Judge Griesa later reached the same conclusion with respect to the remaining New York plaintiffs.  He found that, "unless Miller and Liddle's pre-purchase claims are saved by a statute of limitations defense . . . those claims are time-barred."  *Miller v. Hyundai Motor Am.* ("*Miller I*"), No. 15-cv-4722, 2016 WL 5476000, at *6 (S.D.N.Y. Sept. 28, 2016).  Judge Griesa

10

then rejected plaintiffs' arguments that such a defense salvaged their claims. *Id.* at *10-12. Thus, plaintiffs' Section 349 claims "survive[d]" dismissal only to the extent they relate to HMA's alleged "post-sale" conduct. *Id.* at *7.[5]

The alleged post-sale conduct and injury asserted by the New York plaintiffs is different from the allegedly pre- *and* post-purchase conduct and injury underlying the putative class's Section 349 claims. *Taylor*, 2015 WL 4560739, at *12 (no commonality/typicality where each plaintiff's and "class member's situation" did not "arise out of the same course of events.") (internal quotations and citation omitted). The proof required also would be different. While the claims of the putative class would focus on the effect, if any, that information disclosed prior to and at the time of purchase would have had on vehicle price, the claims of plaintiffs will depend on the information they received *after* purchase—including from individual research and from oral representations by dealers—and on whether the alleged defects resulted in unreimbursed repair costs. *See In re Teflon Prod. Liab. Litig.*, 254 F.R.D. 354, 365 (S.D. Iowa 2008) (no typicality where "[e]ach plaintiff was exposed to different representations, at different time periods"); *In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, No. 05-cv-02623, 2007 WL 4287511, at *6 (N.D. Ill. Dec. 4, 2007) (same "where a putative class is exposed to a varied mix of representations communicated through different channels") (citations omitted).

For example, Miller asserts that after his "first repair" he "researched brake complaints" on the internet and found that other "people were having [the] problem" he was. Miller Depo. at 113:1-7, 123:10-16. And White claimed that the mechanic who repaired his vehicle was critical of the brakes. White Depo. at 9:18-25; *see also* Memo. at 14 n.7 (certain owners were told about corrosion issues by independent mechanics). Others received different information upon

---

[5] The statute of limitations also would bar the vast majority of the putative class's pre-purchase Section 349 claims. *See infra* at Section II(A)(6).

contacting HMA.  *See* Ex. 19 to Mot.  In other words, the information available to plaintiffs and

the putative class *after* purchase varied by time, speaker, and medium.  *See Solomon v. Bell Atl.*

*Corp.*, 777 N.Y.S.2d 50, 57 (1st Dep't 2004) (no typicality as there were "differences . . . as to

which advertisements [plaintiffs] saw" and "whether they . . . obtained information . . . from

other sources"); *Newman v. RCN Telecom Servs., Inc.*, 238 F.R.D. 57, 74–75 (S.D.N.Y. 2006)

("each plaintiff will have to show that [the] disclosures . . . were inadequate").

    In another case, this Court denied certification of a Section 349 claim because each

airline passenger in the putative class would be "required to prove that he or she personally

received some representation[,]" often orally, and was injured as a result.  *Mullaney v. Delta Air*

*Lines, Inc.*, 258 F.R.D. 274, 279 (S.D.N.Y. 2009) (McMahon, J.).  The same is true here:

whether each putative class member suffered injury in light of the available post-sale information

can only be answered on an individual basis.  *See Butler v. Porsche Cars N. Am., Inc.*, No. 16-

cv-02042, 2017 WL 1398316, at *10–11 (N.D. Cal. Apr. 19, 2017) ("individualized issues

predominated . . . where the information to which class members were exposed was not

uniform") (internal quotations and citation omitted).  In short, plaintiffs have no pre-purchase

Section 349 claim typical of or in common with a portion of the putative class, and a post-

purchase claim is particularly unsuited for class certification.

    **B.**    **McCormick is Not a Member of the Putative Class, and No Plaintiff Has a**
            **PUTPCPL Claim in Common with Any Member of the Putative Class.**

    In addition, no plaintiff can assert a PUTPCPL claim alleging pre-purchase deception on

behalf of the putative class.  McCormick purchased her vehicle in New Jersey, not Pennsylvania,

and therefore is not a member of the putative class.  Memo. at 1 (class includes "all persons who

purchased or leased a" putative class vehicle in New York or Pennsylvania); McCormick Depo.

at 27:22-23 (testifying that she bought her vehicle in Burlington, New Jersey).  She thus cannot

represent the putative class.  *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("a

class representative must be part of the class") (internal quotations and citations omitted).

Even if the putative class were redefined to encompass Pennsylvania residents (as

opposed to purchasers), no plaintiff would be typical because none would have a consumer

protection claim under Pennsylvania law alleging pre-purchase deception.  Plaintiffs other than

McCormick do not contend that they are asserting PUTPCPL claims.  And the New Jersey

Consumer Fraud Act ("NJCFA") would apply to any pre-purchase claim McCormick raises

because she purchased her vehicle there.[6]  McCormick's out-of-state purchase would make her

an anomaly relative to a class of Pennsylvania residents—nearly all of whom purchased their

vehicles in Pennsylvania.  *See* Ex. M at HMAML_000825 (about 96% of the 26,601 vehicles

purchased from Pennsylvania dealers were bought by Pennsylvania residents).

The difference in applicable law is material when—as here—consumer protection

statutes conflict.  *See In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 147

(S.D.N.Y. 2008) ("In New York, the first step in any case presenting a potential choice of law

issue is to determine whether there is an actual conflict") (internal quotations and citation

omitted).  The PUTPCPL requires proof of reliance, while the NJCFA and Section 349 do not.

*Compare Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 224 (3d Cir. 2008) (PUTPCPL claims based

on supposedly "deceptive conduct" require "justifiable reliance"), *as amended* (Nov. 6, 2008),

*with Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.*, 929 A.2d

1076, 1087 (N.J. 2007); *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000).[7]

---

[6] Although Judge Griesa addressed McCormick's claim under Pennsylvania law, *see Miller v. Hyundai Motor Am.* ("*Miller II*"), No. 15-cv-4722, 2017 WL 4382339, at *9-10 (S.D.N.Y. Sept. 29, 2017), choice of law was not briefed or presented to him at that time.

[7] Judge Griesa previously suggested that, with a duty to disclose, "reliance" under the PUTPCPL is "implicit and is established by operation of law."  *Miller II*, 2017 WL 4382339, at *10.  But

And New Jersey also has the greater interest in applying its law to McCormick's claim for alleged pre-purchase deception. *See In re Grand Theft*, 251 F.R.D. at 148 ("the Court must determine which jurisdiction has the greatest interest in this litigation"). Courts have repeatedly concluded that the state where the allegedly deceptive transaction occurred has the greatest interest. *See In re Takata Airbag Prod. Liab. Litig.*, 193 F. Supp. 3d 1324, 1334 & n.5 (S.D. Fla. 2016) (state where plaintiff "purchased the vehicle[,]" not the state of residence, had the most significant relationship).[8] This conclusion is all the more appropriate in this case because McCormick testified that her decision to purchase was not influenced by any advertisements she saw before visiting the New Jersey dealer. *See McCormick Depo. 26:8-21* (purchasing decision "was absolutely based on [her] prior [positive] experience" with other Hyundai vehicles).

Because every plaintiff's claim other than McCormick's is governed by New York law, they also have no reason to prove the reliance element of a PUTPCPL claim. *See Daniels v. Amerco*, No. 81-cv-03801, 1983 WL 1794, at *5 (W.D.N.Y. Mar. 10, 1983) (plaintiffs must "have the incentive to prove all the elements of the cause of action which would be presented by the individual" class members). Thus, no plaintiff has a claim typical of or in common with the pre-purchase PUTPCPL claim that would be asserted on behalf of the putative class. *See Rapcinsky v. Skinnygirl Cocktails, L.L.C.*, No. 11-cv-06546, 2013 WL 93636, at *6 (S.D.N.Y.

---

the Pennsylvania Supreme Court decision he cited affirmed the opposite: "a plaintiff must show that he justifiably relied on the defendant's wrongful conduct . . . ." *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004) (citations omitted). Although a few Pennsylvania trial courts have presumed reliance, *see Zwiercan v. Gen. Motors Corp.*, 58 Pa. D. & C.4th 251 (Com. Pl. 2002), federal and state appellate courts have refused to do so, *see Hunt*, 538 F.3d at 227 ("presumption of reliance" is "inconsistent with Pennsylvania case law"); *Debbs v. Chrysler Corp.*, 810 A.2d 137, 158 (Pa. Super Ct. 2002) (reliance not presumed where "consumers could have a wide range of reactions to the undisclosed information"). In any event, even a rebuttable presumption represents a conflict as the NJCFA requires no reliance.

[8] *See also Mazzuocola v. Thunderbird Prod. Corp.*, No. 90-cv-00405, 1995 WL 311397, at *6 (E.D.N.Y. May 16, 1995) ("New Jersey has an undeniable interest in regulating . . . the sale of products[] within its borders[,]" regardless of "whether the purchaser . . . is a . . . resident").

Jan. 9, 2013) ("where a plaintiff purchased the product at issue in Massachusetts, he cannot be the typical representative of a class asserting claims under New York law"); *In re Yasmin & Yaz (Drospirenone) Mktg.*, 275 F.R.D. 270, 274 (S.D. Ill. 2011) (plaintiff was not "typical representative of persons whose claims arise under the laws of different states").

### C.      Commonality and Typicality Are Not Satisfied for the Warranty Claim.

HMA plans to shortly move for summary judgment on the express warranty claims of the only two plaintiffs who still have them—Marshall and White.  If that motion is granted, no plaintiff will have a warranty claim (under any state's law) and thus none will be typical of the putative class for that claim.  *See Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*, 721 F.3d 95, 112 (2d Cir. 2013) ("there must be a named plaintiff sufficient to establish jurisdiction over each claim advanced") (citation omitted); *Schachner v. Blue Cross & Blue Shield of Ohio*, 77 F.3d 889, 896 n.6 (6th Cir. 1996) ("Schachner, who can assert only federal ERISA claims, would be unable to adequately represent a class which includes state law claimants").

## II.      The Putative Class Satisfies Neither Rule 23(b)(3)'s Predominance Nor its Superiority Requirements.

Rule 23(b)(3) requires that common legal or factual issues predominate over individual issues and that class treatment is superior to individual litigation.  Fed. R. Civ. P. 23(b)(3).  The putative class in this case satisfies neither the predominance nor the superiority requirements.

### A.      Common Questions Do Not Predominate.

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem*, 521 U.S. at 623.  "[A] court examining predominance must assess (1) the elements of the claims and defenses to be litigated; and (2) whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's

15

entitlement to relief." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015) (internal quotations and citations omitted).

Many—and certainly the most substantial—of the issues in this case cannot be established using generalized proof.[9]  Specifically, plaintiffs have not (and cannot) supply generalized proof on the questions of:  (i) which putative class vehicles required brake component replacements; (ii) which of these replacements were caused by the alleged defects as opposed to other factors, such as environmental conditions, neglected maintenance, individual driving patterns, or normal wear and tear; (iii) whether one or more of the various, alleged defects advanced by plaintiffs constitutes a class-wide defect; (iv) which putative class members presented their vehicles to authorized third-party dealerships for warranty service; (v) which brake repairs or replacements were covered under warranty; and (vi) which decisions to deny coverage by third-party dealerships were justified under the terms of the Limited Warranty.

1.      Plaintiffs Cannot Provide Common Proof of Injury.

Injury is a requirement of each of plaintiffs' claims.  *See Frank v. DaimlerChrysler Corp.*, 741 N.Y.S.2d 9, 12 (1st Dep't 2002) (affirming dismissal of Section 349 claim for failure to plead "actual injuries"); *Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 180 (3d Cir. 2015) (for "the [P]UTPCPL, a plaintiff must demonstrate . . . ascertainable loss of money or property") (internal quotations and citation omitted); *Brumfield v. Trader Joe's Co.*, No. 17-cv-03239, 2018 WL 4168956, at *3 (S.D.N.Y. Aug. 30, 2018) (express warranty claim requires "injury to the buyer caused by the breach").  And it is not enough to merely allege injury at the class certification stage; the Second Circuit requires plaintiffs to adduce "common evidence [that] all

---

[9] In contrast, many of the supposedly common issues plaintiffs identify, like "the existence of an express warranty[,]" Memo. at 38, would not "substantially advance the case" and are "overwhelmed by [the] individual issues" discussed below, *Johnson*, 780 F.3d at 138 (internal quotations and citations omitted).

class members suffered *some* injury" as a result of HMA's supposed conduct. *Sykes v. Mel S.
Harris & Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015) (internal quotations and citations omitted);
*see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006); *In re Asacol Antitrust
Litig.*, 907 F.3d 42, 45 (1st Cir. 2018) (reversing certification where "ten percent of the class had
not suffered any injury attributable to defendants"); *Harnish v. Widener Univ. Sch. Of Law*, 833
F.3d 298, 305-06 (3d Cir. 2016) (holding class certification requires "economic loss—that is, the
fact of damage—on a common basis") (internal quotations and citation omitted).

Here, plaintiffs assert two distinct forms of injury:  paying a supposedly inflated purchase
or lease price and paying repair costs not covered by the warranty.  Memo. at 35.  As to the first,
not all plaintiffs contend that HMA's alleged conduct led to paying more for the vehicle.  *See*
McCormick Depo. at 41:13-15 (testifying that she would not have paid less to purchase her
vehicle); White Depo. at 84:23-85:10 (same).[10]  And, for the other plaintiffs, their contention
"amounts to nothing more than subjective disappointment . . . ."  *Irvine v. Kate Spade & Co.*, No.
16-cv-07300, 2017 WL 4326538, at *4 (S.D.N.Y. Sept. 28, 2017) (internal quotations and
citations omitted).

Beyond such individual assertions, plaintiffs have adduced no evidence that putative class
members paid an inflated purchase or lease price.  In other cases (including those cited by
plaintiffs), experts attempted to identify a premium and connect it to the challenged conduct.
*See*, *e.g.*, *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 571-72 (S.D.N.Y. 2014).  But, here,
plaintiffs' experts eschewed any such analysis.  Courts in this District repeatedly have denied
certification where the plaintiffs failed to prove the *existence* of an inflated purchase price.  *See*

---

[10] Although some plaintiffs also asserted they would not have purchased their vehicles at all but
for HMA's supposed misconduct, they are mistaken if they believe that this assertion entitles
them to a full refund.  Memo. at 35-37.  The New York Court of Appeals has rejected this theory
as "legally flawed . . . ."  *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 56 (1999).

*Ault v. J.M. Smucker Co.*, 310 F.R.D. 59, 67 (S.D.N.Y. 2015) ("Plaintiff offer[ed] no evidence that a price premium actually existed" for the product); *Oscar v. BMW of N. Am., LLC*, 274 F.R.D. 498, 513 (S.D.N.Y. 2011) ("Whether [vehicle] purchasers would have paid less for their cars had defendant disclosed an increased risk of tire failure is unknown. But [plaintiff] has not produced any evidence on this issue, nor has [plaintiff] addressed how the fact of damage—let alone the amount—could be established on a class-wide basis."); *Weiner v. Snapple Beverage Corp.*, No. 07-cv-08742, 2010 WL 3119452, at *6 (S.D.N.Y. Aug. 5, 2010) ("Only by showing that plaintiffs in fact paid more for Snapple beverages *as a result* of Snapple's 'All Natural' labeling can plaintiffs establish the requisite elements of causation and actual injury").

It is no answer to say that individualized proof of the quantum of *damages* does not preclude certification. Memo. at 35-36. Plaintiffs selected a theory of injury based on allegedly inflated purchase prices. Under that theory, injury is "bound up in proof of damages . . . ." *Ault*, 310 F.R.D. at 67 (internal quotations and citations omitted). When that occurs, plaintiffs still must establish class-wide injury, even if the quantum of damages that each individual might be entitled to can be determined later. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 188 (3d Cir. 2001) ("Proof of injury (whether or not an injury occurred at all) must be distinguished from calculation of damages (which determines the actual value of the injury)."), *as amended* (Oct. 16, 2001).

Similarly, the availability of statutory damages does not allow plaintiffs to avoid proving class-wide injury. Memo. at 42. Deception—even if established with evidence (which plaintiffs have not done)—"is not, standing alone, an actual injury." *Irvine*, 2017 WL 4326538, at *3-4 (internal quotations and citations omitted). In other words, "a § 349 claim is infirm where the

18

alleged injury consists only of having been deceived." *Kacocha v. Nestle Purina Petcare Co.*, No. 15-cv-05489, 2016 WL 4367991, at *13 (S.D.N.Y. Aug. 12, 2016).

The second theory of injury alleged is for unreimbursed repair costs. But here again, there is no class-wide evidence that the putative class (or even a significant portion of it) *paid* for brake repairs. Plaintiffs are wrong when they assert that HMA "consistently" denied warranty coverage of brake repairs. Memo. at 5. HMA—through a network of authorized, third-party dealerships—paid ███ brake warranty claims. Exs. 15, 16 to Mot.; Walker Report at 46, 54 (removing duplicate paid warranty claims).[11] As plaintiffs' expert conceded, HMA is "meeting [its] obligation if there is no charge" for the "replace[ment of] the component . . . ." 7/28/2016 Lynch Depo. Tr. (Ex. N to Decl. of M. Kidney) ("2016 Lynch Depo.") at 119:11-17. In other words, customers who received coverage suffered no injury.[12] In contrast, HMA received about ███ brake-related complaints. Ex. 19 to Mot. Plaintiffs have not proven how many, if any, of these complaints represent improper warranty denials. Even assuming *arguendo* that plaintiffs had proven that each complaint involved (i) a warranty denial for repairs caused by the alleged defects and (ii) a separate class member, they would still only have produced evidence of ███% of the 66,989 putative class members suffering an injury—far from the entire class. *See* Ex. 27 to Mot.; *Ruffo v. Adidas Am. Inc.*, No. 15-cv-05989, 2016 WL 4581344, at *3 (S.D.N.Y. Sept. 2,

---

[11] In the Memorandum and supporting declaration, Exhibits 15 and 16 also are incorrectly described as "complaints" submitted to the "Customer Assistance Call Center . . . ." Graifman Decl.; Memo. at 14, 26. As discussed *infra* at Section II(A)(3), the warranty claims in this case are *paid* warranty claims administered by authorized, third-party dealers. In contrast, the documents collected in Exhibit 19 to the Motion are Customer Assistance Call Center contacts.

[12] Plaintiffs fare no better by arguing that lubrication of the brake components should have been covered under warranty. Memo. at 8, 27, 28, 41. As an initial matter, they are incorrect in contending that HMA did not disclose that vehicle owners would be responsible for cleaning and lubrication. The Limited Warranty provides that "[n]ormal maintenance services such as . . . cleaning" and "lubrication" are not covered "unless such services are performed as part of a covered warrantable repair." HMAM_002316. Moreover, each putative class member would have to show that he or she paid to clean and lubricate the brakes.

19

2016) ("defect return rate" of 0.8% "seriously undermine[d] the proposition that *every* person who bought [shoes] eventually experienced harm").

Short of unreimbursed repair costs, plaintiffs have no basis even to suggest that most of the putative class vehicles have required brake repairs due to the alleged defects.[13]  Neither of plaintiffs' experts calculated the failure rate associated with any of the alleged defects or compared it to the same rate for equivalent components on other vehicles.[14]  The documents produced in discovery are similarly unhelpful:  they concern reports of various, corrosion-related issues and do not establish that an alleged class-wide defect was certain to require brake replacements in 66,989 putative class vehicles.  *See infra* at Section II(A)(4).  In short, plaintiffs' case shares a fatal flaw with many that have come before it:  "proposed breach of warranty and consumer classes of 'all owners and lessors' are frequently rejected because the proposed class manifestly includes persons who have not suffered any injury because their product performed exactly as expected."  1 McLaughlin on Class Actions § 5:56 (15th ed.) (collecting cases).[15]  As in those cases, certification should be denied for failure to offer evidence of a class-wide injury.

---

[13] *See In re Canon Cameras*, 237 F.R.D. 357, 360 (S.D.N.Y. 2006) (in defect case, "malfunction is a prerequisite to any of [the] [section 349] claims"); *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 99 (S.D.N.Y. 1997) ("[p]urchasers of an allegedly defective product have no legally recognizable [warranty] claim where the alleged defect has not manifested itself"); *Feinstein v. Firestone Tire and Rubber Co.*, 535 F. Supp. 595, 603 (S.D.N.Y. 1982) ("Those class members whose tires had performed as warranted would have to be . . . eliminated from the action.").

[14] Plaintiffs' assertion that HMA sold the Sonata vehicles with the supposed defects already present also is unavailing because HMA did not promise that the vehicles "would be free from defects[,]" *i.e.,* without parts that may fail.  *Schwatka v. Super Millwork, Inc.*, 965 N.Y.S.2d 547, 550 (2d Dep't 2013); *see also* Memo. at 38; Limited Warranty at HMAM_002315.  Similarly, the mere existence of corrosion is insufficient to establish an injury.  Memo. at 31.  As plaintiffs' experts conceded, corrosion does not always have "functional consequence[,]" 2016 McLellan Depo. at 103:18-104:2; 2016 Lynch Depo. at 49:10-12, 112:9-12—much less result in brake repairs that must be performed at the vehicle owner's expense.  In reality, "[e]verything[,]" not just the putative class vehicles, "corrodes" over time.  2016 Lynch Depo. at 106:12-15.

[15] *See also Lewis v. Ford Motor Co.*, 263 F.R.D. 252, 264 (W.D. Pa. 2009) (class wide injury depends on "whether [each] consumer paid for repairs" of the alleged defect).

20

2.      Common Proof is Not Available to Establish Causation.

In addition to injury, plaintiffs cannot provide common proof of causation (required for

the 349 and express warranty claim) or causation and reliance (required for the PUTPCPL

claim).  *See Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 557 (S.D.N.Y. 2014) (in

Section 349 claims, "[t]he causation element is essential:  The plaintiff must show that the

defendant's material deceptive act caused the injury") (internal quotations and citations omitted);

*Brumfield*, 2018 WL 4168956, at *3 (express warranty claim requires proof of causation);

*Debbs*, 810 A.2d at 156 (PUTPCPL claim requires causation and reliance).

With respect to plaintiffs' price premium theory of injury, there is no evidentiary basis to

conclude that information about the alleged defects would have affected the vehicles' price or

played a role in putative class members' purchase or lease decisions.  *See In re Avon Anti-Aging

Skincare Creams & Prods. Mktg. & Sales Practices Litig.*, No. 13-cv-00150, 2015 WL 5730022,

at *7 (S.D.N.Y. Sept. 30, 2015) (the many customers "who actually wanted the product

notwithstanding the misleading act were not injured") (internal quotations and citations

omitted).[16]  As Judge Engelmayer explained when denying certification of a case in this District

that alleged a failure to disclose a supposed automotive defect:

> [I]t is impossible to conclude, on a global basis, whether the disclosure of the downsides
> of [run-flat tires] would have affected purchasers' decisions to buy the [the vehicles], or
> the price at which they would have made that purchase. This is so for two independent

---

[16] The case relied upon by plaintiffs does not suggest otherwise.  Memo. at 27.  To begin with,
the court in *Ackerman v. Coca-Cola Co.* refused to certify a Rule 23(b)(3) class based, in part, on
one of HMA's arguments—*i.e.*, that "loss causation must be addressed individually."  No. 09-cv-
00395, 2013 WL 7044866, at *19 (E.D.N.Y. July 18, 2013) (citations omitted).  In addition, the
*Ackerman* court declined to insist that the class members share "identical motivations" where
they received a single misrepresentation.  *Id.* at *10.  By contrast, it is implausible that
information allegedly *withheld* about supposed defects would have played a role in every
putative class members' decision.  *See Sergeants Benevolent Ass'n Health & Welfare Fund v.
Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 94 (2d Cir. 2015) (implausible that "the [] information
allegedly withheld . . . would dictate *every* physician's decisionmaking" regarding prescriptions);
*Pelman v. McDonald's Corp.*, 272 F.R.D. 82, 95 (S.D.N.Y. 2010).

21

reasons: (1) the inherently individualized nature of the purchase decision, and (2) the conjectural nature of the *post hoc* inquiry into how a consumer's purchase decision might have been affected.

*Oscar v. BMW of N. Am., LLC*, No. 09-cv-00011, 2012 WL 2359964, at *7 (S.D.N.Y. June 19, 2012).[17]  Even if it were possible on an aggregate basis, years later, to untangle the many factors underlying these decisions, plaintiffs have made no effort to do so here—whether through expert testimony or otherwise.  *Cf. Oscar v. BMW of N. Am., LLC*, No. 09-cv-00011, 2011 WL 6399505, at *5 (S.D.N.Y. Dec. 20, 2011) (cases "alleging . . . deceptive trade practices—in which the consumer's perception is key—usually turn on the persuasiveness of a consumer survey") (internal quotations and citations omitted).

The other injury alleged is that putative class members incurred costs for brake repairs that were not covered under warranty.  For this theory, each putative class member must establish that the alleged defects, and not some other factor, caused his or her out of pocket repair costs.  *See Nealy v. U.S. Surgical Corp.*, 587 F. Supp. 2d 579, 584 (S.D.N.Y. 2008) ("it is the plaintiff's burden to establish causation" in a product defect case) (citations omitted).[18]

Courts have repeatedly concluded that "breach of warranty suits involving motor vehicles often involve complicated issues of individual causation that predominate over common

---

[17] To the extent plaintiffs contend that the effect of the supposed omission can be presumed, they are mistaken.  *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 224-25 (2d Cir. 2008) (refusing to extend class-wide presumptions beyond their origins in the securities context to the consumer purchase decisions).  "[W]here, as here, a host of individual factors could have influenced" each "class member's decision to purchase the product[,]" reliance cannot be presumed.  *Hazelhurst v. Brita Prods. Co.*, 744 N.Y.S.2d 31, 33 (1st Dep't 2002); McCormick Depo. at 23-25 (testifying that vehicle color, the warranty, a test drive, and her prior experience factored into her purchase decision).  Nor can causation.  *See Marcus v. BMW of N. Am.*, LLC, 687 F.3d 583, 607 (3d Cir. 2012) (no presumption of causation in an automotive defect case).

[18] Plaintiffs cannot avoid this burden by observing that the Limited Warranty does not require the alleged defects to be "the sole reason" for replacement.  Memo. at 38 n.13.  Each putative class member "has the burden of showing that a defect in the product was a substantial factor in causing the injury . . . ."  *Beckford v. Pantresse, Inc.*, 858 N.Y.S.2d 794, 795 (2d Dep't 2008).

22

questions regarding the existence of a defect." *Oscar*, 274 F.R.D. at 510 (collecting cases).[19]

Similarly, individualized causation issues preclude class-wide treatment of plaintiffs' consumer

protection claims as well. *See Oscar*, 274 F.R.D. at 513 ("determining whether each tire failed

as a result of the allegedly concealed defect. . . will devolve into numerous mini-trials."); *In re*

*Canon Cameras Litig.*, 237 F.R.D. at 360 (same). The logic behind these holdings is apparent.

In the automotive context, "the need to establish injury and causation with respect to each class

member will [often] require a detailed factual inquiry including physical examination of each

vehicle, a[] mind-boggling concept that is preclusively costly in both time and money."

*Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 449 (E.D. Pa. 2000). The same conclusion is

appropriate here. In addition to material and coating selection, other factors can contribute to

brake system corrosion and wear. Walker Report at 43. These factors are addressed below.

> a.   Exposure to Environmental Conditions and Corrosive Deicing
>       Materials Lead to Brake Replacements

To begin with, environmental conditions and deicing materials play a significant role in

brake wear. HMA disclosed as much in the Owner's Manual when it advised that the

components at issue must receive periodic maintenance more frequently when a vehicle is driven

(i) "in areas using salt or other corrosive materials or in very cold weather" or (ii) "on rough,

dusty, muddy, unpaved, graveled or salt-spread roads . . . ." HMAM_001430-32.[20] This extra

care is particularly necessary in certain parts of New York and Pennsylvania that experience

---

[19] *See also Kaczmarek v. Int'l Bus. Machs. Corp.*, 186 F.R.D. 307, 311 (S.D.N.Y. 1999) (no certification as there were "too many potential" non-defect "sources of . . . computer problems").

[20] HMC, the designer of the vehicles, also "takes [severe conditions] into consideration[,]" while "also provid[ing]" instructions "on how to maintain . . . vehicles in such conditions." 10/14/2015 Kim Depo. Tr. (Ex. O to Decl. of M. Kidney) ("Kim Depo.") at 83:8-13; *see also* 10/15/2015 Lee Depo. Tr. (Ex. P to Decl. of M. Kidney) ("Lee Depo.") at 83:23-84:16 (HMC cannot account for all "the conditions or the environment and the driving conditions of all vehicles."). There is no evidence that other manufacturers go further in investigating the myriad of possible conditions worldwide that can potentially affect vehicles.

severe winter weather conditions, which lead local governments to apply large amounts of salt, chemicals, and abrasives to the roads.  As explained by Diana Clonch, an expert in roadway maintenance, "the chemicals used for snow and ice control are corrosive and can have negative impacts on . . . vehicles . . . ."  DW Clonch, LLC, Winter Roadway Maintenance Practices (Ex. Q to Decl. of M. Kidney) ("Clonch Report") at 6.  Plaintiffs' experts do not disagree.  "[O]ne of the factors that affects the rate of corrosion" would be "the amount of exposure to corrosive deicing materials . . . ."  2016 McLellan Depo. at 107:22-25; *see also* 2016 Lynch Depo. at 88:15-89:13 (every area with a lot of "salted road[s]" is a "very, very severe environment").

Plaintiffs request for class certification depends on disregarding the effects of both environmental conditions and corrosive deicing materials claiming such effects are common, normal, and expected.  Memo. at 21-22.  But, in fact, the putative class vehicles have not been exposed in a common manner to either these materials or these conditions.  For this case, Ms. Clonch collected data from a number of New York and Pennsylvania municipalities, counties, and state-wide government entities on their use of deicing materials.  She found that agencies from across both states "choose different materials depending on availability and agency preferences."  Clonch Report at 12.  For example, Warren County and the City of Canandaigua in New York and Bristol Township in Pennsylvania purchase and apply almost exclusively rock salt (sodium chloride).  *Id.* at 9-12.  Albany County, the Town of Oyster Bay, and the Town of Queensbury, by contrast, rely on both rock salt and sand.  *Id.*  Other New York and Pennsylvania entities use chemicals like calcium chloride or magnesium chloride.  *Id.*  Still others modify deicing materials before applying them.  The City of Rochester, for instance, "treats" salt with additives intended to enhance performance as a freeze depressant.  *Id.* at 6, 10.

24

In addition, the amount of deicing materials used on state and local roadways varies significantly depending on the responsible agency.  Ms. Clonch found that New York agencies spread on average anywhere from 3.9 tons of solid materials per lane mile to over *nine* times that amount.  *Id.* at 13.  For agencies in Pennsylvania, this range also varies from 4.5 tons to over 25 tons.  *Id.*  And the amount applied also changes on a yearly basis in response to, among other things, the severity of individual winters.  *Id.* at 18.  The City of Rochester, for example, applied 10,000 tons of rock salt in 2012, but spread almost two and half times that amount two years later.  *Id.* at 15-16.  Similarly, Falls Township in Pennsylvania used nearly 3 times as much salt in 2014 as it did two years later.  *Id.* at 17.  Ultimately, Ms. Clonch concluded that the putative class members would not have encountered common conditions.  Instead, their experience would have been "determined by the roads on which they are traveling and the snow and ice control practices of the several agencies that are likely to have jurisdiction over those roads."  *Id.* at 19.

The effect of variations in environmental conditions across the State of New York also is apparent.  When analyzing the paid warranty claims associated with brake pads, rotors, and calipers in New York, Mr. Walker found that "the largest number . . . were addressed in the upstate region . . . ."  Walker Report at 47.  This pattern reappeared at a more local level:  certain authorized dealerships were far more likely to receive and accept warranty claims for brake repairs.  For example, Fuccillo Hyundai of Syracuse accepted ███ such claims.  *See id.* at 47-48. In contrast, Atlantic Hyundai West Islip administered fewer than ███, even though far more people live near Atlantic Hyundai and it sold over 2,000 more putative class vehicles than Fuccillo.  *Id.*  In other words, this disparity is not explained by either (i) the population that lived in proximity to a particular dealership or (ii) the number of vehicles that dealership sold.  *Id.* at 44, 45, 47 (pictorial analyses of New York population, vehicle sales, and paid warranty claims).

This mismatch is significant because "a common design defect would be expected to have a relatively constant rate of occurrence independent of the location of the sale, and increased sales volumes would therefore be expected to result in increased paid brake claims." *Id.* at 48.

But, in New York, a correlation exists between the number of warranty claims each dealer paid and the environmental conditions associated with that dealer's location. *Id.* at 47, 49, 50 (pictorial analyses of New York paid warranty claims, average snowfall, and average temperature). For example, Syracuse, where Fuccillo is located, receives an average of 123 inches of snow per year, according to the National Oceanic and Atmospheric Administration. *Id.* at 49. In contrast, Long Island, where Atlantic Hyundai is located, receives 35.1 inches. *Id.*[21] A similar relationship exists between paid warranty claims and average temperature: "it is readily apparent that paid brake warranty claims generally are more frequent in those geographic regions with average temperatures that remain below freezing during the winter months." *Id.* at 50.

Adding the putative class vehicles from Pennsylvania further confirms the absence of a common, class-wide alleged defect. As in New York, paid warranty claims in Pennsylvania "do not correlate well to either population distribution or sales location . . . ." *Id.* at 55; *see also id.* at 52, 53, 55 (pictorial analyses of Pennsylvania population, vehicle sales, and paid warranty claims).[22] In other words, neither state exhibits the pattern expected of vehicles with a common alleged defect. Nor do the vehicles within the two states share some other identified, common pattern, even though plaintiffs seek to unite them in one putative class.

---

[21] This correlation is not surprising; "increased exposure to water in its liquid form[,]" *e.g.*, melted snow, typically "will . . . accelerate the corrosion process[,]" resulting in more claims. *Id.* at 20. Also, more snowfalls mean more applications of corrosive deicing materials.

[22] Unlike New York, no "apparent relationship exists" in "Pennsylvania between paid brake claims and . . . snowfall[] or temperature . . . ." *Id.* at 48. This further highlights the complexity of factors that lead to brake wear and corrosion, *i.e.*, other factors are at play in Pennsylvania.

Plaintiffs' experts do nothing to overcome this evidence showing the lack of a common, class-wide defect.  One of them does not "consider [himself] an expert in . . . the application of corrosive chemicals . . . ." 2016 Lynch Depo. at 95:20-22.  And the other did not perform any analysis of "how much salt is applied [in] the state of New York on roads."  2016 McLellan Depo. at 167:18-23.  Moreover, both clarified at their depositions that not all areas experience common conditions.  Rochester and Buffalo in New York and Erie, Pennsylvania, for example, experience "the most severe conditions in terms of exposure to snow and ice removal chemicals . . . ."  *Id.* at 168:16-169:6; *see also* 2016 Lynch Depo. at 96:16-20 (admitting that between Rochester and Buffalo is "a rough area" in terms of the corrosive conditions it experiences).  Given these differences and their effect on the corrosion and wear of brake components, plaintiffs' effort to gloss over them should be rejected.  They cannot contest that the putative class vehicles are exposed to varying environmental conditions and deicing materials.

> b.    Neglected Maintenance Leads to Brake Replacements

Neglected maintenance also can lead to the replacement of brake components.  The Limited Warranty makes this very clear, explaining that vehicle owners are responsible for maintenance, which "must be carried out in accordance with the recommendations given in [the] Hyundai Owner's Manual."  HMAM_002316.  The Owner's Manual, in turn, advises that certain "procedures must be performed at [specific] intervals . . .  to assure that your warranty remains in effect."  HMAM_001428.[23]  Specifically, the "BRAKE PADS, CALIPERS AND ROTORS (FRONT, REAR)" must be "[i]nspect[ed] and, after [i]nspection, clean[ed], adjust[ed], repair[ed] or replace[d] if necessary" every 12 months or 15,000 miles, "whichever occurs first."  Limited

---

[23] The terms of the Limited Warranty are not unusual; the warranty applicable to the Nissan vehicle Miller owned before his Sonata makes the owner "responsible for properly . . . maintaining . . . [the] vehicle. . . . Failure to do so is likely to result in the denial of warranty coverage."  2007 Nissan Warranty Information Booklet (Ex. R to Decl. of M. Kidney) at 5.

Warranty at HMAM_001431-32.  This inspection includes "[c]hecking the pads for excessive wear, discs for run out and wear, and calipers for fluid leakage."  *Id.* at HMAM_01435.[24]

Conversely, "[d]amage or failure resulting from . . . [n]egligence of proper maintenance" is excluded from the Limited Warranty's coverage.  HMAM_002317.  And for good reason— even plaintiffs' expert concedes that proper maintenance can reduce corrosion.  2019 Lynch Depo. at 31:10-13.  The negative effects of neglected maintenance also are apparent in the field. For example, one vehicle, which had been in service for more than four years in a highly corrosive area near Syracuse, required brake repairs one year after the customer declined a recommended brake service.  *See* Customer Call Records (Ex. T to Decl. of M. Kidney) at HMAML_002642; *see also* Customer Call Records (Ex. U to Decl. of M. Kidney) at HMAM_005325 (repairs necessary after "service was not done on brake pads").  Not surprisingly, plaintiffs have failed to develop evidence that the maintenance patterns at issue are common to the putative class.  *See* Walker Report at 60 (finding that the "proposed Class Vehicles have not been subjected to common . . . maintenance patterns").

        c.      Variation In the Driving Habits of Individual Owners and Lessees Influence How Long Brake Components Last

Finally, driving habits affect brake wear.  The Limited Warranty recognized this and made coverage contingent on "normal use . . . ."  HMAM_002315.  None of the experts contests this point.  "The actual frequency with which [brake] components need to be replaced . . . will be a function of the individual vehicle's specific driving cycles . . . ."  Walker Report at 18.  The

---

[24] Although plaintiffs argue that these inspections do not address "carrier and pad slider clip corrosion," Memo. at 8, the pad slider clip is attached to the brake pad and the carrier is part of the caliper, Walker Report at 26.  Both brake pads and calipers are subject to the periodic inspections and cleaning.  Plaintiffs cannot dispute that cleaning deicing or other corrosive materials from such components will reduce corrosion.  1/30/2019 Lynch Depo. Tr. (Ex. S to Decl. of M. Kidney) ("2019 Lynch Depo.") at 31:10-13 (it "help[s] to bring the vehicle . . . to the dealer and have the dealer clean and service the brakes").

brakes of some vehicles may experience more rapid wear if, for example, their owners engage in

stop-and-go driving or repeatedly engage in hard braking.  Other factors that affect brake

durability include (i) "where [a vehicle is] driven and how it's driven[,]" 2016 Lynch Depo. at

116:21-117:5; (ii) the "frequency with which the vehicle is washed[,]" *id.* at 117:6-12; and (iii)

the temperature at which the vehicle is stored when not in use, 2016 McLellan Depo. at 108:1-

12.  The experience of putative class members confirms the relevance of individual usage

patterns.  *See* Customer Call Records (Ex. V to Decl. of M. Kidney) at HMAML_008266

(repairs necessary on vehicle that "sits for long periods of time"); Customer Call Records (Ex. W

to Decl. of M. Kidney) at HMAML_2701 (offering discount on repairs caused by "amount of

salt used in area, plus that vehicle is 3 years old and only has 12,000 miles").

*       *       *

In short, there are many factors which can cause brake components to wear out.

Plaintiffs' cases do not undermine this principle.  While plaintiffs maintain that warranty claims

are "well-suited" for class certification, especially "auto defect" cases, Memo. at 27, they cite no

supporting automotive case decided by a court in the Second Circuit.  Furthermore, most of

plaintiffs' cases do not support this broad proposition.[25]  Some of them involved warranties that

were breached at the time of sale, thereby obviating the need for evidence linking a repair to the

---

[25] To begin with, several do not involve express warranty claims, or any claim pending in this
case.  *See Edwards v. Ford Motor Co.*, 603 F. App'x 538, 539 (9th Cir. 2015) (listing plaintiff's
claims); *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 849, 853
(6th Cir. 2013) (same); *Falco v. Nissan N. Am. Inc.*, No. 13-cv-00686, 2016 WL 1327474, at *2
(C.D. Cal. Apr. 5, 2016) (same); *Helmer v. Goodyear Tire & Rubber Co.*, No. 12-cv-00685,
2014 WL 1133299, at *1 (D. Colo. Mar. 21, 2014) (same).

defect.[26]  By contrast, where, as here, the warranty promises to repair or replace components, a

repair or replacement is first required.  *Schwatka*, 965 N.Y.S.2d at 550; *supra* at Section II(A)(1).

        In any event, courts across the country have found that warranty cases are unsuited for

class certification.  1 McLaughlin on Class Actions § 5:56 (15th ed.) (collecting cases).

Although some courts have certified warranty claims in the narrow circumstances "where proof

was adduced that the product contained an inherent defect which was substantially certain to

result in malfunction during the useful life of the product[,]" even those decisions represent the

"minority . . . ."  *Id.*  And here, plaintiffs have not provided common proof of allegedly class-

wide defects, *see infra* at Section II(A)(4), much less that they are certain to result in

unreimbursed brake component repairs, *see supra* at Section II(A)(1).

        Plaintiffs also cite a decision from this Court for the proposition that "Section 349 claims

based upon omissions, non-disclosures and deceptive corporate policy are well suited for class

certification."  Memo. at 32 (quoting *Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418, 435

(S.D.N.Y. 2009)).[27]  But that is true only where "the asserted . . . injury . . . was necessarily

caused by the conduct in question, that is, the undisclosed practice . . . ."  *Oscar*, 2012 WL

2359964, at *7 (discussing *Jermyn*).  In *Jermyn*, the class was *defined* so that it included only

individuals who had purchased a product from the defendant and later found a lower price from a

competitor, which the defendant then declined to match despite its advertised policy of doing so.

_____

[26] *See Samuel-Bassett v. Kia Motors Am., Inc.*, 34 A.3d 1, 38 (Pa. 2011) (the warranty promised
"to deliver a vehicle free of manufacturing defects"); *Daffin v. Ford Motor Co.*, 458 F.3d 549,
552 (6th Cir. 2006) (defendant "breached its express warranty by providing vehicles with
defectively designed throttle body assemblies"); *cf. Wolin v. Jaguar Land Rover N. Am., LLC*,
617 F.3d 1168, 1174 (9th Cir. 2010) (where the warranty requires causation, "[a] determination
whether the defective alignment caused a given class member's tires to wear prematurely
requires proof specific to that individual litigant").  While *Parkinson v. Hyundai Motor America*
included an express warranty claim, it was not certified.  258 F.R.D. 580, 595 (C.D. Cal. 2008).

[27] Elsewhere, plaintiffs also suggest that their theory involves alleged misrepresentations.  Memo.
at 5.  But they never identify a particular misrepresentation they saw or heard.

256 F.R.D. at 437.  Because of this definition, all class members were necessarily injured by the challenged conduct.  Here, by contrast, plaintiffs have defined the putative class so that the vast majority of its members have not been injured because the available evidence suggests that (1) most vehicles never needed any brake replacements during the warranty period and (2) to the extent that such replacements were necessary, the overwhelming majority were covered under warranty.  And there is no evidence of the existence of a price premium.  *See supra* at Section II(A)(1).  For the minority who were denied coverage of brake repairs, those decisions were made by various non-party dealerships that were charged with the responsibility for weighing the many factors that can cause brake component corrosion and wear.  *See infra* Section II(A)(3).[28]

Ultimately, "[w]hile the issue of generic causation"—*i.e.*, whether the alleged defects *can* cause brake components to fail prematurely due to corrosion—"may be common to [some] class [members], the question of specific causation"—*i.e.*, whether the alleged defects *did* result in component replacements on each putative class vehicle—"requires an individualized assessment."  *Patton v. Topps Meat Co.*, No. 07-cv-00654, 2010 WL 9432381, at *3 (W.D.N.Y. May 27, 2010) (citations omitted).  Because "[a] finding of 'general causation' would do little to advance this litigation[,]" common issues do not predominate.  *Id.* at *8.[29]

---

[28] In another of plaintiffs' cases—*Sanchez-Knutson*—the court "framed . . . damages as the diminution in the intrinsic value of [the vehicles], not the repair costs[,]" thereby avoiding some individualized causation issues.  *In re Atlas Roofing Corp. Chalet Shingle Prod. Liab. Litig.*, 321 F.R.D. 430, 443 (N.D. Ga. 2017) (distinguishing *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529 (S.D. Fla. 2015)).  But, unlike here, the *Sanchez–Knutsen* plaintiff had an expert to identify the effect of the withheld information on the vehicles' value.  310 F.R.D. at 538-39.

[29] Even if it were feasible to consider causation on an individual basis, most putative class members would not be able to prove what caused their brake repairs.  Invoices, especially from independent repair facilities, often do not specify the reason for a repair.  The first time Miller paid anything is a good example.  MILLER PROD._000009 (invoice from independent repair facility that does not specify reason for brake component replacement).

\\DC - 029016/000009 - 13424266 v14

3.     Plaintiffs' Theory depends on the Actions of Third Parties that are Not Subject to Generalized Proof.

Compounding the individualized causation issues discussed above is that HMA does not make the initial decision regarding whether a brake repair is covered under the Limited Warranty.  Instead, HMA largely delegates that decision to authorized third-party dealerships.

In a putative class action involving Medicaid recipients, this Court found that the plaintiffs sought to "litigate hundreds of independent decisions regarding different individuals'" access to home health care "at the same time." *Taylor*, 2015 WL 4560739, at *9.  This was not possible on a class-wide basis because each of these decisions was made—not by a single decision maker—but by one of many independent managed care organizations or managed long term care plans. *Id.* at *11.  The same conclusion applies here.  The discretion delegated to third-party dealerships prevents plaintiffs from proving on an aggregate basis their contention that HMA, "as a matter of course," denied brake claims under warranty.  Memo. at 39.

To obtain warranty service, an owner must present his or her vehicle to an authorized, third-party dealership within the warranty period.  *See* Limited Warranty at HMAM_002315-16.  There are approximately 89 dealerships in New York and Pennsylvania.  *See* HMAML_000854 (Ex. X to Decl. of M. Kidney).  Each is a distinct corporation, which is neither owned nor controlled by HMA.  Declaration of Greg Webster (Ex. Y to Decl. of M. Kidney) ("Webster Decl.") ¶ 5.  It is these third-party dealerships that "follow through on all warranty obligations to the Dealer's customer."  Hyundai Warranty Policy & Procedures (Ex. Z to Decl. of M. Kidney) at HMAM_006108.  HMA's role, by contrast, is one of reimbursement, counseling, and supervision.  HMA agrees to "reimburse the Dealer for repair, replacement, or adjustment of any part" covered under warranty.  *Id.* at HMAM_006108.  In addition, HMA "will, from time to time, advise and counsel DEALER on . . . warranty administration" and "will periodically

32

evaluate DEALER's performance of" warranty service.  *Id.* at HMAM_006075.  HMA also

"reserves the right to furnish the final decision in all warranty matters . . . ."  *Id.* at

HMAM_006110; *see also* Memo. at 9.  But it would be impractical for HMA to evaluate the

many warranty decisions each dealer makes on a daily basis.  In an analogous context, this Court

recognized that the defendant's "oversight" role did not make certification proper as "[d]ecision-

making [was] not centralized."  *Taylor*, 2015 WL 4560739, at *11.  So too here.

The individual warranty decisions that are entrusted to these 89 dealerships are inherently

complex.  As a representative of Vision Hyundai (an authorized dealership near Rochester, NY)

explained, coverage decisions depend upon:

> a variety of factors consistent with . . . [the] Limited Warranty, including the specific
> component that needs repair or replacement, the reason the component needs repair or
> replacement, the mileage on the vehicle at the time of the repair or replacement, the
> amount of time the vehicle has been in service at the time of the repair or replacement,
> the vehicle's maintenance history, and the individual use of the vehicle.

Declaration of Greg Melino (Ex. AA to Decl. of M. Kidney) ("Melino Decl.") ¶ 11.  The

decision of third-party dealers to cover, as a matter of good will, claims that do not qualify for

warranty coverage depends on still other considerations, including "customer loyalty."  *Id.* ¶ 12.

Because warranty coverage involves a decentralized and complex process, its application

varies on a case-by-case basis.[30]  This is illustrated by the data for warranty claims related to

brake pads, rotors, and calipers.  Some claims were denied, but many more were paid.  While

HMA received approximately ███ complaints regarding warranty coverage denials for the

replacement of brake pads, rotors, or calipers, *see* Ex. 19 to Mot., HMA paid—through the

network of authorized dealers—for ███ warranty claims related to those same components, *see*

---

[30] This variety renders all plaintiffs' claims unsuitable for class treatment because the only theory
of injury for which there is any evidence is that a minority of putative class members incurred
repair costs as a result of allegedly improper warranty denials.  *See supra* at Section II(A)(1).

Exs. 15, 16 to Mot.  In other words, the number of paid warranty claims in New York and

Pennsylvania (████) is ███% greater than the corresponding number of complaints (███).

Moreover, the components at issue, the reasons for replacement, and the circumstances

varied significantly.  For example, about ████ of the paid claims were covered within the first

12,000-mile period applicable to normal maintenance items such as brake pads; about ███

repairs from *after* 60,000 miles were paid, when HMA was under no obligation to cover them;

and the remainder were within the 60,000-mile period applicable to non-maintenance items.  *See*

*id.*  In addition, while plaintiffs complain that repairs of rusted rotors were not covered, *see*

Memo. at 9, there were, in fact, numerous rusted rotors that were replaced under warranty, *see*

Exs. 15, 16 to Mot.[31]  Notably, other automotive companies exclude rotors from the longer

warranty period.  *See, e.g., Cali v. Chrysler Grp. LLC*, No. 10-cv-07606, 2011 WL 383952, at *1

(S.D.N.Y. Jan. 18, 2011) ("rotors . . . covered for 12 months or for 12,000 miles") (internal

quotations and citations omitted), *aff'd*, 426 F. App'x 38 (2d Cir. 2011).  Had HMA decided to

adopt a similar policy, there was a strong basis for doing so.[32]  But the warranty data

demonstrates that there was no such policy.  In sum, plaintiffs' claims, which depend on a non-

uniform warranty process, are unsuited for aggregate litigation.  *See Cunningham Charter Corp.*

---

[31] These claims were paid even though HMA promises to cover repairs of certain "defective" components, rather than repairs due to rust, which has many non-defect-related causes.  Limited Warranty at HMAM_002315.  For example, a recent survey reported that "U.S. drivers paid an estimated $15.4 billion in rust repairs caused by de-icing methods over the last five years . . . ." *Road De-Icers Cause $ Billion Annually in Vehicle Rust Damage, available at* http://newsroom.aaa.com/2017/02/road-de-icers-cause-3-billion-annually-vehicle-rust-damage/ (last visited February 13, 2019).

[32] In reality, a rotor, as plaintiffs' expert agrees, is a "wear" item; it will "wear down a little bit every time you use it . . . ." 2016 McLellan Depo. at 56:23-25; *see also* Walker Report at 18 ("Due to the rubbing nature of the braking action, both the rotors and brake pads are wearable . . . items.").  But, as a gesture of good will, HMA informed dealers that they could cover rotor repairs for the full 60-month, 60,000-mile warranty period.  Ex. 13 to Mot at HMAM_006023.

*v. Learjet, Inc.*, 258 F.R.D. 320, 335 (S.D. Ill. 2009) (class "would require highly individualized inquiries to determine the propriety of each warranty claim denial").

4.      Plaintiffs Do Not Provide Proof that One or More Common, Class-Wide Defects Exists in the Putative Class Vehicles.

In addition to the individualized issues of injury, causation, and warranty coverage, plaintiffs' case suffers from a failure to provide common proof that one or more class-wide defects exists. "The failure to specify an alleged common defect provides a further basis for concluding that plaintiff has not demonstrated predominance." *Oscar*, 274 F.R.D. at 510; *Gonzalez v. Owens Corning*, 885 F.3d 186, 196-97 (3d Cir. 2018) (affirming denial of certification where the plaintiffs did "not identify a particular defect that can be attributed to all [roof] shingles"). To be sure, plaintiffs devote much of their Memorandum to summarizing reports of potential issues that they contend form a "common defect." Memo. at 1-4, 13-20. But, in fact, these reports do not concern the same or even similar issues. And plaintiffs fail to connect these reports into a common defect theory suitable for class-wide treatment.

To begin with, plaintiffs' experts do not reliably identify a common, class-wide defect, even though expert testimony is required. "[C]ertain issues, because of their scientific or technical complexity, require the special expertise of an expert witness . . . ." *Food Pageant, Inc. v. Consol. Edison Co.*, 54 N.Y.2d 167, 173 (1981). Allegedly common defects in the design of brake components are examples of such issues because they involve complex subjects "not within the ken of the average juror." *Tiner v. Gen. Motors Corp.*, 909 F. Supp. 112, 117 (N.D.N.Y. 1995) (discussing seat belt design).

Based in large part on summaries of documents from discovery, Mr. McLellan and Dr. Lynch offer opinions related to three different mechanisms of corrosion. Together, these three mechanisms supposedly affect several allegedly defective components—namely, the caliper

bracket (or carrier), spring/clip, caliper body, and rotor.  Memo. at 7; Walker Report at 60-61.

For the first mechanism, Mr. McLellan describes a situation in which corrosion may develop at

the interface between the pad backing plate, spring/clips, and caliper frame/bracket (the alleged

"spring/bracket issue").  McLellan Report at 16.  He discusses another in which the piston within

the caliper body may become stuck in its bore due to moisture penetrating the rubber-accordion

seal (the alleged "piston/bore issue").  *Id.* at 9.[33]  Dr. Lynch separately describes a mechanism

under which corrosion can develop on the rotor.  Lynch Report at 4.  Although Dr. Lynch

characterizes the alleged rotor issue as a distinct "type[] of brake system failure[,]" *id.*, Mr.

McLellan views it as derivative of other alleged issues.  McLellan Report at 16 ("The corrosion

on the disc . . . is due to piston and pads frozen with corrosion").

Plaintiffs' experts do not sufficiently unite these three alleged mechanisms of corrosion

into a common, class-wide defect theory.  *See Luppino v. Mercedes Benz USA*, 718 F. App'x

143, 146–47 (3d Cir. 2017) (affirming denial of certification where "the alleged defect

implicated various components of a vehicle's systems"). The failure to connect the alleged

spring/bracket issue and the alleged piston/bore issue is particularly striking.  According to Mr.

McLellan, they progress through non-common—indeed, opposite—mechanisms.  The former

supposedly results in the brake "pad . . . freez[ing] to the frame[/bracket] *away* from the

disc[/rotor,]" while the latter allegedly keeps the pads "continuously *engaging* the disc[/rotor.]"

McLellan Report at 13 (emphasis added).

Mr. McLellan and Dr. Lynch also do not agree about whether the alleged defects affect

the front brakes.  Mr. McLellan is not offering any opinions on front brakes because he did not

"see a problem with the front brakes."  2019 McLellan Depo. at 20:25-21:11.  On the other hand,

---

[33] While he examined a single caliper for the alleged piston/bore issue, "Mr. Sullivan did not
offer any opinions . . . . regarding an alleged defect."  Walker Report at 62; Ex. 25 to Mot at 2.

Dr. Lynch and plaintiffs' counsel believe that the alleged brake defects are not limited to the rear

brakes.  Memo. at 4; 2019 Lynch Depo. at 133:4-16.  This inconsistency is perhaps explained by

the non-common experiences of plaintiffs.  Marshall did not complain about any rear brake

repairs, while McCormick and Miller do not contend that their front brake components

prematurely required replacement.  *See supra* at Background(C).  Mr. McLellan's refusal to

render a single opinion about the front *and* rear brakes is well-advised:

> The front brake system components of the proposed class vehicles differ in design from
> the rear brake system components of the proposed class vehicles. Furthermore, even if
> identical designs were shared between the front and rear brake system components, even
> subtle differences in mounting location, heat shielding, exposure to roadway
> contaminants, water spray, and localized airflow patterns all could influence the actual
> field corrosion performance.

Walker Report at 61.

Moreover, plaintiffs' experts do not connect their various theories with the actual

performance of the putative class vehicles.  Specifically, Mr. McLellan and Dr. Lynch have not

tried to calculate the failure rate associated with any of the mechanisms of corrosion they

describe, 2019 Lynch Depo. at 34:15-18; 2019 McLellan Depo. at 112:21-25, 120:14-17,

121:20-1, much less explain how often any particular mechanism resulted in *unreimbursed* repair

costs, 2019 McLellan Depo. at 109:24-110:13.  In this way, plaintiffs' evidence is even more

deficient than that unsuccessfully proffered in *Oscar*.  There, the court refused to certify a class

in part because the plaintiff had "difficulties in demonstrating the failure rate" at issue.  274

F.R.D. at 505.  Here, in contrast, plaintiffs' experts have neglected the failure rate altogether.

For at least two reasons, this neglect is especially significant in the context of this case.

First, Mr. McLellan and Dr. Lynch both rely on the Limited Warranty as a standard for how long

components supposedly should resist replacement due to corrosion.  Lynch Report at 3;

McLellan Report at 16.  Yet, even adding together paid warranty claims and Customer

Assistance Call Center contacts, the evidence suggests that the majority of brake components in the 66,989 putative class vehicles "last[ed] the length of their warranties" and thus "lack any defect . . . ." *Gonzalez*, 885 F.3d at 196. Even where brake components required replacement within warranty, they were covered free of charge ███ times. *See supra* at II(A)(1). In that situation, plaintiffs' experts admit that HMA is satisfying its obligation towards customers. 2019 McLellan Depo. at 96:25-97:8, 109:19:23; 2016 Lynch Depo. at 119:11-17.

Second, as discussed below, not a single report by HMA or HATCI concerns the alleged piston/bore issue. Thus, its existence is supported only by Mr. McLellan's inspection of two Sonata vehicles from states outside the putative class and Mr. Sullivan's testing of a single caliper from a third, non-class vehicle. McLellan Report at 7-12. And Mr. McLellan has no idea how often the alleged piston/bore issue actually occurred within the putative class. 2019 McLellan Depo. at 120:14-17; *Gonzalez*, 885 F.3d at 198 ("Rule 23 requires . . . that a putative class must describe the product's defect on a classwide basis.").

In an effort to gloss over the (often unexplored) differences in the nature and rate of occurrence of their various theories, Mr. McLellan and Dr. Lynch assert that they all are attributable to inadequate materials or coatings. Lynch Report at 38; McLellan 16. But this generalization does not withstand scrutiny. Neither expert has made any effort to investigate what materials and coatings peer vehicles use. 2016 Lynch Depo. at 24:21-24, 115:20-25; 2019 McLellan Depo. at 113:6-9. As a result, Dr. Lynch did not know, for example, that every peer vehicle analyzed uses 17-7 stainless steel for the springs/clips. 2019 Lynch Depo. at 87:12-14; *see also* Walker Report at 36.[34] Similarly, if plaintiffs' experts had investigated other

---

[34] In fact, the springs/clips on some putative class vehicles had the potential for superior corrosion resistance relative to their peers because, within the putative class period, the springs began being coated with ███. Walker Report at 30; Expert Report of Eric P. Guyer, Ph.D. (Ex. BB to Decl. of M. Kidney) ("Guyer Report") at 15. This change followed a suggestion for

components on peer vehicles, they would have discovered, as Mr. Walker did, that each material used for the Sonata brake components is "commonplace, mainstream, and substantially similar to peer and competitive vehicles."  Walker Report at 65.  Dr. Guyer supplemented Mr. Walker's analysis by testing the coatings of the same brake components using tools and methods that plaintiffs' experts ignored—including a scanning electron microscope, x-ray fluorescence, and Fourier transform infrared spectroscopy.  Guyer Report at 4.  For each component tested, Dr. Guyer concluded that the "coating composition [is] substantially similar to and coating thickness falls within or at" least at "the range of competitors' equivalent products."  *Id.* at 16.  Neither Mr. McLellan nor Dr. Lynch challenges these findings.  Assuming they continue to believe that the materials and coatings used on the brake components in Sonata vehicles are somehow inadequate, they necessarily also imply the same for equivalent components on peer vehicles. The sweeping nature of this implication highlights the insufficient bases Mr. McLellan and Dr. Lynch possess to reliably identify a common, allegedly class-wide defect.

Even assuming that plaintiffs were not required to submit expert evidence (which they are), they also failed to submit non-expert evidence of a common, class-wide defect.  For example, plaintiffs rely on certain vehicles' supposed non-compliance with a "█████████████ kilometers" caliper specification.  Memo. at 14, 41 n.16; Ex. 18 to Mot.  But as a corporate designee for HMC (the author of that specification) made clear, it applies only to ███████████ ██████████████████████████████████ and is farthest from the alleged areas of corrosion identified by plaintiffs' experts.  Lee Depo. at 104:10-15; McLellan Report at 9, 16; Lynch Report at 4.  Similarly, plaintiffs contend that the mere appearance of corrosion in a controlled test performed by HMC's supplier Mando is evidence of alleged defects.  Memo. at 1,

further study to determine if a type of brake noise could be addressed with ████, a brand name of ████.  Ex. 3 to Mot. at HMAML_000735, HMAML_000738.

20; Ex. 1 to Mot.  As an initial matter, the document plaintiffs identify relates to testing of an

aluminum caliper from Santa Fe (CM) vehicle, rather than a cast iron caliper from a Sonata

vehicle.  Ex. 1 to Mot. at HMCH_000867.  In addition, the appearance of corrosion in this

context is expected because suppliers "deliberately" perform "component-level corrosion

testing" to "accelerate[] the corrosion process . . . ."  Walker Report at 46; *see also* 2019 Lynch

Depo. at 74:15-19 ("salt spray or salt fog testing is a more corrosive environment than would be

experienced in real life").  Indeed, that is why the caliper at issue passed Mando's test.  ██████

███████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████  Ex. 1 to Mot at 1-2.

    Plaintiffs also rely on contacts that consumers had with HMA's Customer Assistance Call

Center.  Memo. at 14-16; Ex. 19 to Mot.  These are summaries of communications between

HMA representatives and customers.  The vast majority of both groups are not engineers.

Although these summaries also sometimes contain notes of conversations with dealership

technicians, these notes are double-hearsay relayed through a customer service representative

who is not trained as an engineer.  *See Instant Media, Inc. v. Microsoft Corp*., No. 07-cv-02639,

2007 WL 2318948, at *14 (N.D. Cal. Aug. 13, 2007) (summary of telephone calls with

customers is hearsay).  Moreover, these summaries are not intended to diagnose alleged defects

in an entire line of vehicles.  Rather, each is meant to capture a single customer's experience

with his or her vehicle.  *See* Walker Report at 43 (explaining that "summarizing" customer

complaints, without more, "is not a sound engineering methodology through which one can

reliably determine the actual causes, conditions, and  circumstances" underlying those

complaints).[35]  In any event, these summaries do not describe common issues; instead, they

_____

[35] *Callahan v. Toys "R" US-Delaware, Inc.*, No. 15-cv-02815, 2017 WL 219371, at *2 (D. Md.
Jan. 19, 2017) (finding unreliable "allegations of defect" that "are unverified and . . . are logged

\\DC - 029016/000009 - 13424266 v14

relate to non-uniform symptoms, including (i) "sticking" of pads and rotors, (ii) rotor resurfacing, (iii) frozen calipers, and (iv) brake noise, Memo. at 14-16, the last of which McLellan admits he cannot "connect" to corrosion, 2019 McLellan Depo. at 99:6-9, 99:19-21.

On top of these shortcomings, the so-called HATCI report and other HATCI documents do not establish the existence of a common, class-wide defect.  Memo. at 1-3, 17-18; Exs. 2, 4 to Mot.  As their name suggests, these documents were not prepared by HMA or by HMC, the designer and manufacturer of the putative class vehicles, but by HATCI, a third-party affiliate. *See* Webster Decl. ¶ 3.  Because plaintiffs have provided no basis for disregarding these corporate distinctions, HATCI-authored documents do not represent an "admission" by HMA on any point.  Memo. at 18.  Plaintiffs also have offered no explanation for how the HATCI documents would even be admissible at trial.  *In re Nassau Cty. Strip Search Cases*, 742 F. Supp. 2d 304, 319 (E.D.N.Y. 2010) (one-off document did not qualify for the business record exception to hearsay, which "rests on [] 'regularity' and [] 'routine'").

The HATCI documents and other reports cited by plaintiffs are also unhelpful to plaintiffs because they concern various, often unrelated issues—which HMA learned of, if at all, at different times.  And none of these documents or reports addresses the alleged piston/bore issue Mr. McLellan describes.  Exhibit 20 to the Motion, for example, described a phenomenon known as "storage rust" that can occur when a vehicle is "stored for a period of about 250 days." Ex. 20 to Mot. at HMAM_004878, HMAM_004881.  This condition typically develops prior to the time of sale while a vehicle remains in a dealer's inventory and then presents within the first 1,000 miles of use.  *Id.* at HMAM_004876.  No plaintiff, however, claims to have experienced

---

simply for customer service/satisfaction"); *Gardner v. Ford Motor Co.*, 166 F. Supp. 3d 1261, 1269 (M.D. Fla. 2015) (granting summary judgment where plaintiff relied on "complaints received by Ford's customer call center") (internal quotations and citations omitted).

any brake issue within that time frame. *See also* Ex. 23 to Mot. at HMAM_004866 (identifying a "minor" issue that can, if noticed, "detract[] from vehicle appearance").

In addition, Exhibit 2 is presented out of context. It is not a single document, but an amalgamation assembled by plaintiffs that discusses unconnected issues. For example, the first twelve pages describe a potential issue in which an elastomer material can be transferred to the surface of the rotor. Ex. 2 to Mot. at HATCI 0000011. Notably, there is no suggestion that this potential issue can result in pad seizure, either in contact with or away from the rotor. The next issue discussed in this packet concerns an iron oxide "residue" on the rotors that is "not from pad material transfer." *Id.* at HATCI 000017, HATCI 000020. HATCI attributed the latter issue to a cause never argued in plaintiffs' Memorandum—namely, that the pad friction material allowed for high water absorption. Ex. 2 to Mot. at HATCI 000020, HATCI 000085; Memo. at 7, 39 (defining "subject" or "covered" parts as not including friction material). With good reason: plaintiffs do not dispute that the brake pads, including their friction material, are maintenance items that are warranted for only 12,000 miles. Limited Warranty at HMAM_002316.

To be sure, plaintiffs' assembly of documents also discusses certain caliper characteristics, *see* Ex. 2 to Mot. at HATCI 000037, but none of these involve the alleged issue described by McLellan, under which the seal may purportedly allow moisture to enter the bore, leading to the development of corrosion. *See id.* at HATCI 000052, HATI 000054 (discussing, for example, fluid displacement and housing deflection); Ex. 4 to Mot. at HMAH_001386 (HATCI discussing possible seizure of the pads in the interface with the caliper bracket). In addition, although plaintiffs suggest that parts of this document support the superiority of the Camry caliper over the Sonata caliper, Dr. Lynch admitted that the latter outperformed the former on four of the six caliper characteristics at issue. 2019 Lynch Depo. at 57:18-21. And

42

while the Sonata caliper did not meet a specification for piston rollback, that specification set a minimum (not a maximum) rollback target, and the Sonata caliper produced greater rollback than the Camry caliper.  *See id.* at 53:15-21; Ex. 2 to Mot. at HATCI 000048.

Moreover, the HATCI report and other documents concern a couple dozen vehicles— none of which plaintiffs, their experts, or attorneys inspected or inquired as to their maintenance and usage histories.  *See also* Exs. 21, 22 to Mot. (discussing one vehicle each).  Such anecdotal reports are not a sufficient basis to identify a class-wide defect in 66,989 vehicles.  *See* Ex. 27 to Mot.  And the substance of the HATCI report and other documents shows that they are akin to brainstorming in a corporate environment with an eye toward continuous improvement, rather than the type of rigorous engineering analysis that would have been necessary to diagnose a defect.  Plaintiffs have not pointed to any evidence that the authors of the HATCI report or other documents had experience designing or testing brake system components, or that they even consulted with any HMC engineers who had such experience.  The author of the HATCI report, like plaintiffs' experts, did not attempt to identify materials that could be used in the components involved in the alleged spring/bracket issue to better resist corrosion.  Ex. 4 to Mot.; *see also* Ex. 5 to Mot. at HMAM_002599 (author was trying "to identify the condition regarding uneven rear brake wear" without suggesting design changes to potentially address that condition).[36]

This is important for two reasons.  First, changes to component material and coatings, like any change, often come with "*undesirable* brake system characteristics . . . ."  Walker Report at 62; *see also* 2019 Lynch Depo. at 57:25-58:5 ("What works in one design may not be acceptable in another.").  Even Mr. McLellan recognized this when he explained that, while enclosing the brake system could have a positive effect on corrosion, it likely would increase

---

[36] Contrary to plaintiffs' suggestion, Memo. at 3, the most natural reading of Exhibit 5 is that driving habit and road and weather conditions were inapplicable only with respect to the single, "incident vehicle" that was inspected as part of that document.  Ex. 5 at HMAM_002591.

brake fade.  2019 McLellan Depo. at 88:18-89:9.  Second, the only expert analysis of materials

and coatings in this case revealed that the components involved in alleged spring/bracket issue

use the same state of the art materials and coatings that their peers did.  Walker Report at 30-42;

Guyer Report at 16.  At bottom, plaintiffs have not supplied reliable evidence of a common,

class-wide defect.  For this additional reason, certification should be denied.

> 5.      No Warranty Claim Should be Certified Because There is No Common
>         Proof of Presentation and Opportunity to Repair.

Individualized issues predominate for the express warranty claim.  The Limited Warranty

makes coverage available only to owners who, within the warranty period, delivered their

vehicles to an authorized dealer.  HMAM_002315-16.  New York and Pennsylvania law endorse

similar prerequisites.  *See Broe v. Oneonta Sales Co.*, 420 N.Y.S.2d 436, 437 (Sup. Ct. 1978)

("the purchaser" must "present the automobile for examination"); *Schmidt v. Ford Motor Co.*,

972 F. Supp. 2d 712, 718-19 (E.D. Pa. 2013) ("constructive notice" by other class members

insufficient where multiple defects alleged); *Sinnerard v. Ford Motor Co.*, No. 95-cv-02708,

1996 WL 363932, at *4 (E.D. Pa. June 20, 1996) (dismissing where the defendant had no

"opportunity to repair"), *aff'd*, 116 F.3d 469 (3d Cir. 1997).  Here, there is no common evidence

establishing whether each putative class member complied with this condition.[37]

> 6.      Most Putative Class Members Have Time Barred Section 349 Claims.

Common questions also do not predominate because "a substantial number of [the

putative] class members" have Section 349 claims that are barred by the applicable statutes of

limitations.  *McLaughlin*, 522 F.3d at 233.  These claims are subject to a three-year statute of

limitations.  N.Y. C.P.L.R. 214.2.  Accrual "first occurs when plaintiff has been injured[,]"

*Gaidon v. Guardian Life Ins. Co. of Am.*, 96 N.Y.2d 201, 210 (2001), and "is not dependent upon

---

[37] Because ▮▮▮▮ pertinent warranty claims were covered and paid, putative class members
cannot argue that compliance with this condition would have been futile.  Walker Report at 46.

. . . discovery of the alleged deceptive practice[,]" *Statler v. Dell, Inc.*, 841 F. Supp. 2d 642, 648 (E.D.N.Y. 2012) (citation omitted).  As discussed *supra* at Section II(A)(1), plaintiffs assert injuries based on allegedly inflated purchase price and on repair costs that were not covered by warranty.  As to the former, HMA estimates that the statute of limitations would bar about 77% of the pre-purchase claims; 31,226 of the 40,388 members of the putative class who purchased their vehicles in New York did so more than three years prior to the March 5, 2012 filing of the original *Marshall* complaint.  *See* HMAML_000825; *see also Daniels*, 1983 WL 1794, at \*5 (denying certification where "an estimated 128 of the 153" class members had time-barred claims).  And this analysis even assumes that the putative class members are entitled to class action tolling.  *See American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974).  In addition, many putative class members, if they paid anything out of pocket for brake repairs during the warranty period, likely did so more than three years before the filing of this action.

If plaintiffs invoke the equitable doctrines of tolling and estoppel in an effort to salvage some of the putative class members' Section 349 claims, they only render this case more unsuitable for class treatment.  "Under either doctrine, the plaintiff must show that his failure to [file a timely claim] was not due to lack of diligence . . . ."  *Stuart v. Stuart*, No. 12-cv-05588, 2013 WL 6477492, at \*4 (S.D.N.Y. Dec. 10, 2013) (citation omitted).  The level of diligence required depends upon each putative class member's knowledge at any given point in time.  *Rite Aid Corp. v. Grass*, 854 N.Y.S.2d 1, 2 (1st Dep't 2008) (estoppel "will not toll a limitations statute where plaintiffs possessed timely knowledge sufficient to have placed them under a duty to make inquiry") (citation omitted); *Jang Ho Choi v. Beautri Realty Corp.*, 22 N.Y.S.3d 431, 432 (1st Dep't 2016) (same for equitable tolling).  And knowledge is an inquiry involving "a plaintiff-by-plaintiff determination of not only what each plaintiff actually knew and when they

45

knew it, but also the sources of information available . . . ."  1 McLaughlin on Class Actions §

5:43 (15th ed.).[38]  For this additional reason, common questions do not predominate.  *See*

*McLaughlin*, 522 F.3d at 233-34 (reversing certification where statute of limitations analysis

depended on individual awareness of the alleged misrepresentation).

*       *       *

The failure of plaintiffs to present reliable common evidence relating to the critical issues

described in Section II(A) also means that plaintiffs cannot satisfy Rule 23(a)(2)'s commonality

requirement because they have not demonstrated "the capacity of a classwide proceeding to

generate common *answers* apt to drive the resolution of the litigation."  *Dukes*, 564 U.S. at 350

(internal quotations and citations omitted).

### B.      A Rule 23(b)(3) Class Action is Not Superior to Individual Litigation.

In addition to predominance, plaintiffs must show that a class action is "superior to other

available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.

23(b)(3).  Manageability is "the most critical concern" of superiority.  *Sykes*, 780 F.3d at 82

(internal quotations and citations omitted).  For this requirement, plaintiffs must articulate "at the

time of certification a reasonable and workable plan" for affording HMA an opportunity to

challenge at trial the non-common elements of their claims without allowing those "individual

inquiries to overwhelm common issues."  *In re Asacol*, 907 F.3d at 58.  Yet, plaintiffs offer no

plan, workable or otherwise, for handling individualized inquiries at trial.  Memo. at 40.

---

[38] While this Court certified a class despite the presence of time-barred claims, *see Jermyn*, 256
F.R.D. at 430-31, HMA respectfully submits that denial of certification is more appropriate for
this case given the individualized issues implicated by plaintiffs' tolling and estoppel theories.

46

### III.     A Putative Subclass Cannot be Certified.

Plaintiffs mention a "subclass" only once (in a heading), Memo. at 31, but never define it or request that this Court certify it.  By omitting any analysis, plaintiffs have "waived" their right to certify any subclass.  *Patton*, 2010 WL 9432381, at *5 n.7 (citations omitted).

### IV.     Certification of the Putative Rule 23(b)(2) Class is Not Appropriate.

Certification of a Rule 23(b)(2) putative class is not warranted here for three reasons.

First, HMA has not acted or refused to act on grounds that apply generally to the putative class.  Plaintiffs seek an injunction requiring HMA to cover the alleged defects under warranty. Memo. at 41.  Yet, HMA has paid warranty claims ███ times.  *See supra* at Section II(A)(1). Thus, as this Court put it, there is no "group-wide injury" that "is necessary to redress with an injunction."  *Jermyn,* 256 F.R.D. at 433 (internal quotations and citation omitted).

Second, although plaintiffs seek a separate injunction under Section 349, they do not define the nature of that injunction.  Nor is one necessary.  In *Jermyn*, this Court considered enjoining the defendant from promoting its price-match guarantee.  *See id.*  But, here, plaintiffs have not identified any deceptive advertisement.  The "Best Warranty in America" slogan, for example, constitutes mere puffery that putative class members may or may not have seen.  *See Grassi v. Int'l Comfort Prod., LLC*, No. 15-cv-00253, 2015 WL 4879410, at *6 (E.D. Cal. Aug. 14, 2015) ("best warranties in the industry" is non-actionable puffery).

In *Jermyn*, this Court also discussed enjoining the defendant from enforcing an undisclosed policy of denying customers the benefit of a price-match guarantee.  256 F.R.D. at 433.  Plaintiffs in this case, however, have identified no uniform, yet undisclosed, policy.  As discussed, HMA, through its network of authorized dealers, paid the vast majority of brake repairs under warranty.  And to the extent that plaintiffs are asserting that additional information

about the potential effects of corrosion should have been disclosed in the Owner's Manual, they "never clearly define[] *what* information" that is. *Butler*, 2017 WL 1398316, at *10.

Third, "Rule 23(b)(2) applies only when a single injunction . . . would provide relief to each member of the class." *Dukes*, 564 U.S. at 360. Here, an injunction requiring HMA to pay for brake repairs necessitated by the alleged defects would not entitle putative class members to relief. It would simply beg the question of what caused each repair. *See supra* at Section II(A)(2). And third-party dealerships would need to answer that question on an individual basis, after considering the vehicles' age, use, and maintenance history. *See* Melino Decl. ¶ 11.

Moreover, this case is unlike *Jermyn* where the defendant allegedly continued to enforce its undisclosed policy to the detriment of new customers. 256 F.R.D. at 434. Here, by contrast, most members of the putative class would not benefit from the proposed injunctive relief. *See Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534, 558-59 (C.D. Cal. 2012) (denying Rule 23(b)(2) certification because "the declaratory relief claims will result in no tangible benefit to former owners"). No customer owns or leases a 2006-2010 model year Sonata vehicle that is still within the five-year warranty period. Indeed, the oldest have been on the road for more than a dozen years. And other customers have by now sold their vehicles or ended their leases. Furthermore, the available evidence suggests that most of the 66,989 putative class vehicles never required a brake repair due to the alleged defects. *See supra* at Section II(A)(1, 2).

Finally, other putative class members may already have received whatever information plaintiffs seek to have disclosed. For example, Miller and White received brake-related information after purchase. *See supra* at Section I(A). And no plaintiff has standing to seek a Section 349 injunction requiring the disclosure of additional information *before* purchase. *See id.* For these reasons, certification of a putative Rule 23(b)(2) class is not appropriate.

48

**V.      Rule 23(c)(4) Does Not Apply to this Case.**

For two reasons, a putative issue class should be not be certified.  First, Rule 23(c)(4) is intended for cases where "Rules 23(a) and (b) are satisfied as to common issues . . . ."  *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578 593–94 (S.D.N.Y. 2013).  But, here, plaintiffs have failed to satisfy Rule 23(a)'s commonality and typicality requirements.  *See supra* at Section I.

Second, resolution of the issues that are supposedly common would not "materially advance[] the disposition of the litigation as a whole."  Manual for Complex Litigation (Fourth), § 21.24 (2004).  For example, answering whether, in the abstract, HMA's practices were capable of deceiving a reasonable consumer is largely unhelpful since issues of liability would remain for individual adjudication, including whether those alleged practices *caused* each putative class member *actual injury*.  *See supra* at Section II(A)(1, 2); Memo. at 42; *Newman*, 238 F.R.D. at 74 ("causation" for a Section 349 claim "often dissolves into a myriad of individualized" inquiries) (internal quotations and citation omitted); 1 McLaughlin on Class Actions § 4:43 (15th ed.) (no issue certification "where the determination of liability itself requires an individualized inquiry").

Even assuming plaintiffs could somehow establish HMA's liability (which they cannot), Rule 23(c)(4) certification still would be inappropriate as damages do not "track liability in the manner contemplated by *Comcast* . . . ."  *Jacob*, 293 F.R.D. at 589.  Plaintiffs have not offered a model for class-wide injury or damages.  Thus, each putative class member would need to come forward with proof of relevant, unreimbursed repair costs, the amount of those costs, and payment.  "[G]iven the number" and the complexity "of questions that would remain for individual adjudication, issue certification would not . . . promote judicial economy."  *McLaughlin*, 522 F.3d at 234 (internal quotations and citations omitted).

**CONCLUSION**

For all these reasons, HMA respectfully requests that this Court deny plaintiffs' Motion.

49

Dated:  February 14, 2019                 Respectfully submitted,

                                             By: /s/Michael L. Kidney
                                             Michael L. Kidney, Esq.*
                                             E-mail: michael.kidney@hoganlovells.com
                                             James W. Clayton, Esq.*
                                             E-mail: james.clayton@hoganlovells.com
                                             HOGAN LOVELLS US LLP
                                             555 Thirteenth Street, N.W.
                                             Washington, DC 20004
                                             Telephone: (202) 637-5600
                                             Facsimile: (202) 637-5910
                                             (* - admitted *pro hac vice*)

                                             John J. Sullivan (JS 1726)
                                             HOGAN LOVELLS US LLP
                                             875 Third Avenue
                                             New York, NY 10022
                                             Telephone: (212) 918-3000
                                             Facsimile: (212) 918-3100

                                             *Attorneys for Defendant Hyundai Motor America*

\\DC - 029016/000009 - 13424266 v14