**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

KAREN MARSHALL, PAUL FLANNERY, and   :
DARRELL R. WHITE, on behalf of themselves  :
and all others similarly situated,          :
                                   :

            Plaintiffs,           :
                                   :

        v.                      :
                                   :

HYUNDAI MOTOR AMERICA,            :
                                   :
                                   :

            Defendant.          :

---------------------------------------------------------------x
---------------------------------------------------------------x

STEVE MILLER, RICHARD KOTELLY,      :
KATHLEEN RIORDAN, CHARLENE LIDDLE,  :
KRISTA PIERSKALLA, and REBECCA      :
MCCORMICK, on behalf of themselves and all  :
others similarly situated             :
                                   :  Case Nos. 15-cv-04722 (CM),
                                   :  12-cv-03072 (CM)

            Plaintiffs,           :
                                   :

        v.                      :
                                   :

HYUNDAI MOTOR AMERICA,            :
                                   :

            Defendant.          :

---------------------------------------------------------------x

**EXHIBIT B TO DECLARATION OF MICHAEL L. KIDNEY IN SUPPORT OF**
**DEFENDANT HYUNDAI MOTOR AMERICA'S MOTION TO EXCLUDE**
**THE EXPERT TESTIMONY OF DR. RICHARD LYNCH**

[Docs. No. 185, 196]

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| **Nicholas Kuhar et al.,**<br><br>       **Plaintiff,**<br><br>   **v.**<br><br>**Petzl Co. et al.,**<br><br>       **Defendants.** | **Civil No. 16-0395 (JBS/JS)** |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter is before the Court on the "Motion[s] to Preclude Plaintiffs' Liability Expert's Report and Testimony" filed by defendants Uintah Fastener & Supply, LLC ("Uintah") [Doc. No. 185] and Bailey's Corporation ("Bailey's") [Doc. No. 196] (collectively, "Defs.' Mots."). The Court received the opposition of plaintiffs [Doc. No. 214, 215] and Uintah's reply [Doc. No. 222]. The Court recently held oral argument. For the reasons to be set forth in this Order, defendants' motions are GRANTED and the entirety of the liability expert report of Dr. Lynch is STRICKEN.[1]

Background

Plaintiffs Nicholas Kuhar and Julie Kuhar (collectively, "plaintiffs") commenced this action on December 23, 2015 in the

_____

[1] All parties declined the opportunity to present live testimony in connection with these motions and asked the Court to decide the motion on the papers.

1

Superior Court of New Jersey, asserting various claims against defendants Petzl America, Inc. and Petzl Company (collectively, "Petzl") and Bailey's, including allegations of product defects pursuant to the New Jersey Products Liability Act ("PLA"). See Compl. ¶¶ 25-27. [Doc. No. 1-1]. On January 22, 2016, defendants removed the case to federal court. See Doc. No. 1. The product underlying plaintiffs' complaint is a "wire core flip-line safety harness" (hereinafter "safety harness" or "harness") that was designed, manufactured, or otherwise packaged and/or distributed in some respect by defendants. Id. ¶ 2.

Generally speaking, plaintiff's harness consists of three component parts: a "micrograb," a bolt, and a rope. Petzl sold the micrograb to Bailey's, who then combined it with a wire-core rope and sold it "as a package at retail to plaintiff in January 2006." Petzl Mot. Summ. J., Br. at 1 [Doc. No. 193-2]; see Uintah Br. [Doc. No. 185-2]. Following initial discovery, plaintiffs learned Thompson Manufacturing, Inc. ("TMI") designed and manufactured the micrograb, and that it also included a bolt purchased from Uintah. See Uintah Br. at 2. Plaintiffs proceeded to amend their complaint to add TMI and Uintah as parties. See Am. Compl. [Doc. No. 45].

Subsequently, plaintiffs learned that Uintah "likely did not manufacture the bolt in question, but that it was instead manufactured by one of two companies: Porteous or Brighton-Best." Second Mot. to Am. [Doc. No. 96]. Further, the bolt may have been

"sent away to be plated by a company named Quality Plating." Id. In light of these new revelations, plaintiffs were granted another opportunity to amend their complaint to add defendants Porteous, Brighton-Best, and Quality Plating. See Second Am. Compl. [Doc No. 102].

Plaintiffs' claim arises out of an incident which allegedly took place on or about December 24, 2013 in Bridgeton, New Jersey, while plaintiff Nicholas Kuhar was working on the roof of a barn.[2] Uintah Br. at 1. Plaintiff contends he was "utilizing [defendants'] safety harness to clean gutters" when the "bolt attached to the carabiner of the safety harness snapped," causing plaintiff to fall thirty-seven (37) feet off the roof and "strike crushed concrete." Second Am. Compl. ¶ 4. Plaintiff sustained serious injuries from the fall,[3] which is now alleged to have been caused by design and manufacturing defects associated with the safety harness and its component parts. Id. ¶¶ 1-11; see Lynch Report at 6-7 [Doc. No. 185-5]. The shoulder bolt that fractured in two

---

[2] Any reference by the Court to the singular "plaintiff" shall refer only to Nicholas Kuhar.

[3] Plaintiff alleges he "suffered severe personal injury, including, but not limited to, a crushed sternum, complete tearing of the muscles located in his right shoulder, a broken right thumb, three (3) fractured vertebrae, a fractured pelvis, a fractured hip, damage to his left and right knees, and [a] burst fracture on his spinal cord." Id.

pieces is the focus of plaintiffs' case. Plaintiffs allege the bolt broke while being used by plaintiff and caused his fall.[4]

On or about February 7, 2018, plaintiffs' liability expert, Dr. Richard F. Lynch, issued an eight-page report in which he opined on the bolt's cause of failure. See Lynch Report. Dr. Lynch, who has a Ph.D. in metallurgy and materials science and forty years of experience, opined "to a reasonable degree of metallurgical and engineering certainty" that the bolt would not have failed if not for the presence of two design defects and one manufacturing defect. Id.; Pls.' Opp. [Docs. No. 214]. Dr. Lynch also opined that Bailey's chose an "improper rope" to include with plaintiff's micrograb kit. See Bailey's Br. Specifically, Dr. Lynch expressed the following ten opinions at the close of his report:

1. The bolt failed by high cycle low stress fatigue failure, followed by final overload failure.
2. The failure location was at a notch in the bolt shank profile created by a sharp reduction in the bolt diameter.
3. The sharp profile change at the failure initiation site was a design defect.
4. Sharp threads on the bolt at the crack initiation site were a design defect.
5. Machining grooves on the bolt further concentrating the stress at the failure initiation site.
6. Machining grooves were a manufacturing defect.
7. The bolt would not have failed on December 24, 2013 if the design and/or manufacturing defects were not present.
8. Bailey's choose [sic] an improper rope to include in the micrograb kit.
9. I hold the above opinions to a reasonable degree of metallurgical and engineering certainty.

---

[4] Plaintiffs do not critique the nut accompanying the bolt.

10. I reserve the right to modify, change or supplement my opinions if additional information becomes available to me.

Lynch Report at 7.

Defendants now move to strike Dr. Lynch's report contending it fails to satisfy the requirements of Federal Rule of Evidence 702 and <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993).[5] For the most part, defendants do not challenge Dr. Lynch's qualifications, but rather allege his report and the opinions contained therein are based upon "incorrect" facts, and that his findings as to the "defects [are] both factually incorrect and unsupported by scientific/engineering principles." Uintah Br. at 10. Defendants contend Dr. Lynch fails to mention any standards or specifications in his report, notably "ANSI B18.3 – 1976[,] the specification for the bolt." <u>Id.</u> at 19. Defendants also contend Dr. Lynch fails to identify any quantifiable data he relied upon to reach his conclusions, and that he omits critical information, such as proposals for an alternative design or a risk-utility analysis to justify the finding of a design defect. <u>See</u> Uintah Br. at 18-21; Bailey's Br. at 7-9. In sum, Uintah contends Dr. Lynch merely provides an inadmissible "net opinion" because he does not "give the why and wherefore" of his opinions. Uintah Br. at 7-8.

---

[5] Uintah seeks to strike Dr. Lynch's report in full. <u>See</u> Oral Arg. Tr. 75:18-19, Sept. 21, 2018. Bailey's motion only seeks to exclude the opinions expressed in conclusions seven (7) and eight (8) of the report. <u>See</u> Bailey's Mot.

In opposition, plaintiffs argue Dr. Lynch is "more than qualified to testify regarding the metallurgical analysis of the bolt and what caused it to fail," despite defendants not calling it into question. See Pls.' Opp. at 2. Plaintiffs also contend that defendants' attacks on the "correctness" of Dr. Lynch's report are misguided, because "this is the province of the jury." Id. at 3.

Discussion

Federal Rule of Evidence 702 governs the admissibility of expert testimony, permitting a witness "qualified as an expert by knowledge, skill, experience, training, or education" to testify in the form of an opinion, provided that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; see generally Daubert, supra. Because Rule 702 "clearly contemplates some degree of regulation of the subjects and theories" to which an expert may testify, the Supreme Court has stated:

> [I]n order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation – i.e., "good grounds" based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

_Id._ at 590; _see also_ _Oddi v. Ford Motor Co._, 234 F.3d 136, 144-45 (3d Cir. 2000). In practice, this requires the court to act as a "gatekeeper" to prevent expert testimony running afoul of Rule 702 from ever reaching the jury. _See_ _Daubert_, 509 U.S. at 596-97. Thus, the court "must determine . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." _Id._ at 592. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." _Id._ at 592-93.

The Third Circuit has described Rule 702 as embodying a "trilogy of restrictions on expert testimony: [1] qualification, [2] reliability, and [3] fit." _Calhoun v. Yamaha Motor Corp., U.S.A._, 350 F.3d 316, 321 (3d Cir. 2003) (quoting _Schneider v. Fried_, 320 F.3d 396, 405 (3d Cir. 2003)). First, the witness must be qualified to testify as an expert, which requires "that the witness possess specialized expertise." _Id._ This requirement, however, has been interpreted liberally to encompass "a broad range of knowledge, skills, and training." _In re Paoli T.T. Yard PCB Litig._, 35 F.3d 717, 741 (3d Cir. 1994). Second, the testimony must be reliable, which demands that "the expert's opinion must be based upon the 'methods and procedures of science,' rather than on 'subjective belief or unsupported speculation.'" _Daubert_, 509 U.S.

at 590; see Calhoun, 350 F.3d at 321. Thus, the court must assess the "reliability of scientific evidence under Rule 702" in order to determine "its scientific validity." Daubert, 509 U.S. at 590. Third, the expert's testimony must "fit" the case. Id. at 592. Otherwise known as the "helpfulness" standard, this requires there be "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Id. at 591-92. The fit requirement "goes primarily to relevance." Id. "[T]he expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." Schneider, 320 F.3d at 404 (3d Cir. 2003) (citations omitted). The party that proffers the expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. Daubert at 592 n.10 (citing Bourjaily v. United States, 483 U.S. 171, 175-76 (1987)).

Here, defendants primarily contest the opinions expressed by Dr. Lynch in his report by alleging they fail to satisfy the reliability and fit requirements of Daubert. Defendants do not challenge Dr. Lynch's qualification to testify as to metallurgical or engineering principles. Instead, they argue his opinions lack the proper foundation and amount to net opinions, and as such, are inadmissible. In determining the reliability of expert testimony, the Court is guided by the following principles:

(1) whether a method consists of a testable hypothesis;
(2) whether the method has been subject to peer review;
(3) the known or potential rate of error; (4) the

8

> existence and maintenance of standards controlling the
> technique's operation; (5) whether the method is
> generally accepted; (6) the relationship of the
> technique to methods which have been established to be
> reliable; (7) the qualifications of the expert witness
> testifying based on the methodology; and (8) the non-
> judicial uses to which the method has been put.

Calhoun, 350 F.3d at 321 (quoting In re Paoli, 35 F.3d at 742 n.8).

However, the court is not restricted to any "definitive checklist

or test." Daubert, 509 U.S. at 593. This inquiry is "a flexible

one" focusing "solely on the principles and methodology, not on

the conclusions that they generate." Id. at 595.

While reliability does not require "correctness," it does

prohibit "too great a gap between the data and the [expert's]

opinion proffered." Oddi, 234 F.3d at 146 (quoting Gen. Elec. Co.

v. Joiner, 522 U.S. 136, 146 (1997)). Thus, the court "must examine

the expert's conclusions in order to determine whether they could

reliably flow from the facts known to the expert and the

methodology used." Id. (quoting Heller v. Shaw Indus., Inc., 167

F.3d 146, 153 (3d Cir. 1999)). In contrast to the reliability prong

of Daubert, the fit restriction "goes primarily to relevance,"

which requires the testimony "fit" the issues in dispute and assist

the trier of fact in understanding them. Krys v. Aaron, 112 F.

Supp. 3d 181, 190 (D.N.J. 2015) (quoting Daubert, 509 U.S. at 591).

Put simply, the expert's testimony must be relevant to the case

and helpful to the jury in deciding the issues therein. This

"'helpfulness' standard requires a valid scientific connection to

the pertinent inquiry as a precondition to admissibility." Schneider, 320 F.3d at 404 (quoting Daubert, 509 U.S. at 591-92).

The Court finds that Dr. Lynch's report and the opinions contained therein leave too large a gap between the data presented and the conclusions rendered, and consequently, it fails to satisfy Daubert's reliability and fit requirements. The Court will address each of Dr. Lynch's opinions in sequence.

1.   Opinion No. 1

Dr. Lynch's first opinion states as follows:

> The bolt failed by cycle low stress fatigue failure, followed by final overload failure.

Lynch Report at 7.

The Court finds Dr. Lynch's first opinion is an insufficiently reliable net opinion. This is true because Dr. Lynch does not lay the proper foundation for his findings, and accordingly, it cannot be said the proposed testimony rests upon "good grounds." See Daubert, 509 U.S. at 589-90. The Court also finds that Dr. Lynch's report does not indicate his opinion is the product of reliable scientific methods and procedures. Rather, Dr. Lynch's opinion is merely his own "subjective belief or unsupported speculation." Id. at 590.

A net opinion is essentially "a longstanding rule that dictates exclusion of expert testimony that contains 'bare conclusions, unsupported by factual evidence.'" Worrell v. Elliot,

10

799 F. Supp. 2d 343, 349 (D.N.J. 2011) (quoting Holman Enter. V.
Fidelity & Guar. Ins. Co., 563 F. Supp. 2d 467, 472 n.12 (D.N.J.
2008)). Expert testimony "must be predicated upon evidence, [and]
not speculation." Id. (citing State v. Kelly, 97 N.J. 178 (1984));
see also Mays v. Gen. Binding Corp., No. 11-5836, 2013 WL 1986393
(D.N.J. May 10, 2013) (holding the expert's report had "significant
gaps" and was net opinion "insufficient to enable Plaintiffs to
establish a design defect"). Thus, "an expert opinion based upon
speculation, possibilities or contingencies is inadmissible."
Worrell, 799 F. Supp. 2d at 349 (citation omitted).

Throughout Dr. Lynch's report, the terms "low stress fatigue
failure," "final overload fracture," or some combination thereof,
appear often, but only as bald assertions without any meaningful
support or explanation of what the terms actually mean.
Specifically, Dr. Lynch states in his report:

> The bolt failed by high cycle, low stress fatigue
> followed by final overload failure. The fracture
> surfaces show classic fatigue features, with an initial
> flat section resulting from fatigue crack propagation
> and growth until the remaining cross-section would not
> support the load applied, resulting in final overload
> failure by ductile shear.

Lynch Report at 6. Dr. Lynch attempts then to support these
findings by referencing general terms without any supporting data.
For example, Dr. Lynch explains:

> Fatigue failure occurs at a much lower stress than the
> ultimate tensile stress or breaking stress and also
> below the yield point or deformation stress level.

11

Id. Despite attempting to define one term of art with four more, what is particularly significant is that Dr. Lynch omits any reference to quantitative data. Dr. Lynch makes no reference to the stress level placed on the bolt. Nor does he state that the bolt was not able to withstand anticipated or appropriate stresses. At bottom, Dr. Lynch took no quantifiable stress measurements, nor does he refer to such measurements in his report. Without this data, such as the bolt's actual "breaking stress," the Court is unable to conclude that Dr. Lynch's opinions "reliably flow from the facts known" to him. Oddi, 234 F.3d at 146 (citation omitted). Thus, in light of these critical failures, the first opinion is stricken.

   2. Opinion No. 2

Dr. Lynch's second opinion states as follows:

>   The failure location was at a notch in the bolt shank
>   created by a sharp reduction in the bolt diameter.

Lynch Report at 7.

   The Court finds Dr. Lynch's second opinion is not reliable because it is premised upon his subjective belief or speculation and not scientific principles or methodologies. See Oddi, 234 F.3d at 145 (emphasizing that the focus of admissibility "must be solely on principles and methodology, not on the conclusions they generate").

Dr. Lynch neither defines the terms "notch" or "shank," nor does he explain what constitutes a "sharp reduction." When comparing the subject bolt with an exemplar bolt, Dr. Lynch stated "[t]he diameter of the reduced cross-section adjacent to the threaded portion of the exemplar bolt is 0.241 inch which is only ~65% of the diameter of the bolt shank." Id. at 4. However, he also indicated the diameter of the subject bolt "was not measured because of the location of fracture, [but that] the [subject] bolt appears to have a similar reduced cross section at this location." Id. In other words, Dr. Lynch's opinion is based upon his subjective belief that the subject bolt and exemplar bolt "appear" to share certain qualities. Thus, because it is a product of speculation and not the product of a reliable scientific method or principle, the Court strikes opinion two.

### 3. Opinion No. 3

Lynch's third opinion states as follows:

> The sharp profile change at the failure initiation site was a design defect.

Lynch Report at 7.

The Court finds opinion three to be insufficiently reliable because Dr. Lynch's conclusion does not reasonably flow from the examinations he performed. Further, the opinion also fails because it amounts to a net opinion which omits the "why and wherefore."

13

The New Jersey PLA requires plaintiffs alleging claims of design defects to demonstrate "the product was defective, that the defect existed when the product left the defendant's control, and that the defect caused injury to a reasonably foreseeable user." Milanowicz v. The Raymond Corp., 148 F. Supp. 2d 525, 528 (D.N.J. 2001) (citing Zaza v. Marquess & Nell, Inc., 144 N.J. 34, 49 (1996)). "The determination of whether a manufacturer/seller defectively designed a product involves a 'risk-utility analysis' that seeks to balance the magnitude of 'the danger posed by the product' against the social utility attained by putting the product on the market." Kemly v. Werner Co., 151 F. Supp. 3d 496, 505 (D.N.J. 2015). New Jersey courts use a seven-factor test to evaluate a product's risk-utility, but "the prevalent view is that, unless one or more of the factors might be relevant in a particular case, the issue upon which most claims turn is the proof by plaintiff of a 'reasonable alternative design . . . the omission [of which] renders the product not reasonably safe.'" Appleby v. Glaxo Wellcome, Inc., No. 04-0062 (RBK), 2005 WL 3440440, at *6 (D.N.J. Dec. 13, 2005) (quoting Cavanaugh v. Skil Corp., 164 N.J. 1, 8 (2000)); see also Mays v. Gen. Building Corp., No. 11-5836 (JBS/JS), 2013 WL 1986393, at *6 (D.N.J. May 10, 2013) (quoting Lewis v. Am. Cyanamid, Co., 155 N.J. 544, 560 (1998)) ("In order to succeed on a design defect claim, a plaintiff is 'required to

prove that a practical and feasible alternative design existed that would have reduced or prevented [his or her] harm.'").

Although Dr. Lynch opined the bolt at issue is defectively designed, he does not offer a proposal for an alternative design. He also did not do a risk-utility analysis of the bolt's design. "Courts have . . . indicated that the only situation justifying a finding of design defect in the absence of an alternative design" is upon a showing of circumstantial evidence "that the product is 'so dangerous and of such little use that under the risk-utility analysis [the] manufacturer [should] bear the cost of liability to others.'" Toms v. J.C. Penney Co., Inc., No. 05-2582 (PCS), 2007 WL 2893052, at *3 (D.N.J. Sept. 28, 2007) (quoting Smith v. Keller Ladder Co., 275 N.J. Super. 280, 283-84 (App. Div. 1994)). To make such a showing, a plaintiff must "negat[e] other causes of the failure of the product for which the defendant would not be responsible, in order to make it reasonable to infer that a dangerous condition existed at the time the [manufacturer] had control of the product." Id. at *4 (quoting Scanlon v. Gen. Motors Corp., 65 N.J. 582, 593-94 (1974)). Dr. Lynch has not negated other potential causes such as the fact the bolt fractured because the nut was loose or the bolt fractured when it hit the ground.

As discussed, Dr. Lynch neither proposes an alternative design nor conducts a risk-utility analysis. He also fails to exhaust or negate other potential causes of the bolt's failure.

15

Standing alone this is enough to strike Dr. Lynch's design defect opinions. <u>Mendez v. Shah</u>, 28 F. Supp. 3d 282, 297 (D.N.J. 2014) ("For a design defect, plaintiff must assert that the product could have been designed more safely and present under a risk-utility analysis the existence of an alternative design that is both practical and feasible."). In addition, opinion three is stricken because there is an inherent conflict between Dr. Lynch's examination of the bolt and his ultimate conclusions relating to design defects. Dr. Lynch states in relevant part:

> The bolt shaft cross-section exhibited a sharp reduction in diameter at the fracture location. This design defect created a sharp profile change or notch with a relatively sharp transition which increased the effective stress at this location.

Lynch Report at 6. Here, the Court finds Dr. Lynch's logic wanting. When comparing the bolt with its exemplar and the ANSI B18.3 – 1976 diagram, Dr. Lynch states:

> Although the [subject] bolt diameter adjacent to the threaded section was not measured because of the location of the fracture, the [subject] bolt appears to have a similarly reduced cross section [as the exemplar] at this location. This reduced diameter before the threaded section of the bolt is on the bolt specification but the actual diameter is not specified, just the [diameter of the] threaded nut. . . . All these measurements are close to specification values but the specified tolerance [of the bolt] is unclear.

<u>Id.</u> at 4. Thus, Dr. Lynch concludes the "sharp profile change" at the bolt's "notch," which does not deviate from the ANSI specifications or the exemplar, is a design defect. <u>Id.</u> at 4, 7.

The problem here is Dr. Lynch does not allege that defendants' utilization of this type of bolt with the safety harness was a design defect, but instead, alleges the bolt itself is defective – without offering any alternative design or addressing potential alternative causes of the bolt's failure. Without any discussion of an alternative design or a risk-utility analysis of the bolt, Dr. Lynch's third opinion amounts to an impermissible expert opinion. See Mays, 2013 WL 1986393, at *6 (striking plaintiff's expert's report opining to design defects because the report contained a single reference to an alternative design, and did "not provide any diagrams, calculations or specifications"); Milanowicz, 148 F. Supp. 2d at 535 (noting that expert testimony has been stricken for simply excluding an adequate discussion of the alternative design's feasibility, let alone omitting this element altogether).

Despite Federal Rule of Evidence 704(a) "permit[ing] an expert to proffer testimony that 'embraces an ultimate issue to be decided,'" this "ultimate issue rule does not enable an expert to 'merely tell the jury what result to reach.'" Krys, 112 F. Supp. 3d at 192 (quoting Fed. R. Evid. 704(a), 704 advisory committee's notes (1972)). For instance, "an expert may not make a conclusory statement on a party's capacity, but may provide testimony that touches the underlying issues relevant to a determination of capacity." Id. at 193. Thus, "[t]he district court must limit

17

expert testimony so as to not allow experts to opine on 'what the law required.'" Holman Enter., 563 F. Supp. 2d at 472 (quoting United States v. Leo, 941 F.2d 181, 196-97 (3d Cir. 1991)). "This prohibition on experts testifying as to their own legal conclusions is 'so well established that it is often deemed a basic premise or assumption of evidence law – a kind of axiomatic principle.'" Id. (quoting Casper v. SMG, 389 F. Supp. 2d 618, 621 (D.N.J. 2005)).

In present case, without laying the proper foundation for what constitutes a design defect under the relevant law, Dr. Lynch does no more than "merely tell the jury what result to reach." Krys, 112 F. Supp. 3d at 192. For these reasons, the Court strikes opinion three.[6]

4. Opinion No. 4

Lynch's fourth opinion states as follows:

> Sharp threads on the bolt at the crack initiation site were a design defect.

Lynch Report at 7.

The Court finds that opinion four fails for the same reasons as opinion three and incorporates the discussion from above by

---

[6] The bolt at issue is a standard off-the-shelf item designed to meet ANSI B18.3 – 1976. Plaintiff has failed to dispute this fact and has failed to offer any evidence that the bolt does not meet the ANSI design standard. Nowhere does Dr. Lynch dispute Uintah's contention that plaintiff is attacking the standard physical characteristics of a generic bolt and the design set forth in ANSI B18.3 – 1976. See Uintah Reply Br. to Pls.' Opp. to Summ. J. Mot. at 2-3 [Doc. No. 221].

reference. While Dr. Lynch critiques the bolt's "sharp profile change," he admits the area was not measured. Id. at 4. He also does not explain why "sharp threads" are a design defect. In fact, Dr. Lynch ignores the fact that the so-called sharp threads are included as part of the bolt's specifications. Dr. Lynch simply jumps to his conclusion without providing the proper foundation, such as proposing an alternative design and/or performing a risk-utility analysis. Therefore, the Court strikes opinion four for its insufficient reliability.

    5. Opinion No. 5

Lynch's fifth opinion states as follows:

> Machining grooves on the bolt further concentrating the stress at the failure initiation site.

Lynch Report at 7.

The Court finds that Dr. Lynch's fifth opinion amounts to an inadmissible net opinion because he does not lay the proper foundation to reliably establish how he reached his conclusion. As stated infra, the net opinion rule bars testimony that contains "bare conclusions" that are provided without support. The Court reiterates that Dr. Lynch provides no quantitative data or quantifiable testing results to support the "concentration" of stress to which he refers. As such, the Court strikes opinion five.

    6. Opinion No. 6

Lynch's sixth opinion states as follows:

Machining grooves were a manufacturing defect.

Lynch Report at 7.

The Court finds opinion six should be stricken because it is unreliable. Incorporating the Court's discussion from above on net opinions, the Court finds that Dr. Lynch has failed to lay the proper foundation for his opinion. However, even if he did, which is not the case, the opinion would still fail to meet Daubert's reliability requirement because there exists an inherent conflict between Dr. Lynch's factual findings and his ultimate conclusion.

In order to assert a manufacturing defect under the New Jersey PLA, plaintiffs must show the bolt "deviated from the design specifications, formulae, or performance standards of the manufacturer or from other identical units manufactured to the same manufacturing specifications or formulae." N.J.S.A. 2A:58C-2; Worrell, 799 F. Supp. 2d at 350 (stating common examples include physical flaws, damage, or improper assembly). In other words, "[t]o establish the presence of a manufacturing defect," plaintiffs are required to demonstrate, "in a general sense and as understood by a layman, that something was wrong with the product." Id. (quoting Ebenhoech, 239 F. Supp. 2d at 473); Mendez, 28 F. Supp. 3d at 298 (citation and quotation omitted) ("To determine whether a product contains a manufacturing defect, the product may be measured against the same product as manufactured according to the manufacturer's standards.").

Dr. Lynch concludes the bolt suffered from a manufacturing defect exhibited by "machining grooves," but only after he already found it to be "quite similar" and "virtually identical" to the "exemplar bolt" that he examined. Lynch Report at 4, 7. Moreover, in essence he confirmed the bolt's conformity with the applicable ANSI specification. Id. Thus, on the one hand, Lynch alleges the bolt was defectively manufactured, but he never states the bolt did not meet its specification – ANSI B18.3 - 1976. In fact, Dr. Lynch never referenced the standard in his report. Because Dr. Lynch's opinion is inherently unreliable for its failure to logically flow from the data he examined and the analysis he performed, the Court strikes the sixth opinion.

### 7. Opinion No. 7

Lynch's seventh opinion states as follows:

> The bolt would not have failed on December 24, 2013 if the design and/or manufacturing defects were not present.

Lynch Report at 7.

The Court finds opinion seven must be stricken as a net opinion because it merely incorporates by reference the previously stricken opinions.

### 8. Opinion No. 8

Lynch's eighth opinion states as follows:

> Bailey's choose [sic] an improper rope to include in the micrograb kit.

Lynch Report at 7.

The Court finds Dr. Lynch's eighth opinion must be stricken because it is unreliable under the standards set forth in <u>Daubert</u>. Dr. Lynch provides the following explanation in support of his opinion:

> . . . The wire core rope supplied required that the micrograb be disassembled and re-assembled to insert the wire rope, as it had metal hooks on both ends. When this rope was inserted it virtually obscured the ability to see the bolt within the micrograb. Kurth testified that this wire core rope was not an acceptable rope to use with the micrograb.

Lynch Report at 7. The Court finds this terse account of the harness' assembly is insufficient to render the opinion reliable. Dr. Lynch neither indicates what constitutes an "improper rope," nor does he expound upon what constitutes an alternative rope.

The Court also finds Dr. Lynch is not qualified to render an opinion as to what rope Bailey's should have used. Dr. Lynch is a metallurgist. He has no experience or qualifications with regard to ropes or the harness at issue. Dr. Lynch does not explain how his analysis of the rope/micrograb combination relates to his expert qualifications. He also renders a bald opinion with no supporting facts or data. Thus, because Dr. Lynch's eighth opinion is not "ground[ed] in the methods and procedures of science," and Dr. Lynch is not qualified with regard to the rope Bailey's should have used, the Court finds that it must be stricken. <u>Id.</u>, 509 U.S. at 589-90.

22

9. <u>Summary of Court's Conclusions</u>

Uintah summarizes the main deficiencies in Dr. Lynch's report as follows:

- Lynch does not mention ANSI B18.3 - 1967 the specification for the bolt in his report;
- Lynch never compared the dimensions obtained at the joint inspection of the bolt with the manufacturing specifications;
- Lynch never compared the subject bolt with another bolt from the same manufacturer or an exemplar bolt when evaluating any manufacturing defect;
- Lynch failed to offer any quantification of the so called "sharp profile" change;
- Lynch failed to offer any quantification of the "sharp threads";
- Lynch failed to offer any quantification of any stress levels to which the bolt was subjected;
- Lynch failed to offer any quantification of the yield strength of the bolt;
- Lynch fails to provide any understandable photographic representation of the defects he finds;
- Lynch provides no alternative design to the bolt; and
- Lynch does not explain how the inclusion of standard features of all shoulder bolts was improper in the subject bolt.

Uintah Br. at 19.

The Court agrees this accumulation of deficiencies renders Dr. Lynch's opinions unreliable. Dr. Lynch's opinions "lack[] a basis in sound principles, evidence, and methodology." <u>Ruggiero v. Yamaha Motor Corp., U.S.A.</u>, No. 15-49 (JBS/KMW), 2017 WL 1197755, at *6 (D.N.J. Mar. 31, 2017). In the absence of any measurements, meaningful test results or reenactments, Dr. Lynch's opinions amount to speculation or an educated guess. <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 157 (1999) (citation omitted)

("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."). In addition to being unreliable, Dr. Lynch's opinions also do not "fit" the case. This is so because, inter alia, Dr. Lynch did not compare the bolt to its specifications, and he did not propose an alternative design or perform a risk-utility analysis on the bolt.[7] Plaintiffs' opposition to defendants' motions [Doc. Nos. 214, 215] is not persuasive. Plaintiffs do not address the crux of defendants' argument that Dr. Lynch's methodology is deficient. Plaintiffs also do not contest that Dr. Lynch did not compare the subject bolt to its design specifications and performance standards. Nor do plaintiffs contest that Dr. Lynch did not propose a reasonable alternative design or do a risk-utility analysis. Whether or not Dr. Lynch relied on the same materials or procedures as defendants' experts is irrelevant for present purposes. The present motion addresses whether Dr. Lynch's opinions meet the Daubert standard. The Court will deal separately with any challenges to defendants' expert reports.

To the extent plaintiffs insist that a hearing is necessary to decide defendants' motions, the request is denied. The Court already heard oral argument and plaintiffs specifically declined

---

[7] Dr. Lynch's opinions nine (9) and ten (10) are not relevant to the Court's Daubert analysis.

the opportunity to present Dr. Lynch's live testimony to rebut defendants' arguments.

<u>Conclusion</u>

For all the reasons discussed above, the Court finds that Dr. Lynch's report does not meet the <u>Daubert</u> admissibility standard and must be stricken.

<u>ORDER</u>

Accordingly, for the foregoing reasons,

IT IS HEREBY ORDERED this 27th day of November 2018, that defendants "Motion[s] to Preclude Plaintiffs' Liability Expert's Report and Testimony" [Docs. No. 185, 196] filed by Uintah and Bailey's are GRANTED. Dr. Lynch's February 7, 2018, liability expert report is hereby STRICKEN.


<u>/s/ Joel Schneider</u>
JOEL SCHNEIDER
United States Magistrate Judge


Date: November 27, 2018