**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6 14 2019

KAREN MARSHALL, PAUL FLANNERY, and
DARRELL R. WHITE, on behalf of themselves and
all others similarly situated,

                    Plaintiffs,

          v.

HYUNDAI MOTOR AMERICA,

                    Defendant.

No. 12 Civ. 3072 (CM)

STEVE MILLER, RICHARD KOTELLY,
KATHLEEN RIORDAN, CHARLENE LIDDLE,
KRISTA PIERSKALLA, and REBECCA
MCCORMICK, on behalf of themselves and all
others similarly situated,

                    Plaintiffs,

          v.

HYUNDAI MOTOR AMERICA,

                    Defendant.

No. 15 Civ. 4722 (CM)

## DECISION AND ORDER
## DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

McMahon, C.J.:

In these consolidated cases brought pursuant to the Class Action Fairness Act, 28 U.S.C.

§ 1332(d) ("CAFA")—as no federal claim is pleaded—purchasers of model year 2006 to 2010

Hyundai Sonatas allege that Defendant Hyundai Motor America ("HMA") (*i*) engaged in unfair

and deceptive business practices by misrepresenting the quality and warranty policies of these

vehicles, and (*ii*) breached its "bumper-to-bumper" limited warranty by denying coverage for

brake parts known to be faulty.

Five individuals who reside in New York and Pennsylvania seek to certify a class of approximately 67,000 individuals who purchased one of five model year Hyundai Sonatas over a period of seven years. All five plaintiffs had problems with their brakes, and all five claim to have lost money because they had to pay to fix their brakes. Whether there was a common, brake-related defect in these vehicles, and whether Hyundai took pains to conceal it both before and after these cars left the lot, are indeed common questions.

But plaintiffs' claims give rise to a number of "uncommon" questions. Class members purchased their vehicles from 89 different dealers, had different types of brake problems (some front brakes, some rear brakes), and saw those problems manifest differently (grinding, sticking, and burning smells) and at different times over the lifespan of their vehicles. Even the five supposedly representative plaintiffs had different types of repairs and/or replacements, and each was told something different by a different representative of Hyundai in connection with those repairs or replacements—sometimes by independent Hyundai dealers and sometimes by employees at Hyundai's call center. Some plaintiffs were reimbursed for all or part of the work that was done on their brakes; some were not. Some even worked on their brakes themselves or had non-authorized vendors (like Meineke) do so.

These "uncommon" questions—each of which will require individualized proof—will plainly predominate at trial. Accordingly, their motion for class certification is denied.

## BACKGROUND

### I.    Facts

Unless otherwise noted, the facts are taken from the most recent amended complaints in *Marshall, et al., v. Hyundai Motor America* (12-cv-3072, Dkt. No. 24) (the "*Marshall* Complaint") and *Miller, et al. v. Hyundai Motor America* (15-cv-4722, Dkt. No. 27) (the "*Miller* Complaint").

2

Class discovery was conducted in both cases, and, where necessary, supplemental facts are taken from these materials.

## A.    The Alleged Defect

Model year 2006 to 2010 Hyundai Sonatas (the "Class Vehicles") are sedan vehicles with disc braking systems.  In brief, disc braking systems employ hydraulic pressure and friction to slow the rate of rotation of the vehicle wheels.  (*See* Expert Report of Dave McLellan, Ex. 24(b) to Graifman Decl., 12-cv-3072, Dkt. No. 85 at 3.)[1]

Plaintiffs allege that HMA "sold the Class Vehicles with a defective rotor/caliper brake assembly." (Pls.' Mem. of Law in Supp. of Class Certification ("Br."), 12-cv-3072, Dkt. No. 84 at 3.)  According to Plaintiffs, "The defect is caused by Hyundai's manufacture or installing of the rotor/caliper brake assembly from materials that corrode when they come into contact with the road salts, ice, and snow that accumulate during the winter in states in the northern part of the United States[.]"  (*Id.* at 3–4.)  "Due to this defect in materials installed, Sonatas manifest premature deterioration of the rotors, calipers, slider clips[,] and carriers[.]"  (*Id.* at 4.)  Allegedly, "The corrosion causes brakes of the Class Vehicles, primarily the rear brakes, to seize and become inoperative, leading to failure of the rear braking system, antilock braking system, and electronic stability control system." (*Id.* at 4.)

Approximately 66,989 of these vehicles were purchased in New York and Pennsylvania (the "Class Vehicles").  (*See* Ex. 27 to Graifman Decl.)  Plaintiffs allege that HMA received hundreds of consumer complaints related to this defect, and was in possession of internal testing

---

[1]        For purposes of this motion, the Court has accepted and considered the expert testimony submitted in support of Plaintiffs' argument that they allege a class-wide defect in the Class Vehicles.  Since certification is being denied despite the consideration of this testimony, I have not bothered to grapple with Defendant's *Daubert* motions addressed to this testimony, which were made applicable to the already fully briefed class certification motion by letter dated May 8, 2019 (Dkt. No. 128).  The *Daubert* motions are being denied without prejudice to renewal when summary judgment motions are due—see the schedule at the conclusion of this opinion.

done by its affiliate Hyundai-Kia America Testing Center and by its parts supplier Mando, which testing showed that the parts corroded prematurely when exposed to winter conditions in the so-called "Salt States."   (Br. at 13–14 (citing Exs. 15–16 to Graifman Decl.); *see also* Ex. 19 to Graifman Decl.)

Plaintiffs allege that the corrosion contributed to brake problems, which manifested as "sticking," "freezing," "shuddering," or brake noise, in the following ways:

1. Rusting and extensive iron oxide corrosion product buildup "binds" the brake pad slider clips and carriers together, preventing movement;

2. Iron oxide corrosion product buildup on the disc surfaces causes shuddering during braking; and

3. Corrosion product buildup "binds" or "freezes" the caliper piston inside its bore, preventing depression of the brake pedal.

(Expert Report of Dr. Richard Lynch, Ex. 6 to Graifman Decl. at 4.)

Plaintiffs seek to recover monies they paid out of pocket for brake repair and replacement that, they allege, should have been covered free of charge under HMA's New Vehicle Limited Warranty.   Alternatively, they allege that HMA should have recalled their cars for brake replacement.   One Plaintiff alleges that Hyundai should have disclosed the defect at the time of sale.

## B.    The Vehicle Warranty

HMA guaranteed that its vehicles would be protected by its "bumper-to-bumper" express, limited warranty (the "New Vehicle Limited Warranty" or "Warranty"), which provided that HMA was responsible for repair and labor for defective, covered car parts during the first 60,000 miles

driven or the first 60 months (five years) of ownership, whichever came first. (Ex. D to Kidney Decl. ("Warranty"), 12-cv-3072, Dkt. No. 95, at HMAM_002315.)[2]

To obtain warranty service, an owner must present his or her vehicle to an authorized Hyundai dealership within the Warranty period.[3] (*Id.*) HMA has 89 authorized, third-party dealers in New York and Pennsylvania. (Ex. X to Kidney Decl., at HMAML_000854 (data as of April 5, 2016).) Each is a distinct corporation, which is neither owned nor controlled by HMA. (Decl. of Greg Webster, Ex. Y to Kidney Decl., ¶ 5.) HMA does not make the initial decision regarding whether a brake repair is covered under its Limited Warranty. Instead, it is these third-party dealerships that "follow through on all warranty obligations to the Dealer's customer." (Hyundai Warranty Policy & Procedures, dated May 2015 ("P&P"), Ex. Z to Kidney Decl., at HMAM_006108.) As one independent authorized dealer has testified, coverage decisions depend on many factors, including "the specific component that needs repair or replacement, the reason the component needs repair or replacement, . . . the vehicle's maintenance history, and the individual use of the vehicle." (Decl. of Greg Melino, Ex. AA to Kidney Decl., ¶ 11.)

Generally, the New Vehicle Limited Warranty provides for the repair or replacement of original parts that do not wear out under everyday use conditions. Under the heading "WHAT IS COVERED," the Warranty specifies:

> Repair or replacement of any component originally manufactured or installed by Hyundai Motor Company, Hyundai Motor Manufacturing Alabama (HMMA) or Hyundai Motor America

---

[2]     Because two plaintiffs owned 2006 vehicles, HMA focuses on the 2006 versions of the warranty and glovebox documents. However, HMA states that the 2007–10 iterations are substantially similar (Def. HMA's Mem. of Law in Opp. to Pls.' Mot. for Class Certification ("Opp."), 12-cv-3072, Dkt. No. 94 at 4 n.2) and Plaintiffs do not contest that statement. A compendium of warranty excerpts may be found at Exhibit 10 to the Graifman Declaration.

[3]     No party has briefed the issue of whether (*i*) using a non-authorized repair shop or (*ii*) installing non-Hyundai parts voids the warranty. Moreover, neither Judge Karas nor Judge Griesa addressed this potential argument at the motion to dismiss stage.

(HMA) that is found to be *defective in material or workmanship under normal use and maintenance,* except any item specifically referred to in the section "What is Not Covered."

(Warranty at HMAM_002315 (emphasis added).)

Under the heading, "WHAT IS NOT COVERED," the Warranty reads, in relevant parts:

* Normal maintenance services such as: cleaning & polishing, minor adjustments, lubrication, oil/fluid changes, filters, anti-freeze coolant replenishment, wheel alignment and tire rotation unless such services are performed as part of a warrantable repair.

* Normal maintenance items (#) are warranted in normal service, only when the replacement is the result of a defect in material or factory workmanship, for 12 months from the date of original retail delivery or date of first use, or 12,000 miles, whichever occurs first, or up to the first scheduled maintenance replacement interval. (# - such as belts, brake pads and linings, clutch linings, filters, wiper blades and bulbs)

* Slight irregularities not recognized as affecting quality or function of the vehicle or parts, such as slight noise or vibration, or items considered characteristic of the vehicle.

[ . . . ]

* Normal deterioration or wear of any part.

[ . . . ]

Worn brake pads/linings

[ . . . ]

* Damage or failure resulting from:

Negligence of proper maintenance as required in the Owner's Manual.

[ . . . ]

Use of parts other than Hyundai Genuine Parts, or parts of non-equivalent quality and design.

(*Id.* at HMAM_002316–17 (emphasis added).) The parties generally agree that brake pads are not covered by the Warranty, but any defectively manufactured rotors, clips, sliders, caliper

brackets/carriers, and caliper assemblies would be considered covered parts. Defective brake pads are not at issue in these actions.

The Warranty also requires owners to maintain their vehicles, and lists "Proper use, maintenance and care of your vehicle in accordance with the instructions contained in this handbook and in your Owner's Manual" under the heading "OWNER'S RESPONSIBILITIES." (*Id.* at HMAM_002316.)

Once an authorized third-party dealer decides whether to honor a customer's warranty claim, HMA agrees to "reimburse the Dealer for repair, replacement, or adjustment of any part" covered under warranty." (P&P at HMAM_006108.) In addition, HMA "will, from time to time, advise and counsel DEALER on . . . warranty administration" and "will periodically evaluate DEALER's performance of 'warranty service.'" (*Id.* at HMAM_006075.) HMA "reserves the right to furnish the final decisions in all warranty matters." (*Id.* at HMAM_006110.)

Through its network of authorized dealers, HMA paid at least 4,775 warranty claims on 2006–2010 Sonatas related to rotors, calipers, and (even though they are not at issue in this case) brake pads. (*See* Def. HMA's Mem. of Law in Opp. to Pls.' Mot. for Class Certification ("Opp."), 12-cv-3072, Dkt. No. 94 at 19 (citing Exs. 15–16 to Graifman Decl.).) About 1,228 of the paid claims were covered within the first 12,000-mile period, while 783 of these claims were paid after 60,000 miles—when HMA was under no obligation to cover them. (*Id.* at 34.)

**C.   Named Plaintiffs' Experiences With Their Class Vehicles**

The five Named Plaintiffs in these proposed class actions did not have anything like identical experiences with their vehicles—except that they all owned Sonatas and they all had brake problems.

### 1.     Plaintiff Karen Marshall (*Marshall* Action)

Plaintiff Karen Marshall ("Marshall") is a resident of Bedford Hills, New York. (*Marshall* Compl. ¶ 9.)

In or about November 2005, she purchased a new 2006 Sonata from nonparty Healy Brothers Hyundai, an authorized dealer in Bedford Hills. (*Id.*; *see also id.* ¶ 23.)

At approximately 11,297 miles, Marshall brought the vehicle into the dealer, complaining that her "car and steering wheel vibrate[d] when applying brakes." (*Id.* ¶ 24; Dep. of Karen Marshall, taken July 19, 2018 ("Marshall Dep."), Ex. 33 to Graifman Decl. 39:7–11.) Healy Brothers found that the front rotors were warped. (Marshall Dep. 39:24–40:10.) Healy resurfaced the front rotors at no cost to Marshall. (*Id.*)

On April 4, 2008, when the vehicle had approximately 42,782 miles on it, Marshall brought the vehicle to a different dealer, nonparty Falcon Hyundai, alleging that her brakes "pulsate[d]," with a "shimmy felt through the steering wheel" and a "brake-induced vibration through the brake pedal." (*Id.* 41:14–42:7.) Falcon Hyundai made a report that the "front pads and rotors [were] worn below in spec" (*id.* 42:14–16)—a term Plaintiffs do not define. Marshall asked Falcon that these repairs be covered under warranty, but Falcon apparently refused. (*Id.* 43:14–24.) The upshot is that Marshall paid to have her brake pads (not at issue) and rotors (in issue) replaced. (*Id.* 42:25–43:1.) She paid $429.45 for parts and labor. (*Id.*)

Around June 2010, when the vehicle had approximately 74,692 miles on it, Marshall again experienced vibrations when applying the brakes. This time she brought the vehicle to a local repair shop, not to an authorized dealer. (*Id.* 44:11–45:7.) Again, the front brake pads and rotors were replaced, at a cost of $388.38. (*Id.* 45:8–46:7.) Again, Plaintiff asked HMA to cover the repairs under warranty; her request was denied—which was not surprising, as the vehicle's warranty had expired at 60,000 miles. (*Id.* 44:19–22.)

In September 2010, less than 10,000 miles since the last repair, Plaintiff noticed the same noises occurring and the same vibrations when applying the brakes. (*Marshall* Compl. ¶ 26.) It is not clear whether Marshall incurred costs associated with this round of problems.

When the vehicle was about seven years old, and had about 100,000 miles on it, Marshall replaced a caliper. (Marshall Dep. 47:20–49:5; 53:22–54:8.)

Marshall testified that her husband also performed work on the vehicle's brakes, using auto parts she had purchased from an independent parts store. This work included replacing pads and rotors. Marshall could not recall when it was done. (*Id.* 49:25–53:21.)

### 2.    Plaintiff Darrell R. White (*Marshall* Action)

Plaintiff Darrell R. White ("White") is a resident of Mattydale, New York. (*Marshall* Compl. ¶ 10.)

In or about August 2007, he purchased a new 2007 Sonata from an authorized dealer in Syracuse, New York. (*Id.*; Dep. of Darrell White, taken July 10, 2018 ("White Dep."), Ex. 37 to Graifman Decl. 11:3–24.)

In June 2008, at 9,590 miles, White brought the vehicle to the Hyundai dealer after hearing abnormal brake noise. (Ex. 38 to Graifman Decl.; *Marshall* Compl. ¶ 27.) Finding "abnormal wear," the dealer replaced the rear calipers on both sides of his vehicle. (*Id.*) The repair was covered under the warranty. (Ex. 38 to Graifman Decl.)

In or about June 2009, when White's vehicle had roughly 27,000 miles on it, he heard a loud grinding noise when applying the brakes. White again brought the vehicle to the dealer. (*Marshall* Compl. ¶ 27; White Dep. 58:15–59:3.) The mechanic at the dealership allegedly said, "This happens all the time" and told him he would just have to keep bringing it back to the dealer every year for "brake maintenance." (*Marshall* Compl. ¶ 27.) HMA refused to cover the brake repairs—which included replacing the rear brake pads and machining the rear rotors—which

totaled approximately $310.00.  (*Id.* ¶¶ 27–28; White Dep. 59:4–60:8.)  The vehicle appears to have been under warranty at the time.

In September 2011, White again noticed that the brakes and rotors "were performing in a defective fashion" and brought the vehicle to "a mechanic." (*Marshall* Compl. ¶ 29.)  White paid $473.43 to replace the brakes and rotors.  (*Id.*)  "At the time, the vehicle had 75,200 miles" on it, but he alleges that it should have been covered under an extended warranty offered by Hyundai— or, alternatively, it should have been covered under Hyundai's Basic Warranty because that warranty was "unconscionable as applied to the rotors and calipers." (*Id.*)

### 3.   Plaintiff Steve Miller (*Miller* Action)

Plaintiff Steve Miller ("Miller") is a resident of Brooklyn, New York. (*Miller* Compl. ¶ 9.)

In or about November 2007, Miller purchased a new 2008 Sonata from a Hyundai dealership, located in Brooklyn, New York. (*Id.* ¶ 24; Dep. of Steve Miller, taken June 28, 2018 ("Miller Dep."), Ex. 36 to Graifman Decl. 9:6–15.)

In or about February 2009, when Miller's vehicle had been driven approximately 15,332 miles, he noticed a burning smell from the right rear brake. (*Miller* Compl. ¶ 26.)  Miller brought the vehicle to the Hyundai dealership. (*Id.*)  The Hyundai dealership tested the car but was unable to duplicate the burning smell. (*Id.*; Miller Dep. 42:23–44:6)  Miller was not charged for the visit. (Miller Dep. 44:4–6.)

Ten months later, in about December 2009, Miller again noticed a burning smell in his rear brakes. (*Miller* Compl. ¶ 27; Miller Dep. 44:11–25.)  At the time the car had about 24,000 miles on it. (*Miller* Compl. ¶ 27.)  Rather than bring his car to an authorized third-party dealer, he took it to an independent shop. (*Id.*)  The repair shop recommended a replacement of the rear brake caliper assembly, rotors, and brake pads. (*Id.*)

Miller contacted HMA through its customer service call center and asked that HMA cover these repairs under the warranty. (*Id.*)  HMA refused, presumably because the repairs were not performed by an authorized dealer. (*Id.*)  As a result, Miller paid $355. (*Id.* ¶ 28; Miller Dep. 50:3–8.)

On or about December 2010, Miller returned to the dealership, again complaining of a burning smell coming from his right rear tire. (*Id.* ¶ 29.) Again, the dealer could not duplicate the problem. (*Id.*)  Miller does not allege he was charged for this visit. (*Id.*)

Since then, Miller claims to have had "continual problems with the rear brake pads seizing up in the calipers due to corrosion build up on the calipers." (*Id.* ¶ 30.)  Miller "did not contact Hyundai for reimbursement of his subsequent repairs as he was previously told by the customer care center that these brake repairs are not covered under warranty." (*Id.*)  "Instead, Miller purchased the parts himself and paid an independent mechanic to replace his brake components." (*Id.*)  He has replaced corroded hardware (calipers and rotors) three times—in March 2010, September 2010, and October 2016—due in part to seizing. (*Id.*)  He has replaced the brake pads approximately seven times. (*Id.*)  He has spent approximately $802.73 on these repairs. (*Id.*)

### 4.  Plaintiff Charlene Liddle (*Miller* Action)

Plaintiff Charlene Liddle ("Liddle") is a resident of Syracuse, New York. (*Miller* Compl. ¶ 12.)

In or about November 2005, Liddle purchased a 2006 Sonata from a Hyundai dealership in Syracuse, New York. (*Id.* ¶ 48.)

Liddle first heard "squeaking" in her rear brakes in August 2006, when the vehicle had approximately 3,500 miles. (*Id.* ¶ 49.)  Plaintiff took the vehicle into an authorized, third-party dealership located in Syracuse, New York. (*Id.*)  Her front and rear rotors were replaced under warranty. (*Id.*)

On or about December 2006, with approximately 5,572 miles on the car, Plaintiff brought the vehicle into the dealership complaining of continued squeaking coming from the rear brakes. (*Id.* ¶ 50.)  The dealership did not find a problem.  (*Id.*; Dep. of Charlene Liddle, taken July 11, 2018 ("Liddle Dep."), Ex. 32 to Graifman Decl. 43:8–24.)

On August 18, 2008, with approximately 15,013 miles on the vehicle, Liddle paid an authorized dealer $436 to replace her rear brake rotors and pads.  (¶ 51; Liddle Dep. 45:5–49:10.) HMA refused to cover this repair under the warranty.  (Liddle Dep. 48:8–49:10.)

Since that visit, Liddle has had six more repairs performed on her vehicle, including two relating to the brakes—one at 38,613 miles and another at about 44,000 miles.  (*Miller* Compl. ¶ 52.)  The *Miller* Complaint does not include any specifics regarding these repairs.[4]

Liddle's most recent repair occurred on April 7, 2015 (*id.*), which was well beyond the expiration of the five-year warranty.

### 5.    Plaintiff Rebecca Carr, née McCormick (*Miller* Action)

Plaintiff Rebecca Carr, née McCormick ("McCormick") is a resident of Levittown, Pennsylvania.  (*Miller* Compl. ¶ 14; Dep. of Rebecca Carr, taken July 16, 2018 ("McCormick Dep."), Ex. 34 to Graifman Decl. 4:7–24.)

In or about March 2012, McCormick purchased a used 2009 Sonata from City Auto Park in Burlington, New Jersey, while the warranty was still in effect.  (*Miller* Compl. ¶ 14; McCormick Dep. 12:10–13:16.)  At that time, the vehicle was more than two years old and had approximately 14,502 miles on it.  (McCormick Dep. 13:11–16.)

---

[4]     Of Liddle's breach of warranty claims, Judge Griesa observed, "It is . . . mathematically impossible for Liddle to assert valid Warranty claims for events occurring between 2008 and 2015," because her warranty expired in 2010, but the four-year statute of limitations stretched back only as far as 2011. *Miller v. Hyundai Motor Am.*, No. 15-cv-4722, 2016 WL 5476000, at *9 (S.D.N.Y. Sept. 28, 2016) (*Miller I*).

Between the time McCormick purchased the vehicle and the first time she brought it to a dealer (*Miller* Compl. ¶ 60), an acquaintance of McCormick's husband repaired the brakes. (*Id.* 55:13–56:3.)

In September 2014, McCormick began noticing a grinding sound and burning smell coming from her rear brakes. (McCormick Dep. 52:10–14.) When the car had 60,652 miles on it —it was out of warranty—she brought it to the dealer. (*Id.* 52:15–53:5.) McCormick did not pay for the visit. (*See* Ex. 35 to Graifman Decl. at HMAML_000852.)

In October 2014, McCormick heard the grinding sound again and brought the car back to the dealer. She was told by someone at the dealer that the brake pads were sticking in the left rear caliper and that her vehicle required the replacement of the rear caliper and rotors. (*Miller* Compl. ¶ 61; McCormick Dep. 53:13–24.)

McCormick paid $207.80 for this repair, and then contacted the Hyundai Customer Service Center. (*Miller* Compl. ¶ 61; McCormick Dep. 56:12–58:14.) McCormick eventually received a check from Hyundai for $317.50. (*Id.*) Part of that reimbursed her for the brake repair; part was likely intended to cover replacement of the car's battery from an earlier visit to the dealer. (*Miller* Compl. ¶ 62; McCormick Dep. 57:4–58:6.)

In January 2015, McCormick brought her vehicle to the dealership for an inspection. (*Miller* Compl. ¶ 63.) She was told that the front and rear rotors needed replacement. (*Id.*) McCormick brought the vehicle to Meineke—an independent shop—for a second opinion, and Meineke advised that the brakes and calipers needed replacement. (*Id.*) McCormick had Meineke replace the brakes and rotors. (*Id.*) She returned to a dealer the following week to have the calipers replaced. (*Id.*) She was refused coverage and paid $245.77 for the repair. (*Id.*)

## II.   Present Proceedings

### A.  New York Hyundai Owners File a Case

Aggrieved Sonata owners first brought the case of *Marshall, et al. v. Hyundai Motor America*, on March 6, 2012 in the Supreme Court of the State of New York, Westchester County. (12-cv-3072, Dkt. No. 1.)  Three named plaintiffs—Karen Marshall, Paul Flannery,[5] and Darrell R. White, all New York residents—brought the action "on behalf of all citizens of New York who purchased or leased a 2006 to 2010 Hyundai Sonata in New York State." (*Id.* ¶¶ 2, 4 (alterations omitted).)

Defendant HMA removed the action to the Southern District of New York on April 18, 2012, pursuant to CAFA.  (*Id.*)  The case was assigned to the Hon. Kenneth M. Karas.  The *Marshall* plaintiffs then filed an amended complaint.  (12-cv-3072, Dkt. No. 24.)  Most of the claims in that complaint were dismissed; of the six counts alleged, only two—for deceptive post-sale conduct under N.Y. Gen. Bus. Law § 349 ("GBL § 349") and for breach of express warranty—survived HMA's motion to dismiss.  (12-cv-3072, Dkt. No. 46 at 5–31.)  Of particular import, Judge Karas dismissed all of the *Marshall* plaintiffs' claims that were predicated on conduct that occurred prior to and in connection with the purchase of their vehicles (what this Court terms "time-of-sale" conduct).  *Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 465 (S.D.N.Y. 2014) (*Marshall*).

### B.  A Second Case Is Filed, and the Cases Are Consolidated

A second group of aggrieved Sonata owners—Steve Miller, Richard Kotelly, Kathleen Riordan, Charlene Liddle, Krista Pierskalla, and Rebecca McCormick,[6] represented by the same

---

[5]   Flannery is not one of the five Proposed Class Representatives.  I do not know if he is still a party plaintiff.

[6]   Riordan is not a Proposed Class Representative, and I do not know if she is still a party plaintiff.  Kotelly and Pierskalla had all their claims dismissed.

counsel as the *Marshall* plaintiffs—filed a separate complaint directly in federal court on June 17, 2015. (15-cv-4722, Dkt. No. 1.) Shortly thereafter, on September 7, 2015, Judge Karas entered an order consolidating the *Marshall* and *Miller* actions for all purposes. (15-cv-4722, Dkt. No. 12 at 1.)

On May 13, 2016, these cases were reassigned to the Hon. Thomas P. Griesa. (15-cv-4722, Dkt. Entry dated May 13, 2016.) At that time there was pending a motion to dismiss the *Miller* plaintiffs' claims. (15-cv-4722, Dkt. No. 13.) Judge Griesa granted that motion and a subsequent motion (15-cv-4722, Dkt. No. 30) in substantial part; he left in the case only the following claims: (*i*) Plaintiffs Miller's and Liddle's claims under GBL § 349 for post-sale deceptive conduct; (*ii*) Plaintiff Riordan's deceptive practices and unfair conduct claims under the Illinois Consumer Fraud Act[7]; and (*iii*) all of Plaintiff McCormick's deceptive and unfair conduct claims under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1 *et seq.* ("PUTPCPL")—including claims for time-of-sale[8] and post-sale deceptive and unfair conduct. *Miller v. Hyundai Motor Am.*, No. 15-cv-4722, 2016 WL 5476000, at *17 (S.D.N.Y. Sept. 28, 2016) (*Miller I*); *Miller v. Hyundai Motor Am.*, No. 15-cv-4722, 2017 WL 4382339, at *10 (S.D.N.Y. Sept. 29, 2017) (*Miller II*). Again, all claims by all the *Miller* plaintiffs for deceptive conduct at the time of their purchases were dismissed, except for McCormick's claim, which allegedly arose under the PUTPCPL (although McCormick did not purchase her car in Pennsylvania).

After Judge Griesa died, the cases were reassigned to my docket.

---

[7]     Riordan has not been designated as a Proposed Class Representative, and Illinois purchasers are not included in the proposed class definition, so I assume that she is no longer in the case.

[8]     The analogous claims brought under GBL § 349 were dismissed on statute of limitations grounds; Pennsylvania's limitations period is six years, not three years as is the case in New York.

### C.      Plaintiffs Move Jointly for Class Certification

On December 5, 2018, the Proposed Class Representatives—Karen Marshall, Darrell White, Steve Miller, Charlene Liddle, and Rebecca McCormick—moved jointly to certify two classes, pursuant to Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).  (12-cv-3072, Dkt. No. 83; 15-cv-4722, Dkt. No. 64.)  Both classes are defined as

> All persons who purchased or leased a Hyundai Sonata vehicle, Model Years 2006 through 2010 (the "Class Vehicles"), in the State of New York and State of Pennsylvania.

(Br. at 1.)

The motion does not seek certification of subclasses; all Named Plaintiffs appear to be designated as representatives of the entire class. *Cf. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 603 (1997).

Because no consolidated amended class complaint was ever filed, and because there have been two separate motions to dismiss (decided by two judges, neither of whom is this judge), and because some named plaintiffs whose claims survived motions to dismiss are not moving for class certification (Paul Flannery (New York); Kathleen Riordan (Illinois)), it has taken some effort to figure out what claims are actually in this case.   It appears that Plaintiffs are moving for certification of a class that would assert the claims under one common law and two statutory theories of recovery:

### 1.      Breach of Express Warranty

Plaintiffs seek class certification for claims that assert breach of express warranty under New York and Pennsylvania law.  (Br. at 4–5.)  The breach of warranty claims of three of the five Proposed Class Representatives were dismissed on motion, so Marshall and White are the only movants who could represent a class on such a claim. *Marshall*, 51 F. Supp. 3d at 473 (denying

motion to dismiss Marshall and White's breach of warranty claims); *Miller I*, 2016 WL 5476000, at *3, *10 (dismissing McCormick, Miller, & Liddle's breach of warranty claims).

### 2.   Deceptive Conduct under N.Y. Gen. Bus. Law § 349

Plaintiffs move for class certification of a claim that would include both time-of-sale and post-sale deceptive conduct under GBL § 349. (Pls. Br. at 5.) I note that all New York Named Plaintiffs have had their statutory time-of-sale claims dismissed by Judges Karas and Griesa as time-barred. *Marshall*, 51 F. Supp. 3d at 473; *Miller I*, 2016 WL 5476000, at *7. However, a non-New York Named Plaintiff has a surviving time-of-sale claim for deceptive conduct (McCormick). While her personal claim allegedly arises under Pennsylvania law, if she had a viable claim she could, under CAFA, represent a class of persons who, unlike the New York Named Plaintiffs, were able to assert timely time-of-sale GBL claims.[9] However, as will be seen, McCormick does not have a viable time-of-sale claim under Pennsylvania law.

Plaintiffs' claims pursuant to GBL § 349 for a variety of allegedly deceptive post-sale practices were not, however, dismissed by Judges Karas and Griesa. From parsing the complaints and Plaintiffs' memorandum of law in support of their motion for class certification, it seems that they are asserting four separate theories of why the GBL was violated after they purchased their Sonatas:

First, HMA refused to cover the defect in the brakes under warranty. *Miller I*, 2016 WL 5476000, at **6–7.

---

[9]      It is not clear whether there are any such individuals. McCormick did not file her lawsuit until June 17, 2015; by that time New York's three-year statute of limitations on GBL claims had run for all cars purchased prior to June 17, 2012. Moreover, Judge Griesa ruled that the New York plaintiffs in *Miller*—and by extension all New York plaintiffs—could not relate their claims back to the filing of the *Marshall* Complaint. *Miller I*, 2016 WL 5476000, at *12.

Second, HMA failed to issue a warning or recall for the Sonatas that had defective brakes, despite hundreds of consumer complaints and thousands of brake-related warranty claims. *Id.*

Third, HMA or its agents told customers that their brakes had corroded for reasons other than the fact that they were defectively manufactured, such as customers' failing to perform regular maintenance of their brakes or because of harsh weather conditions.[10]   (Br. at 3.)

Fourth, HMA "masked the known defect by having its dealers consistently charge customers for the repairs and/or the temporary 'field fix,'" *i.e.*, oiling the brake assembly rather than repairing or replacing the components. (*Id.* at 19.)[11]

### 3.   Deceptive Conduct under the PUTPCPL

Plaintiffs also move to certify a claim for time-of-sale and post-sale deceptive conduct under the PUTPCPL.[12]  This claim arose only in the *Miller* case, and McCormick is the only Named Plaintiff with ties to Pennsylvania.

Both time-of-sale and-post sale PUTPCPL claims survived HMA's motion to dismiss. *Miller I*, 2016 WL 5476000, at *13; *Miller II*, 2017 WL 4382339, at *8, *10.

McCormick's post-sale PUTPCPL claim is predicated on the same four theories as the New York Named Plaintiffs' post-sale GBL claims (*see supra*).  Her time-of-sale claim asserts that HMA (*i*) misrepresented (by omission) the existence of a material defect at the time of purchase;

---

[10]      Plaintiffs theorize that salt and winter weather do, in fact, prematurely corrode the brakes; their complaint is that HMA and its representatives omitted to advise consumers that there was a defect in the brakes as manufactured that permitted salt and winter weather to corrode the brakes prematurely.

[11]      This specific allegation is not recited in the complaints but appears in the class certification briefs.

[12]      In the *Miller* Complaint, McCormick added a separate cause of action (Count Nine) "under the 'unfair conduct' branch of the Pennsylvania UTPCPL." (*Miller* Compl. ¶ 210.) However, Judge Griesa found that this claim also sounded in fraud and was otherwise factually indistinguishable from her deceptive conduct claim. *Miller II*, 2017 WL 4382339, at *7.

and (*ii*) engaged in deceptive marketing, advertising, and promotion of its vehicles, including with respect to the warranty. (*See Miller* Compl. ¶¶ 197–98 (citing 73 P.S. § 201-2).)

In addition, McCormick asserts a claim under 37 Pa. Code § 301.2(6), which prohibits, "The making of a representation or statement of a fact in an advertisement or sales presentation if the advertiser or salesperson knows or should know that the representation or statement is false and misleading or if the advertiser or salesperson does not have sufficient information upon which a reasonable belief in the truth of the representation could be based." *Id.* (*see Miller* Compl. ¶ 199).

## DISCUSSION

### I.   Legal Standard

"In order to obtain class certification under Federal Rule of Civil Procedure 23, the class proponent bears the burden of showing that each of the requirements of subsection 23(a)— numerosity, commonality, typicality, and adequacy of representation—is, in fact, satisfied." *Flores v. Anjost Corp.*, 284 F.R.D. 112, 121 (S.D.N.Y. 2012). The test is conjunctive; if one element is not met, then the claim cannot be certified for class treatment. "These four requirements . . . effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Bowling v. Johnson & Johnson*, No. 17-cv-3982, 2019 WL 1760162, at *3 (S.D.N.Y. Apr. 22, 2019) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011)).

In addition, the movants must demonstrate that the requirements of Rule 23(b) are met. To certify a class for damages under Rule 23(b)(3), a court must find "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Among other factors, the court must consider "(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.*

To certify a class for injunctive or declaratory relief under Rule 23(b)(2), a court must find that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2). The relief must be necessary and appropriate on its own; 23(b)(2) does not create another avenue to money damages. *Amara v. CIGNA Corp.*, 775 F.3d 510, 519 (2d Cir. 2014).

While Plaintiffs can undoubtedly satisfy their minimal burden to demonstrate numerosity, and while their counsel are competent to represent the proposed class,[13] this is a case in which common questions are few, uncommon questions are many, and the uncommon questions overwhelmingly predominate. In addition, Plaintiff McCormick's time-of-sale claims, which arise under Pennsylvania's consumer protection law, are not typical of the claims of the class members she would represent, since she purchased her car in New Jersey (which means her time-of-sale claims would be dismissed on a motion for summary judgment).

For these reasons, the motion to certify the proposed class is denied.

## A.    Commonality

"Rule 23(a)(2) requires a showing that common issues of fact or law affect all Class members." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04-cv-8144, 2009 WL 5178546, at *9 (S.D.N.Y. Dec. 23, 2009). "Even a single common question will do." *Wal-Mart*, 564 U.S.

---

[13]    The Court will not bother to discuss these issues in great detail; for purposes of deciding this motion it is assumed that both numerosity and the adequacy of counsel and the Named Plaintiffs to represent the class are established.

at 359 (internal quotation omitted). But the Supreme Court's decision in *Wal-Mart* "increased the 'rigor' with which courts must analyze the threshold element of 'commonality' under Rule 23(a)(2)." *Haddock v. Nationwide Fin. Servs., Inc.*, 293 F.R.D. 272, 279 (D. Conn. 2013). Specifically, that case held that, since "any competently crafted class complaint literally raises common questions," the relevant inquiry for class certification is "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 349–50 (internal quotations omitted) (emphasis in original).

So let us examine the existence of common questions "apt to drive the resolution of the litigation" in connection with each of the plaintiffs' asserted theories of recovery.

### 1.   Breach of Express Warranty

To allege a breach of express warranty in New York, a claimant must show "that an express warranty existed, was breached, and that [they] had relied on that warranty." *Reed v. Pfizer, Inc.*, 839 F. Supp. 2d 571, 578 (E.D.N.Y. 2012). The elements under Pennsylvania law are similar, and include statements made by the seller, breach of those statements, reliance by the consumer, and damages proximately caused by the seller's breach. *Yurcic v. Purdue Pharma, L.P.*, 343 F. Supp. 2d 386, 394 (M.D. Pa. 2004).

Certain questions that will resolve elements of a breach of warranty claim are susceptible of common proof when, as here, the same standard warranty was issued with respect to all vehicles in the class. Those questions are two:  was there a classwide defect in the vehicle?  (Yes, a classwide defect is alleged.)  And was there a promise to cover that particular defect under HMA's New Vehicle Limited Warranty?  (The interpretation of the contract will be the same for all plaintiffs.)

There are, however, two of what I have called the "uncommon" questions that are necessarily raised in connection with the proposed class' breach of warranty claims.

First, does the particular instance of brake failure fall within the terms of the warranty? As we already know, some of the repairs for which the Named Plaintiffs seek damages came after the car had been driven for five years or 60,000 miles—which is to say, the claim arose after the warranty had expired.

Second, has each individual plaintiff complied with all the terms and conditions of the warranty, such that warranty coverage that might otherwise might be available has not been voided? Again, we know that at least four of the Named Plaintiffs did things—took their cars to non-authorized dealers for repair, performed repair work themselves—that either did not entitle them to warranty coverage for those repairs, or that may have taken the car out of warranty altogether, even if five years had not passed or the car had not been driven 60,000 miles.

### 2.    Consumer Protection Claims (GBL § 349 and PUTPCPL)

"To state a cause of action under [GBL] § 349, a plaintiff must allege (1) a deceptive consumer-oriented act or practice which is misleading in a material respect, and (2) injury resulting from such act." *Exxonmobil Inter-Am., Inc. v. Advanced Info. Eng'g Servs., Inc.*, 328 F. Supp. 2d 443, 447 (S.D.N.Y. 2004). "To bring a private cause of action under the [P]UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance." *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004).

As noted, plaintiffs assert a claim for deceptive practices in connection with the initial sale of the vehicle (what I am calling "time-of-sale" deceptive practices claims) and four separate theories of recovery for post-sale deceptive practices (*see supra*, at 17–18). I deal with them separately.

***Time-of-sale deceptive practices***.   Plaintiffs contend that HMA engaged in deceptive advertising and marketing theory prior to sale, in violation of the GBL and under the PUTPCPL.

But as individual reliance by a particular plaintiff is an element of the PUTPCPL, the only common questions that could arise would be in connection with allegedly deceptive advertisements and marketing statements that were (1) made by HMA, rather than by individual dealers who sold the cars; and (2) made to all Sonata purchasers. Plaintiffs identify only one such representation: that Hyundai had "America's Best Warranty." [14]   For the New York claims, whether such a misrepresentation was "material" and "consumer-oriented" also presents common questions.

All other representations that might underlie the claims of class members give rise to "uncommon" questions. Any other representations or omissions to disclose were individualized, made (or not made) to prospective purchasers at the time of sale by representatives of one of the 89 dealerships that sold Hyundai Sonatas to putative class members. Claims of this sort have been deemed inappropriate for class certification under federal, New York, and Pennsylvania class action law, precisely because these "uncommon" questions threaten to swallow the few common questions that do exist. *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002); *Lewis Tree Serv., Inc. v. Lucent Techs. Inc.*, 211 F.R.D. 228, 232 (S.D.N.Y. 2002); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 119 F.R.D. 344, 347 (S.D.N.Y. 1988), *aff'd*, 903 F.2d 176 (2d Cir. 1990); *Solomon v. Bell Atl. Corp.*, 9 A.D.3d 49, 53, 777 N.Y.S.2d 50, 55 (1st Dep't 2004); *Gaidon v. Guardian Life Ins. Co. of Am.*, 2 A.D.3d 130, 130, 767 N.Y.S.2d 599, 599–600 (2003); *Seldon v. Home Loan Servs., Inc.*, 647 F. Supp.2d 451, 466 (E.D. Pa. 2009); *Coleman v. Commonwealth Land Title Ins. Co.*, 318 F.R.D. 275, 285 (E.D. Pa. 2016).

---

[14]     Of course, any claims predicated on this "representation" are likely to be disposed of on a motion for summary judgment, since the statement is the quintessential example of puffery, which is not actionable under either Pennsylvania's or New York's consumer protection statutes. *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1024 (Pa. 2018); *Verizon Directories Corp. v. Yellow Book USA, Inc.*, 309 F. Supp. 2d 401, 405 (E.D.N.Y. 2004).

*Post-sale deceptive practices.*   One of plaintiffs' four post-sale theories of recovery obviously applies to every member of the class—the allegation that HMA failed to recall the Sonata. A manufacturer's failure to issue a recall notice raises questions that are common to all class members and susceptible of common proof, namely: was there a common defect affecting the Class Vehicles? Was HMA aware of the defect?[15] Would a reasonable consumer be misled by the failure to issue a recall? *See, e.g., Oscar v. BMW of N. Am., LLC*, 274 F.R.D. 498, 512 (S.D.N.Y. 2011).

As to a second theory of recovery for post-sale deception—that HMA deceptively mishandled warranty claims by not covering replacement of rotors, slider clips, and calipers—Plaintiffs have at least some evidence that would be common to all class members. There is evidence that HMA corporate instructed its dealers, in its Warranty Coverage Guide, not to cover "Damage to rotor caused by brake pad wear" or to cover "Rust." (*See* Ex. 13 to Graifman Decl. at HMAM_006023.) Moreover, HMA's 30(b)(6) witness confirmed that dealers would submit warranty claims to HMA, who then reserved ultimate, centralized discretion over whether to cover such repairs. (Dep. of Greg Webster, taken Oct. 1, 2015 ("Webster Dep.") Ex. 7 to Graifman Decl. 98:7–20.) HMA necessarily reviewed all warranty coverage determinations, since the dealers conducted warranty repairs upfront and later sought reimbursement from HMA. This theory of consumer deception, therefore, is susceptible of common proof, and would generate common questions that include: did HMA routinely refuse to cover defect at issue under warranty? Was the exclusion of "Rust" from the Warranty Coverage Guide a practice that was materially misleading to the average consumer (for the GBL § 349 claim)?

---

[15] Under GBL § 349, scienter is not required, but "proof of scienter permits the court to treble the damages up to $1,000." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26, 647 N.E.2d 741, 745 (1995).

But Plaintiffs' other two post-sale theories of recovery do not "depend upon a common contention . . . that is capable of classwide resolution." *Wal-Mart*, 564 U.S. at 350.

The theory that dealers told customers that their brake problems were caused by something other than defective manufacture—the weather, individuals' driving habits, and the failure to conduct regular vehicle maintenance—involves individual representations that were made or omitted to be made to each class member by different representatives of any of 89 individual, authorized, third-party dealers. Despite years of discovery, Plaintiffs point to no evidence that *HMA instructed or encouraged dealers* to blame corrosion on other factors, such as weather or maintenance, rather than reveal the materials defect.[16] As was the case with the time-of-sale representations discussed above, these are precisely the sort of claims that have repeatedly been held not to raise common questions, because they are not susceptible of classwide proof. *Moore*, 306 F.3d at 1253; *Lewis Tree Serv., Inc.*, 211 F.R.D. at 232; *Gary Plastic Packaging Corp.*, 119 F.R.D. at 347; *Solomon*, 9 A.D.3d at 53; *Gaidon*, 2 A.D.3d at 767; *Seldon*, 647 F. Supp. 2d at 466; *Coleman*, 318 F.R.D. at 285.

Nor does Plaintiff offer any evidence that HMA advised its dealers to "mask" defects by instructing dealers to lubricate rather than repair or replace the defective brake components. The internal HMA report on the benefits of brake greasing that Plaintiffs cite states, "The dealers have *developed their own methods* of servicing and fixing these corrosion induced brake noise vehicles with the method of greasing and lubricating the brake pad ears and/or pad slider clips." (Ex. 4

---

[16]     As the Supreme Court recognizes, "rigorous analysis" of the Rule 23 requirements occasionally "will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). As in *Wal-Mart*, the Named Plaintiffs must show that there was some "common direction" in order to tie together the actions of dozens of individual Hyundai authorized dealerships and their employees. *Id.* at 356.

Graifman Decl. at HMAH_001386 (emphasis added).)   Individualized methods of repair, developed and implemented at the local level, raise the antithesis of a common question.

## B.   Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class[.]"  *Id.*  "Typicality is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Kaplan v. S.A.C. Capital Advisors, L.P.*, 311 F.R.D. 373, 378–79 (S.D.N.Y. 2015) (internal quotation omitted).  "Typicality does not require factual identity between the named plaintiffs and the class members, only that the disputed issues of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *Id.* (internal quotation omitted).

Where the New York Named Plaintiffs are concerned, at least one Proposed Class Representative has a claim that is typical of claims that would be asserted by some members of the proposed class.  The same is not true of Pennsylvania.

### 1.   Breach of Express Warranty

Both Marshall's and White's breach of warranty claims are typical, in that they allege that they brought their vehicle into an authorized New York dealership while the vehicles were still under warranty but were denied coverage.  (*See* discussion at section I.C.1–2, *supra*.)  HMA has moved for summary judgment on both claims (Opp. at 15), but that does not make them atypical plaintiffs.

Furthermore, because Named Plaintiffs who purchased in one state may still be considered "typical" of class members who purchased in other states if the elements of the state consumer protection statutes do not differ materially, *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 127 (2d Cir. 2013); *Langan v. Johnson & Johnson Consumer Cos., Inc.*, 897 F.3d 88, 93 (2d

Cir. 2018), Marshall and White can represent a class of Pennsylvanians who have a breach of warranty claim. Breach of express warranty is a contract claim, and "state contract law defines breach consistently such that the question will usually be the same in all jurisdictions." making it suitable for class certification. *U.S. Foodservice*, 729 F.3d at 127.

### 2. Consumer Protection Claims (GBL § 349 and PUTPCPL)

All four New York Named Plaintiffs assert "failure to recall" claims under GBL § 349 that are typical of the class, as each incurred personal expenses for brake repairs to their Class Vehicles within the applicable three-year limitations period, and HMA did not recall the vehicles.

Moreover, for the reasons stated above, White—but not Marshall—also possesses a "post-sale deceptive warranty handling" claim under GBL § 349. The only visit during which Marshall suffered any pecuniary injury due to denial of warranty coverage—the only time she paid for her brake repairs after service at an authorized dealer within the warranty period—was April 4, 2008. Assuming Marshall's vehicle was in warranty, the three-year period within which Marshall could bring a GBL § 349 claim expired on April 4, 2011—nearly a year before she filed her claim in state court.

This leaves McCormick—the only Named Plaintiff who has not had her claim for time-of-sale misrepresentations and omissions dismissed, and the only Named Plaintiff who brings claims under Pennsylvania's consumer protection statute.

HMA argues that McCormick's claims are not typical of the claims of the Pennsylvania purchasers she would represent, because "McCormick's out-of-state purchase would make her an anomaly relative to a class of Pennsylvania [purchasers]." (Opp. at 13.)

HMA is correct that the New Jersey Consumer Fraud Act, N.J. Stat. §§ 56:8–1 *et seq.* ("NJCFA"), not the PUTPCL, governs McCormick's claim about time-of-sale misrepresentations.

This does indeed render her time-of-sale claim atypical of claims asserted by class members who bought their cars in Pennsylvania.

"In New York, 'the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved.'" *In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 147 (S.D.N.Y. 2008) (quoting *In re Allstate Ins. Co.*, 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 905, 613 N.E.2d 936, 937 (1993)). The PUTPCPL and the NJCFA are not congruent statutes, in that the PUTPCPL requires a showing of justifiable reliance, even for omissions, while the NJCFA does not. *Compare Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 227 (3d Cir. 2008), *with Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co.*, 929 A.2d 1076, 1086 (N.J. 2007); *see also Fresh Start Indus., Inc. v. ATX Telecomms. Servs.*, 295 F. Supp. 2d 521, 528 (E.D. Pa. 2003). Since there is a conflict, a New York court must choose which of the two divergent laws applies to McCormick's purchase.

In cases involving consumer fraud claims, New York courts apply the "greatest interest" test to determine whose law applies. *Grand Theft Auto*, 251 F.R.D. at 148. In product-based consumer fraud cases, even if some tortious conduct occurred elsewhere, the state with the greatest interest in claims arising out of the purchase of a product is the state of purchase. *Id.* at 149; *Wood v. Maguire Auto. LLC*, No. 09-cv-0640, 2011 WL 4478485, at *5 (N.D.N.Y. Sept. 26, 2011), *aff'd*, 508 F. App'x 65 (2d Cir. 2013). Therefore, New Jersey's law, and not Pennsylvania's, applies to McCormick's time-of-sale claim. *See also Fresh Start Indus.*, 295 F. Supp. 2d at 528. Because of the difference between claims under the PUTPCPL and claims under the NJCFA, her claims

are not "typical" of the claims that would be asserted by the members of the class consisting of Pennsylvania purchasers.[17]

McCormick does not address her time-of-sale claims in her reply brief. (Pls.' Reply Mem. of Law in Further Supp. of Mot. for Class Certification ("Reply"), 12-cv-3072, Dkt. No. 121 at 8–9.) She thus admits that the analysis is correct. Instead, McCormick concentrates on the undeniable fact that her *post*-sale claims arise entirely out of transactions conducted in Pennsylvania, and so would be typical of the claims of other Pennsylvanians. (*Id.*)

But McCormick is typical with respect to only one of her two post-sale theories of recovery. McCormick's failure to recall claim is, obviously, typical of the claims of putative class members. But she does not have a viable claim under the PUTPCPL for deceptive, post-sale handling of her warranty, because she did not bring her vehicle to an authorized dealer for brake service before she had driven her car for 60,000 miles. Therefore, she has no viable claim relating to the warranty, which expires at 60,000 miles. Furthermore, she also was compensated retroactively by HMA. (Indeed, her breach of warranty claim was dismissed for these very reasons.) Therefore, any claim she might assert for deceptive, post-sale handling of her warranty claim is atypical of those that could be asserted by other members who are seeking compensation and who sought warranty protection when it was available and who were not retroactively compensated by HMA.

Finally, White—who has a viable deceptive, post-sale handling of warranty claim under GBL § 349—cannot represent the unnamed Pennsylvania class members on similar claims arising under the PUTPCPL, because the latter statute requires a plaintiff to prove reliance, whereas GBL § 349 does not. *Compare Hunt*, 538 F.3d at 227 *with Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29,

---

[17]    Of course, as already held, claims about time-of-sale representations, having been made at a local level and with no indication that representations (or omissions) were dictated by HMA, are presumptively not certifiable for class action purposes. (*See supra*, at 23, 25.)

731 N.E.2d 608, 612 (2000). Therefore, White's claim would not be typical of these absent Pennsylvania class members' claims.

## C.      Fed. R. Civ. P. 23(b)(3) Predominance

A damages-seeking class like the one proposed by movants may be certified under Fed. R. Civ. P. 23(b)(3) only if (1) the requirements of subsection (a) are satisfied, and (2) "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.*

"The Rule 23(b)(3) predominance inquiry 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Flores*, 284 F.R.D. at 130 (quoting *Amchem Prods.*, 521 U.S. at 623). "Predominance requires a further inquiry . . . into whether the common issues can profitably be tried on a classwide basis, or whether they will be overwhelmed by individual issues." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015). "Ultimately, the court must decide whether classwide resolution would substantially advance the case, examining whether certification will reduce the range of issues in dispute and promote judicial economy." *Id.* (internal quotations omitted).

Predominance is not satisfied where classes "require highly individualized determinations of member eligibility." *In re Petrobras Sec. Litig.*, 862 F.3d 250, 268 (2d Cir. 2017); *see also Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 539 (2d Cir. 2016) (no predominance where class membership was a "highly context-specific inquiry").

As it turns out, individualized issues predominate no matter the theory plaintiffs are pursuing—even those, like breach of warranty and failure to recall—that raise common issues, and as to which one or more of the Named Plaintiffs is a typical claimant. Specifically, each breach of

warranty claim will be subject to several individualized defenses, with no hope of classwide resolution. Moreover, with respect to their "failure to recall" and other surviving consumer protection claims, plaintiffs cannot proceed on their "price premium" theory of classwide damages, and have suggested no other method—applicable to the entire class—for proving actual injury or ascertainable loss, as well as, separately, the elements of causation and reliance.

### 1. Individual Questions about Breach Predominate for the Breach of Warranty and Deceptive Post-Sale Handling of Warranty Class Claims

A multitude of individual questions peculiar to each class member would need to be dealt with at a trial on a breach of warranty claim. *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 411 (S.D.N.Y. 2015); *Price v. L'Oréal USA, Inc.*, No. 17-cv-614, 2018 WL 3869896, at *7 (S.D.N.Y. Aug. 15, 2018). The range of individual, fact-specific defenses to breach are neatly previewed by the stories of the individual Named Plaintiffs—three of whom had their breach of warranty claims dismissed. As to each class member, it would have to be established that (1) the class member's vehicle was still under warranty, in that his or her claims for damages arose less than five years from purchase or at fewer than 60,000 miles, and (2) the class member had done nothing either to void the warranty or to create some intervening cause, such as (perhaps) by installing non-Hyundai covered brake parts, having work done at an independent auto parts shops rather than at an authorized Hyundai dealership; or having repair work performed by a family member. Moreover, as we know, HMA reimbursed several of the Named Plaintiffs for some (or, in McCormick's case, all) of the repair work that was done on their brakes by authorized dealers; there is no classwide way to prove that all the members of the class were in fact not reimbursed for warranty work on some or all occasions. Every one of these issues depends on finding facts about each class member's vehicle and each class member's experience.

For the same reasons, the Court also finds that any consumer protection claim advanced under a theory of deceptive post-sale handling of warranty claims would also require individualized proof and could not be established on a classwide basis.

### 2.  Individual Questions Predominate for the Claims Under Both State Consumer Protection Laws

Plaintiffs offer no solution to what would be the plainly foreseeable result of class certification:  that issues of actual injury, causation, and reliance would completely swallow any common issues, including whether there was a common defect.

In assessing predominance for these claims, the Court is guided in part by the recent decision in *Haag v. Hyundai Motor America*, 330 F.R.D. 127 (W.D.N.Y. 2019), a case that was prosecuted by the same law firms and concerned nearly identical allegations that HMA had concealed brake defects from purchasers, in that instance of model year 2007 to 2012 Hyundai Santa Fes. *Id.* at 129.  In *Haag*, a single named plaintiff—a resident of New York who had purchased her vehicle in New York—asserted a timely claim under GBL § 349 for time-of-sale deceptive conduct. *Id.* at 129–30.  While she had previously asserted a breach of warranty claim, it was dismissed. *Id.* at 129 n.2.  No other state's law was implicated.

On plaintiff's motion for class certification, the court found that she had failed to meet her burden to show that common issues would predominate with respect to both causation and injury. *Id.* at 132–33.  The court first observed that "suits alleging defects in motor vehicles often involve complicated issues of individual causation that predominate over common questions regarding the existence of a defect." *Id.* at 132 (internal quotations and alterations omitted).  Next, the court observed that it was possible under New York law to prove "price premium" damages (*see infra*, at 35–36) on a classwide basis, but since plaintiff had "produced no evidence that the Class Vehicles' market value was in fact diminished by the alleged brake defect, and/or that putative

class members would have paid less for their Class Vehicles had they been informed of the potential for premature brake system corrosion"—*i.e.*, no evidence that the theory was anything but speculative, *id.* at 132—plaintiff's "mere assumptions" that this would have been material information to car purchasers at the time of sale or impacted the price paid found no support in the record. *Id.* at 133 (citing *Oscar*, 274 F.R.D. at 512–13; *Ackerman v. Coca-Cola Co.*, No. 09-cv-395, 2013 WL 7044866, at *19 (E.D.N.Y. July 18, 2013) ("loss causation [under GBL § 349] must be addressed individually")).

Here, as in *Haag*, no class can be certified because individual questions predominate with respect to both causation and injury.

### a)   *Actual Injury (GBL § 349 and PUTPCPL)*

*First*, under both states' consumer protection laws, the Court will be required to conduct individualized inquiries to determine whether class members suffered any injuries *at all*—a proposition that is much different than determining the quantum of damages for each class member. "[W]e do expect the common evidence to show all class members suffered *some* injury." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015) (emphasis in original) (internal quotation omitted).

"Actual injury" is an element of any claim asserted under GBL § 349. *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 56, 720 N.E.2d 892, 898 (1999). In the automotive context, New York courts routinely reject the argument "that a 'common' defect which never manifests itself ipso facto cause[s] economic loss," and therefore satisfies the "actual injury" element under § 349—even if reports indicate that the components have already failed in certain cases. *Frank v. DaimlerChrysler Corp.*, 292 A.D.2d 118, 122–23, 741 N.Y.S.2d 9, 13 (1st Dep't 2002); *see also id.* at 121–28, 13–17.

Like GBL § 349, the PUTPCPL requires that private plaintiffs show they have suffered an "ascertainable loss" resulting from their reliance on the deceptive or unfair conduct at issue. *Grimes v. Enter. Leasing Co. of Phila., LLC*, 629 Pa. 457, 464–65, 105 A.3d 1188, 1193 (Pa. 2014). "Ascertainable loss" includes "a loss of money or property." *Id.* The loss must be non-speculative. *Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 181 (3d Cir. 2015), *abrogated on other grounds by Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029 (2019). The loss must be suffered "as a result of the defendant's fraudulent or deceptive conduct." *Lewis v. Ford Motor Co.*, 263 F.R.D. 252, 263 (W.D. Pa. 2009). Moreover, "Although the ascertainable-loss requirement may not bar certification where the defendant has engaged in a uniform practice of overcharging to which all class members were, by definition, exposed, . . . where it is unclear that some or all class members suffered a measurable monetary harm, the ascertainable-loss requirement often precludes certification." *Grand Theft Auto*, 251 F.R.D. at 157 (denying to certify PUTPCPL claim on ascertainable loss grounds).

As Plaintiffs have chosen to prosecute their case, injury to the class could be proven *only* on the basis of individualized evidence. There is no evidence that every model year 2006 to 2010 Hyundai Sonata sold in New York or Pennsylvania suffered brake issues requiring repair; it is not possible to infer, from the fact that some people needed their brakes repaired, that everyone who bought a Sonata needed his or her brakes repaired. What evidence there is suggests that only a fraction of the approximately 67,000 cars included in the class actually experienced brake issues. For example, Plaintiffs identified only 959 relevant complaints received by HMA about brake issues from consumers in New York and Pennsylvania, and only 4,775 warranty claims for brake repairs paid in those same states—about 8.6% of the 67,000 vehicles covered by the proposed two-

state class.  These numbers render dubious Plaintiffs' theory that all class members experienced the brake defect during the life cycle of their vehicles.

In an automotive defects case very similar to the one at bar, where the plaintiffs proposed a broad class definition that did "not incorporate any element of loss," the court denied class certification, finding:

> Under the current definition, any purchaser or lessee of a Class Vehicle would be presumed a member of the class.  Therefore, to determine if a particular class member suffered an ascertainable loss, the Court would need to inquire into the individual circumstances of the purchase or lease, whether the vehicle experienced the Oscillation Defect, whether the consumer paid for repairs, and/or whether when he traded or sold the vehicle, he received a lower price as a result of the Oscillation Defect.  Such a detailed factual analysis would be an unconscionable use of the court's time and makes this case unsuitable for class treatment.

*Lewis*, 263 F.R.D. at 264.  This case is indistinguishable from *Lewis*, because, as discussed above, there is simply no evidence of a classwide injury, and no method by which Plaintiffs propose to calculate one.

Despite this clear law, Plaintiffs argue that injury need not be proven on an individual basis, because, "At the point of sale, class members, in essence, did not receive the benefit of their bargain and purchased vehicles of diminished value."  (Br. at 35.)  In their reply papers, Plaintiffs submit a declaration of their damages expert, Steven P. Gaskin, who opines that he could provide a classwide methodology for calculating damages on the following theory:  "The underlying methodology would be a choice-based conjoint analysis survey to estimate the diminution in market value that the class vehicles would have experienced due to the disclosure of the brake defect by Defendant *at the time and point of first purchase*."  (Decl. of Steven Gaskin ¶ 4, Ex. 3 to Graifman Reply Decl., 12-cv-3072, Dkt. No. 122 (emphasis added).)  This is the so-called "price premium" theory—the theory that class members paid more for their cars than the cars were worth,

and that the car's value at the time of sale would have been lower had the braking defect been disclosed.

This theory that the car's price was higher than it would have been had purchasers known about the brake defect when they bought their vehicles is the precise theory of classwide injury that was considered and rejected in *Haag*—a case (unlike this one) in which the named plaintiff's claim for time-of-sale misrepresentations (*i*) were not time-barred, and (*ii*) met the Rule 23(a) factors. 330 F.R.D. at 132.

In *Haag,* the court found that plaintiffs' price premium theory was "simply too speculative." *Id.* at 133. As the court observed

> All of the Class Vehicles had a manufacturer's suggested retail price of over $ 20,000.00, and there is no basis for the Court to infer that a reasonable consumer—let alone an entire class of consumers— would have demanded a lower purchase or lease price if they were informed that they might have to perform initial brake part replacement and maintenance (at a cost presumably in the neighborhood of the $433.58 alleged by plaintiff for her own vehicle) earlier than they otherwise expected.

*Id.*

If this theory was not viable in *Haag*—where the class representatives were proceeding under the time-of-sale nondisclosure theory—it is even less viable in this case, where all New York Named Plaintiffs' time-of-sale claims have been dismissed, and where the Pennsylvania Named Plaintiff, who has asserted her time-of-sale claim under the wrong state's law, will see it dismissed on a motion for summary judgment. Plaintiffs do not point to a single case in which a court has held that price premium damages are appropriate for liability arising entirely from *post-sale*, as opposed to time-of-sale, deceptive conduct. *See In re Amla Litig.*, 282 F. Supp. 3d 751, 757 (S.D.N.Y. 2017) (deceptive representations at time of sale); *Irvine v. Kate Spade & Co.*, No. 16-cv-7300, 2017 WL 4326538, at *3 (S.D.N.Y. Sept. 28, 2017) (deceptive pricing at time of sale);

*Scotts EZ Seed*, 304 F.R.D. at 409 (deceptive labeling at time of sale); *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 492–93 (E.D.N.Y. 2017) (deceptive advertising pre-sale and labeling at time of sale); *Khoday v. Symantec Corp.*, No. 11-cv-180, 2014 WL 1281600, at *1 (D. Minn. Mar. 13, 2014) (deceptive representations at time of sale); *but see Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 539 (S.D. Fla. 2015) (recognizing price premium damages under the Florida Deceptive and Unfair Trade Practices Act on a combined theory of deceptive omissions at the time of sale and failure to effectively fix the defect post-sale).

Furthermore, even if the Named Plaintiffs in this case could represent a class of persons asserting claims arising out of time-of-sale representations and omissions (they cannot), plaintiffs alleging a "price premium" theory must do more than "merely alleg[e] that [they] paid a premium price [for their product], without making any other factual allegations" to support an inference that they would have paid less absent the misrepresentation or deception. *Goldemberg v. Johnson & Johnson Consumer Cos.*, Inc., 8 F. Supp. 3d 467, 481 (S.D.N.Y. 2014). That, of course, is the lesson of *Haag*, as well as myriad other cases in this district. *Id.*; *In re Amla Litig.*, 328 F.R.D. 127, 138 (S.D.N.Y. 2018) (price premium theory supported by allegations that one out of five discrete components of the product "simply did not function"). Here, Plaintiffs make no such factual allegations. They simply argue, "It is obvious that reasonable consumers would want to know that their brakes will progressively degrade and fail as a result of a defect and that the market price for vehicles with a known defect would be less when such a defect is disclosed." (Reply at 16.)

In an attempt to identify *some* theory of classwide injury, Plaintiffs argue—again, for the first time on reply—that they have been subject to other types of injury, namely: "(1) deprivation of a consumer's right to be free from false, deceptive, or misleading practices" and "(2) exposure

to an unreasonable risk of harm that, standing alone, constitutes a concrete injury." (Reply. at 14 (internal quotation omitted).)  They purport to quantify these injuries using the $50 in statutory damages cap available under GBL § 349.  (*Id.*)  They identify no similar statutory damages provision under the PUTPCPL.

This argument, too, is wide of the mark.  Deception alone cannot constitute "actual injury" under GBL § 349, as to hold otherwise would render that element of the statute wholly superfluous. A plaintiff "must plead facts showing actual injury, not merely the alleged deceptive act." *Bildstein v. MasterCard Int'l Inc.*, 329 F. Supp. 2d 410, 415 (S.D.N.Y. 2004); *see also Amla*, 328 F.R.D. at 135.  Plaintiffs cite no case in which exposure to risk, standing alone, entitles them to recovery under GBL § 349.  *See Baur v. Veneman*, 352 F.3d 625, 634 (2d Cir. 2003) (Article III standing); *Adkins v. Morgan Stanley*, No. 12-cv-7667, 2013 WL 3835198, at *3 (S.D.N.Y. July 25, 2013) (same); *Chanel, Inc. v. Gardner*, No. 07-cv-6679, 2010 U.S. Dist. LEXIS 140233, at *13 (S.D.N.Y. Apr. 6, 2010) (Lanham Act counterfeiting).  Finally, even if a "risk exposure" theory were not foreclosed by black letter law, Plaintiffs "chose expressly to confine the relief sought solely to monetary recoupment[,]" and so are not entitled to claim damages resulting from the risk of physical injury.  *Small*, 720 N.E.2d at 898.

### b)    *Causation (GBL § 349)*

Assuming *arguendo* that injury could be proven on a classwide rather than individual basis, proof of causation would overwhelm any common issues.

Under GBL § 349, a plaintiff must show that he or she was injured as a result of the defendant's deceptive acts or practices.  *Stutman*, 95 N.Y.2d at 29–30; *McCrobie v. Palisades Acquisition XVI, LLC*, 359 F. Supp. 3d 239, 254 (W.D.N.Y. 2019).  Therefore, for Plaintiffs'

"failure to recall" claim, Plaintiffs would need to prove that their post-sale brake repair costs resulted from HMA's failure to recall the brake components at issue.

To evaluate this, the Court would need to consider, among other factors, whether each Class Vehicle was heavily exposed to deicing materials; and whether each owner abided by the recommended maintenance schedule, which includes cleaning and lubricating the brakes. In addition, even where individual plaintiffs could rule out severe environmental and maintenance factors, they would also need to rule out *other Sonata defects* unrelated to the rotors, calipers, and other components at issue. As Plaintiffs' own exhibits demonstrate, drivers experienced brake noise, grinding, or "sticking" as a result of brake *pad* defects (a part not at issue in this case), including overheating of the brake pad's elastomer substrate. (Ex. 2 to Graifman Decl. at HATCI_000011.) Put simply, "determining whether each [brake] failed as a result of the allegedly concealed defect or as a result of unrelated issues, *e.g.*, potholes or reckless driving habits, will devolve into numerous mini-trials." *Oscar*, 274 F.R.D. at 513; *see also Pelman v. McDonald's Corp.*, 272 F.R.D. 82, 94 (S.D.N.Y. 2010).

These complicated causation issues are not the kind of "ministerial" decisions appropriate for resolution by the claims administrator. *Cf. Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418, 436 (S.D.N.Y. 2009) ("*mechanical calculation* of each member's damages" did not preclude certification).

### c) *Reliance (PUTPCPL)*

Finally, individual issues will also predominate with respect to the reliance element of the PUTPCPL—and, despite Plaintiffs' protestations, this claim does indeed include the element of reliance.

Judge Griesa determined that McCormick's PUTPCPL claim sounds in fraud. *Miller I*, 2016 WL 5476000, at *15. That holding is law of the case. Therefore, a PUTPCPL plaintiff must prove all elements of common law fraud—including reliance—in order to prevail. *Toy v. Metro. Life Ins. Co.*, 593 Pa. 20, 46, 928 A.2d 186, 202 (2007).

Moreover, based on holdings in the intermediate appellate courts, I believe that the Supreme Court of Pennsylvania would likely hold that no presumption of reliance arises in this case. The Pennsylvania Superior Court has held quite clearly, in an analogous case alleging that Chrysler had failed to disclose air bag defects to consumers at the time of purchase, that plaintiffs still must establish that they would have acted differently had this information been disclosed to them. *Debbs v. Chrysler Corp.*, 810 A.2d 137, 157–58 (Pa. Super. 2002); *but see Zwiercan v. Gen. Motors Corp.*, No. 3235 June Term 1999, 2003 WL 1848571, at *2 (Pa. Com. Pl. Mar. 18, 2003) (distinguishing *Debbs* by finding that a presumption of reliance can be appropriate when a non-negligible risk of grievous bodily injury is not disclosed).

Like many courts that have considered Pennsylvania state law consumer fraud class actions, this Court finds that individualized issues relating to reliance—which would have to be made for each of the 67,000 class members—would overwhelm common issues. *See, e.g.*, *Grand Theft Auto*, 251 F.R.D. at 146, 156–57.

### D.   Plaintiffs' Motion for Class Certification under Fed. R. Civ. P. 23(b)(2) Is Denied

Plaintiffs also move to certify an injunction-seeking class under this subsection, which would require HMA to (*i*) "disclose to customers the truth and the fact that they should expect to pay significant amounts to repair prematurely corroded brakes" and (*ii*) cease their policies of refusing Warranty coverage for such claims. (Br. at 41.) Alternatively, they move to certify a

declaratory judgment-seeking class, whose remedy would be a declaration that the warranty covers corroded brakes. (*Id.*)

As discussed, Rule 23 provides, "A class action may be maintained if Rule 23(a) is satisfied and if the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2). "Certification of a class under Rule 23(b)(2) is appropriate where the remedy sought is 'an indivisible injunction' that applies to all class members 'at once.'" *Amara*, 775 F.3d at 519 (quoting *Wal-Mart*, 564 U.S. at 363). "Class actions based on claims for individualized monetary relief—implicating the due process rights of absent class members, who need not be given notice and opt-out rights pursuant to Rule 23(b)(2)—are impermissible under this provision." *Id.*

Certification under Rule 23(b)(2) is clearly not warranted here.

*First*, I cannot conclude that, if money were off the table, any sane individual would still have brought this suit to obtain the proposed declaratory or injunctive relief. Indeed, it is not clear how anyone could obtain an injunction with respect to most of the claims asserted here, since the proposed class consists of "all persons who *purchased* or *leased*" (past tense) Sonatas made between 2006 and 2010. No forward-looking injunction (and injunctions are only appropriate when forward-looking relief is sought) would do anything to benefit class members who have owned their vehicles for anywhere between seven and fourteen years.[18] Plaintiffs suggest no reason to suspect that class members' injuries could be cured by a warning; indeed, Plaintiffs' proposed injunction would accomplish no more than would giving notice of this lawsuit to any

---

[18]   Model year n vehicles can be purchased in the year n-1.

certified class. This is the very definition of an "insignificant or sham request[] for injunctive relief." *Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 20 (2d Cir. 2003).

*Second*, the warranty-related injunctive and declaratory relief proposed by Plaintiffs would "result in no tangible benefit" to any member of the class. *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 559 (C.D. Cal. 2012). "No customer owns or leases a 2006–2010 model year Sonata vehicle that is still within the five-year warranty period," (Opp. at 48), so a declaration that brake repairs resulting from the defect are covered for the duration of the warranty period helps precisely no one. Any remedy Plaintiffs have is purely a retrospective one for damages.

Plaintiffs' citation to *Jermyn v. Best Buy Stores, L.P.*, 256 F.R.D. 418 (S.D.N.Y. 2009), is also unavailing. In that case, I certified a 23(b)(2) class seeking to enjoin the defendant Best Buy "from advertising and promoting a price match guarantee or from enforcing its undisclosed Anti-Price Matching Policy." *Id.* at 433. In that case, the allegedly deceptive conduct was ongoing. *Id.* at 434. Here, Plaintiffs have identified no actionable deceptive advertisements or promotions that are presently being made and so must be enjoined.

Plaintiffs' motion to certify a class under Rule 23(b)(2) is therefore denied.

### E.     Plaintiffs' Motion to Certify a Rule 23(c)(4) Class for Liability Purposes Is Denied

Fed. R. Civ. P. 23(c)(4) states, "When appropriate, an action may be brought or maintained as a class action with respect to particular issues." A court must ask whether certifying an isolated issue would "materially advance" the litigation. *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 242 (S.D.N.Y. 2010). "Issue certification" is particularly appropriate where a case can be separated into liability and remedy stages. *Id.* at 243.

Here, the individual elements that would predominate are themselves liability factors, including: breach, actual injury, ascertainable loss, causation, and reliance. While the issue of

whether the Class Vehicles possess a common defect might lend itself to a class proceeding, Plaintiffs have failed to argue—let alone show—how this would "materially advance" the litigation, since individual issues of injury, reliance, and causation, and other issues of damages, would remain to be adjudicated in hundreds or even thousands of cases. *Cf. Amla*, 282 F. Supp. 3d at 765 (denying motion for issue certification where product defect "determination would be followed by separate, individual hearings to determine specific causation and damages for each purchaser in those five states"); *see also Haag*, 330 F.R.D. at 132 n.3 ("Plaintiff has made no showing that certification of a class for liability purposes would clearly and meaningfully advance the litigation, nor would bifurcating the instant case address the more fundamental problem that plaintiff is apparently unable to provide proof that the putative class members have suffered cognizable damages[.]").

The complaints in *Marshall* and *Miller* are prototypical of the sort of case that is routinely certified for Multi-District treatment—cases where coordinated discovery requirements arising out of a common defect, but which are not appropriate for class action treatment, are sent to a single judge for pre-trial proceedings. They are not appropriately certified as class actions under any theory.

## II.    Scheduling Order

Although no class will be certified, this Court retains jurisdiction over the Named Plaintiffs' individual cases under CAFA. *F5 Capital v. Pappas*, 856 F.3d 61, 77 (2d Cir.), *cert. denied*, 138 S. Ct. 473 (2017).

The Court therefore enters the following scheduling order:

Any additional discovery (whether fact or expert discovery) that needs to be taken, either because it has been deferred or in light of this opinion, must be completed by August 30, 2019.

Motions for summary judgment, which should include the grounds identified in this opinion, are due by September 27, 2019. I will go through the summary judgment process only once, so HMA's pending summary judgment motion (12-cv-3072, Dkt. No. 137) is denied without prejudice to renewal in accordance with the schedule herein set. In any such motion, HMA must assert any and all grounds for summary judgment that it has, including any that may have been identified in this opinion.

As noted in footnote 1, *supra*, HMA filed two *Daubert* motions. (12-cv-3072, Dkt. Nos. 111, 115.) Those motions are also denied without prejudice. They should be refiled in connection with renewed summary judgment motions at the end of September.

Opposition papers on all motions are due by October 25, 2019. Reply papers are due November 1, 2019.

These dates will NOT be extended for any reason. The *Marshall* case has been pending for seven years. It is my intention to get these cases off the Court's docket as soon as possible.

I will not require the parties to submit their joint pre-trial order until any motions for summary judgment have been decided.

## CONCLUSION

For the reasons stated above, the Court denies Plaintiffs' motion for class certification, motion to designate the Named Plaintiffs as Proposed Class Representatives, and motion to appoint class counsel. The Court also denies without prejudice HMA's *Daubert* motions and pending summary judgment motion.

The Clerk of Court is respectfully requested to close the following motions:

- For Civil Action No. 12-cv-3072, Dkt. No. 83, 111, 115, and 137; and
- For Civil Action No. 15-cv-4722, Dkt. No. 64.

44

Dated: June 14, 2019

_____

Chief Judge

BY ECF TO ALL PARTIES